UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SHERRY CARROLL, as Natural
Parent & Legal Guardian on
Behalf of DAVID CARROLL,

           Plaintiff,           **MEMORANDUM OF LAW**

-vs-

COUNTY OF MONROE, and Deputy        **Civ. No.:** 07-cv-6123P
Sheriff James Carroll, In His Individual
and Official Capacity,

           Defendants.

## INTRODUCTION

Plaintiff SHERRY CARROLL, as Natural Parent & Legal Guardian on behalf of David Carroll, ("Plaintiff") submits this Memorandum of Law in support of her motion, pursuant to Fed. R. Civ. P. 50, to set aside the jury's verdict in favor of the Defendants County of Monroe ("the County") and Deputy Sheriff James Carroll, in his Individual and Official Capacity ("Deputy Carroll"), or, in the alternative, for a new trial pursuant to Fed. R. Civ. P. 59.[1]

Plaintiff's motion to set aside the jury's verdict under Fed. R. Civ. P. 50 should be granted because the evidence in the record overwhelmingly supports Plaintiff's claims that Plaintiff's property was unreasonably seized by the County and Deputy Carroll, in violation of Plaintiff's Fourth Amendment rights. Based on a review of the record–which will be discussed

---

[1] The trial transcript and documentary exhibits utilized at trial are annexed to Plaintiff's Appendix of Exhibits filed concurrently herewith, and are cited to as "App. Ex.____".

in further detail below–the evidence overwhelmingly support's Plaintiff's claims because the Defendants, despite advance notice that there was a dog present at Plaintiff's residence, made absolutely no plan respecting the use of non-lethal force to control the dog during the execution of the search warrant. The record is absolutely devoid of any evidence the Defendants ever even contemplated, much less planned to implement, any plan to utilize non-lethal force; to the contrary, the Defendants' own testimony made it clear that, in the context of the "no-knock" search warrant effected, they specifically would NOT contemplate any plan for the use of non-lethal force to isolate and/or control the dog. Therefore, the Defendants' actions were unreasonable and represented an unconstitutional seizure of Plaintiff's property in violation of the Fourth Amendment.

In the alternative, Plaintiff respectfully requests that the Court issue an order under Fed. R. Civ. P. 59 for a new trial. A motion for a new trial pursuant to Rule 59 may be granted whenever a jury has reached a"seriously erroneous result" or the verdict is a "miscarriage of justice." It is respectfully submitted that this is just such a case. As noted above, the evidence overwhelmingly supports Plaintiff's claims that Plaintiff's property was unreasonably seized by the County and Deputy Carroll, in violation of Plaintiff's Fourth Amendment rights.

## PROCEDURAL HISTORY

This case was tried to a jury on June 27, 2011. On June 28, 2011, the jury rendered its answer to the special verdict form in favor of the County and Deputy Carroll. (Dkt. # 69). Plaintiff now moves for judgment as a matter of law or, in the alternative, for a new trial.

ARGUMENT

POINT I

**THE JURY'S VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE UNDER FED. R. CIV. P. 50**

A.  *Applicable Standard under FRCP 50(b)*

Pursuant to Federal Rule of Civil Procedure 50 (b), the Court may enter judgment as a matter of law if a jury returns a verdict for which there is no legally sufficient evidentiary basis. The Court must give deference to all credibility determinations and reasonable inferences of the jury, without weighing the evidence or assessing the credibility of the evidence. Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998). Judgment as a matter of law may only be granted if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or if there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it. Cruz v. Local Union No. 3 of the Int'l Bhd. Of Elec. Workers, 34 F. 3d 1148, 1154 (2d Cir. 1994). In deciding a Rule 50 motion, the "same standard that applies to a pre-trial motion for summary judgment applies to motions for judgment as a matter of law during or after the trial..." This is Me v. Taylor, 157 F.3d 139, 142 (2d Cir. 1998)(citing Piesco v. Koch, 12 F.3d 332, 241 (2d Cir. 1993)).

B.  *Applicable Standards Governing Plaintiff's §1983 Claims Alleging Violation of Plaintiff's Fourth Amendment Rights*

Here, the Plaintiff alleged that the Defendant's act of killing the Plaintiff's companion dog, Damian, during the October 11, 2006 search of Plaintiff's residence was in violation of

Plaintiff's constitutional right to be free from unreasonable search and seizure under the Fourth Amendment. It is axiomatic that, under the Fourth Amendment, the Plaintiff had a right to be free of "unnecessarily destructive behavior, beyond that necessary to execute a warrant effectively." Liston v. County of Riverside, 120 F.3d 965, 979 (9th Cir. 1997).

That there was in fact a "seizure" here within the meaning of the Fourth Amendment is beyond dispute. It is well-settled that the killing of a companion dog constitutes a "seizure" within the meaning of the Fourth Amendment. See Altman v. City of High Point, N.C., 330 F.3d 194, 204-05 (4th Cir. 2003); Brown v. Muhlenberg Twp., 269 F.3d 205, 210-11 (3d Cir. 2001); Lester v. Reed, 12 F.3d 148, 150 (8th Cir. 1994); Fuller v. Vines, 36 F.3d 65, 68 (9th Cir. 1994), overruled on other grounds, Robinson v. Solano County, 278 F.3d 1007, 1013 (9th Cir. 2002); see also Siebert v. Severino, 256 F.3d 648, 656 (7th Cir. 2001)(seizure of a horse is a Fourth Amendment event). The destruction of property by state officials poses as much of a threat, if not more, to people's right to be 'secure . . . in their effects' as does the physical taking of them. Fuller, supra, 36 F.3d 65, 68. Thus the killing of a dog is a destruction recognized as a seizure under the Fourth Amendmant and can constitute a cognizable claim under section 1983. San Jose Hells Angels v. City of San Jose, 402 F.3d 960 (9th Cir. 2005).

Here, then, the Defendants' actions in killing the Plaintiff's dog were constitutional only if they were reasonable. See United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). "An officer's conduct in executing a search is subject to the Fourth Amendment's mandate of reasonableness from the moment of the officer's entry until the moment of departure." Lawmaster v. Ward, 125 F.3d 1341, 1349 (10th Cir. 1997). As stated by the Tenth Circuit in Lawmaster, the Fourth Amendment binds the executing officers to act in a

reasonable fashion:

> When officers obtain a warrant to search an individual's home, they also receive certain limited rights to occupy and control the property; however, **the Fourth Amendment binds the officers such that the right to search a home concomitantly obliges the officers to do so in a reasonable manner**.

Lawmaster, supra, 125 F.3d at 1350 (emphasis added). A seizure becomes unlawful when it is "more intrusive than necessary." Ganwich v. Knapp, 319 F.3d 1115, 1122 (9th Cir. 2003), quoting Florida v. Royer, 460 U.S. 491, 504 (1983).

It has thus been held that the killing of a person's dog constitutes an unconstitutional destruction of property absent a sufficiently compelling public interest. Fuller, supra, 36 F.3d at 68; Brown, supra, 269 F.3d at 211-12; Lesher v. Reed, 12 F.3d 148, 150-151 (8th Cir. 1994). To determine whether the shooting of a dog is reasonable, the court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. 386, 396. Furthermore, in assessing reasonableness of the officer's actions under the Fourth Amendment, an appropriate factor is whether the officers considered alternatives before undertaking intrusive activity implicating constitutional concerns. San Jose Hells Angels v. City of San Jose 402 F.3d 962 (9th Cir. 2005), citing Chew v. Gates, 27 F.3d 1432, 1440 (9th Cir. 1994), Gutierrez v. City of San Antonio, 139 F.3d 441, 450 (5th Cir. 1998).

As more fully set forth below, the Defendants not only failed to consider any alternatives to the use of lethal force, but there were no policies, no training, and no instructions imparted to the entry team regarding such measures. To the contrary, the Defendants' testimony made it clear that they expressly chose NOT to consider any less intrusive means other than the use of

lethal force. In fact, the entry team's complete lack of preparation ensured that Deputy Carroll, as the first officer in and the one charged with dealing with the dog, would have NO CHOICE (occasioned by the Defendants' own lack of any alternative plans) but to use lethal force to shoot and kill Plaintiff's dog.

C.  *The Evidence In the Record Overwhelmingly Supports the Conclusion That Defendants Violated Plaintiff's Fourth Amendment Rights*

The evidence adduced at trial was absolutely clear that the GRANET team that executed the search warrant at the Plaintiff's residence on October 11, 2006 had taken absolutely no precautions or other measures in order to attempt the use of non-lethal force to control the Plaintiff's dog. Furthermore, the evidence established that the GRANET team had no applicable policies, or training with respect to the identification of purportedly vicious dogs, the use of non-lethal force to isolate or control a dog, or any instructions concerning the use of non-lethal force.

    1.    <u>There were no Policies or Formal Training Respecting the Use of Non-lethal force against Dogs During the Execution of a Search Warrant</u>

Sergeant Michael R. DeSain ("Sergeant DeSain"), who briefed the entry team in advance of the execution of the warrant and led the entry team during the execution of the warrant, testified that GRANET team members were not trained at all in the use of non-lethal forms of restraining dogs in the execution of search warrants:

Q.    Are you trained to use non-lethal forms of restraining dogs in the execution of search warrants?
A.    No.

App. Ex. A, p. 16, lines 12-14.

\* \* \*

Q. And the countywide training with regard to the use of lethal force against animals, how would you characterize that?
A. There is no training that would state when to use lethal force against a dog. There is no specific training to address that. If an officer is on a routine alarm at a home and a dog runs out and attempts to attack him, there's nothing in the book that says you will do A, B, C, and D, prior to destroying that dog.

App. Ex. A, p. 17, lines 14-22.

* * *

Q. And you don't have the training?
A. Would there be training?
Q. Sir, I'm asking you. Is there training?
A. No, there's no training.

App. Ex. A, p. 18, lines 15-18.

Similarly, Deputy Carroll also admitted there was no training in the use of non-lethal means to restrain a dog:

Q. And I guess my question to you is, are you trained with regard to the use of non-lethal means of restraining a dog?
A. I am. No, I'm sorry, not with the dog.

App. Ex. A, page 45, lines 11-13.

Q. So, sir, are you just simply telling me that you're not trained to use non-lethal means of restraining a dog?
A. We do not use less lethal means on a vicious dog.
Q. And my question, was, are you trained to use –
A. No.

App. Ex. A, page 60, lines 8-12.

Indeed, Investigator Sergeant Scott Walsh of the Monroe County Sheriff's Department, who supervises the execution of search warrants for the units that actually do the executions, testified there is no countywide policy that even deals with how officers are to deal with dogs in the execution of search warrants:

| | |
|---|---|
| THE COURT: | Is there a policy regarding the execution of search warrants, if the officers know in advance there's a dog at the residence? |
| THE WITNESS: | There's not a specific policy, no. |
| By Ms. Agola: | ... Is there a policy at all? |
| A. | It's up to the individual supervisor briefing the warrant team. That is always one of the considerations that is actually asked and addressed. |

App. Ex. A, page 65, lines 6-15.

Similarly, as Investigator Sergeant Walsh's testimony confirmed, the evidence adduced at trial was clear that there is no policy concerning the use of non-lethal force against animals:

Q. Is there a policy with regard to the use of non-lethal force against animals?
A. I've never read one on non-lethal force, no.

App. Ex. A, page 66, lines 13-15.

Significantly, Sergeant DeSain admitted that, although there was no training, he was aware that there exist means to control a dog during execution of a search warrant by non-lethal methods:

Q. So, it's your testimony here today that there is no training with regard to non-lethal uses to control a dog upon the execution of a search warrant?
A. We have training in non-lethal weapons. Do we have training specific to a vicious dog attacking us by using a non-lethal weapon? **We know from past precedent and experience there are means that you could use if presented with them**, but, no, there's no book or training manual that we would refer to use.

App. Ex. A, p. 18, line 19 through p. 19, line 2 (emphasis added).


2. <u>There were no Policies or Formal Training Respecting the Identification or Recognition of a Dog's Temperament (Vicious/Non-Vicious)</u>

Sergeant DeSain also admitted that there was no training in identification of whether a dog was friendly:

| Q. | ... Do you have formal training by the County of Monroe, countywide training, to assist you in determining whether a dog is friendly or not? |
|---|---|
| A. | No. |
| Q. | And is it reasonable to believe that a dog might want to protect his home from invasion? |
| A. | Absolutely. |
| Q. | Now, knowing that, isn't it true that you did not assign any member of the entry team on the night in question, October 11, 2006, with the responsibility of restraining the dog? |
| A. | That is true. |

App. Ex. A, p. 34, lines 4-15.

Deputy Carroll also admitted that he had received no training in the identification of a friendly vs. a non-friendly dog:

| Q. | And is it fair also to say that you never received any training involving the identification of a friendly or a non-friendly dog? |
|---|---|
| A. | Formal training, no. |
| Q. | Have you ever received any formal training on how to isolate a dog upon the execution of a search warrant? |
| A. | Other than what I've learned in previous warrants. |
| Q. | So, it's fair to say there is no formal training with regard to that? |
| A. | I don't believe so. |
| Q. | So, you've never been trained perhaps to use pepper spray on a dog? |
| A. | I've never heard of an episode where pepper spray worked on a dog. |
| Q. | How about a catch pole? |
| A. | I've seen Animal Control use one. |

App. Ex. A, page 37, line 20 through page 38, line 10.

| Q. | And when we make a distinction between vicious and non-vicious dogs, is it fair to say you received no formal training with regard to how to make that determination? |
|---|---|
| A. | Formal, no, but life experience, I think I know what a vicious dog is. |
| Q. | I believe you testified to that. My question is, did you receive formal training on how to make a distinguishment between a vicious dog and a non-vicious dog? |
| MR. FULLER: | Objection; asked and answered. |
| THE COURT: | Overruled. You may answer. |
| THE WITNESS: | No, I do not believe I've received training on identifying a vicious dog. Formal training. |

App. Ex. A, page 62, lines 12-23.

Investigator Sergeant Walsh also testified that there was no formal policy in how to identify a vicious dog:

Q. Okay. Is there a formal policy with regard to that?
A. With regard to –
Q. Recognizing a vicious dog.
A. I don't believe we have a formal policy on that, no.

App. Ex. A, page 66, lines 3-6.

3. The GRANET Team was Aware of the Presence of the Dog at the Plaintiff's Residence Prior to its Entry on the Premises

Deputy Carroll testified that Sergeant DeSain did brief him on the fact there was a dog at the premises in advance of executing the warrant:

Q. Now, prior to the entry into the Carroll residence back in 2006, you were briefed by Officer DeSain, were you not?
A. Yes, ma'am.
Q. And isn't it true that you knew there was a dog present at the Carroll residence?
A. I believe he did tell me that there was a dog at the location.

App. Ex. A, page 38, lines 13-20.

Q. Did you know there was a vicious dog in the house at 284 Ridgedale Circle on October 11, 2006?
A. I believe I was briefed that there was a dog.

App. Ex. A, page 57, lines 21-23.

4. There was no Consideration in Advance by the GRANET Team of Any Non-Lethal Means to Control the Plaintiff's Dog

Sergeant DeSain testified that he never prepared or even considered in the briefing prior to the execution of the warrant that the GRANET team employ non-lethal means to control the dog:

Q. ... What about using non-lethal forms [sic] to restrain the dog?
A. No.

Q. How about pepper spray?
A. No.
Q. Catch pole?
A. No.
Q. How about a Bean Bag?
A. No.
Q. You never discussed any of those things with your officers?
A. They were not discussed, no.

App. Ex. A, p. 15, line 25 to p. 16, line 11.

Therefore the GRANET team did not formulate or consider any plan or means of controlling or isolating the dog:

Q. Okay. So, it's fair to say that prior to the entry to the Carroll residence, that you did not formulate a plan to isolate the dog.
A. Correct.

App. Ex. A, p. 20, lines 21-24.

     5.     <u>The GRANET team's Failure to Consider Any Non-Lethal Means to Isolate or Control Plaintiff's Dog Ultimately Left Deputy Carroll with No Option Other than to Use Lethal Force</u>

Since Sergeant DeSain had not briefed the GRANET entry team in the use of any non-lethal means to deal with the Plaitniff's dog during the execution of the warrant, this left the GRANET team with only one option - the use of lethal force (by Deputy Carroll). In essence, it was "Shoot or Don't Shoot":

Q. Okay. When he's got that shotgun, he's got a split second to make a decision, right?
A. Yes.
Q. Shoot or don't shoot, right?
A. Correct.

\* \* \*

Q. And, again, you did not instruct Deputy Carroll to use any non-lethal means to restrain the dog?
A. Correct.

Q.   And he had – Deputy Carroll had to make a split second decision, did he not?
A.   He did.
Q.   And again, that split second decision was to shoot or not shoot the dog, correct?
A.   Correct.
Q.   And he shot him, did he not?
A.   He did.

App. Ex. A, p. 21, line 12 through p. 22, line 5.

Q.   So, when you entered the Carroll residence, you had to make a judgment call, did you not?
A.   Yes, ma'am.
Q.   And that left you essentially without any option but to kill the Carroll dog, in the event that he attempted to guard his home?
A.   He was making his way at me in a vicious manner. That's when I chose to dispatch the dog.
Q.   Well, understood. But the question is, was there any other option?
A.   The way things were laid out at that time, no, there wasn't.
Q.   And it was a deliberate choice not to create any alternatives, correct?
A.   We did not have the time to come up with another way to deal with this.
Q.   Well, when you say you didn't have the time, you knew in advance, did you not?
A.   Yes, we did.

App. Ex. A, page 39, line 10 through page 40, line 3.

Q.   And isn't that discretion, more or less, the ability in a split-second scenario to make a decision shoot or don't shoot?
A.   I don't know if you call it discretion, but, yes, you have seconds to make the decision.

App. Ex. A, page 61, lines 14-18.

Furthermore, since the GRANET team had not formulated any plan to deal with the dog in advance of executing the warrant, that left the sole discretion whether to shoot the Carroll dog with Deputy Carroll, who had just been attacked by, and shot, two pitbulls a month earlier:

Q.   In that split second, Sergeant, isn't it true that you thought that Damian was a Pitbull.
A.   I did.
Q.   Isn't it also true that a month prior to the Carroll entry, that you had shot two Pitbulls in Penfield –
A.   Correct.
Q.   – during a search warrant?

A. Yes, ma'am.
Q. And they attacked you?
A. Yes.
Q. So, as that Carroll dog quickly approached you, you felt you had no alternative but to shoot it, correct?
A. Not until he was about a foot away from me.

App. Ex. A, page 42, lines 7-19.

      6.    <u>Regardless of the Team's Advance Knowledge of the Presence of the Dog at the Plaintiff's Residence, the Evidence Establishes that It Would Have Made No Difference - The GRANET Team Still Would have Not Considered Any Non-Lethal Alternatives</u>

Incredibly, Sergeant DeSain (while refusing to admit, as Deputy Carroll testified, that he had informed the team in advance of the presence of the dog) also testified that, even had he known of the presence of a dog on the premises to be searched pursuant to the warrant, that would not have caused him to formulate any plans relative to controlling or restraining such a dog:

Q. All right, sir. And what if you had known in advance, prior to a no-knock warrant, that there was a dog on the premises? Is it your testimony here today that you would make no advanced plans?
A. Correct.

App. Ex. A, page 35, lines 3-7.

This testimony was echoed by Deputy Carroll, who testified that for a no-knock warrant, they would not make any advance plans for isolation of a dog:

Q. Is it also correct, Sergeant, that there were no specific plans to isolate any dogs that might have been present at the Carroll residence?
A. We don't plan on isolating a dog for no-knock search warrants.

App. Ex. A, page 38, lines 21-25.

In other words, since it was a no-knock warrant, there was "no difference" if there was a dog on the premises:

Q. Would you do anything different if you know there's a dog on the premises versus not knowing there's a dog on the premises?
A. On a no-knock warrant there's no difference.
Q. And why is that?
A. Again, we use the element of surprise to our advantage, whether there's bad armed people in the location or at the risk of destroying evidence.

App. Ex. A, page 57, lines 13-20.

Such testimony basically encapsulates the Defendants' position - that because the warrant involved was a "no-knock" warrant, they were justified (i.e., reasonable) in their determination to not prepare an advance plan to deal with Plaintiff's dog via non-lethal means. However, this testimony, and indeed the Defendants' entire position, is in direct contravention to the Defendants' obligation (in order to be reasonable by considering the use of less intrusive means) under the Fourth Amendment. As the Court stated in San Jose Hells Angels: "A reasonable officer should have known that to create a plan to enter the perimeter of a person's property, **knowing all the while about the presence of dogs on the property, without considering a method for subduing the dogs besides killing them**, would violate the Fourth Amendment." San Jose Hells Angels, 402 F.3d at 978 (emphasis added). That is exactly what happened here - and exactly why the Defendants' conduct clearly violated the Fourth Amendment.

7. The Proof Adduced at Trial Failed to Establish a Compelling Public Interest to Justify the Defendants' Seizure of the Plaintiff's Dog

The Defendants at trial basically argued that their failure to consider less intrusive means (other than the use of lethal force, as was ultimately used by Deputy Carroll) was justified for two separate reasons: 1) the need to preserve stealth for as long as possible so that evidence

would not be lost/destroyed, and 2) officer safety. Both proffered justifications, although seemingly reasonable on their face, fail to justify the Defendants' actions here, as set forth below.

First, with regard to the contention that they needed to preserve stealth and/or the element of surprise as long as possible, that is defeated by their means of entry into the Plaintiff's residence via the ram tool. As succintly stated by the Ninth Circuit: "It was the officers' own method of entry that compromised their ability to effectuate a quiet entry. At the Souza residence, the SJPOs used a ram to break down the front door before they even dealt with the dogs; . . .". San Jose Hells Angels, supra., 402 F.3d at 976. Here, in identical fashion, the GRANET team lost the element of stealth/surprise as soon as they (via Sergeant DeSain) used the very same ram tool to breach the door and enter into the Plaintiff's residence. See App. Ex. A, page 28, line 12 to page 29, line 12. Once the ram tool had struck the door, which happened before Deputy Carroll ever encountered the dog, the element of stealth/surprise had vanished. In fact, the element of surprise was lost either at the moment of entry, or even just prior thereto, since, according to Officer Hopper (who was directly behind Deputy Carroll in the "stack"), they began to shout their presence either at the same time the ram tool broke open the door or just prior to that point:

A.  Upon entry, once the door is breached, just prior to the door being breached, we start announcing ourselves, "Police, search warrant, police, search warrant," very loudly.

App. Ex. F, page 9, line 24 through page 10, line 3.

There was simply no compelling reason why, at that point (i.e. once entry had been effected and surprise lost), a non-lethal means of isolating or controlling the dog was not possible; the GRANET team, officer DeSain and Deputy Carroll simply chose not to consider

any such less intrusive means,² and, in so doing, were not reasonable for purposes of analyses under the Fourth Amendment. "Other than the officers' interest in preserving evidence, the officers were not presented with exigent circumstances that necessitated killing the dogs. Accordingly, the failure to develop any realistic non-lethal plan for dealing with the dogs is simply not the type of reasonable mistake in judgment to which a court should give deference . ." San Jose Hells Angels, 402 F.3d at 978.

Second, although the Defendants' argument that the use of lethal force (and utter failure to even consider any non-lethal force alternatives) was in the interest of safety might, in the right circumstances, have ordinarily provided a sound justification for the intrusion had the officers been surprised by the dog, that argument is unpersuasive given the fact the GRANET team did in fact know about the presence of the dog in advance of executing the warrant. See App. Ex. A, page 38, lines 13-20; App. Ex. A, page 57, lines 21-23. As noted by the Ninth Circuit in San Jose Hells Angels, "[t]he officers had substantial time to develop strategies for immobilizing the [dog]." Here, although Deputy Carroll knew about the dog in advance of the entry, and was also aware that Animal Control was available to isolate and/or control a dog, the Defendants did not even consider any such measures for the use of non-lethal force. Instead, they opted for the most invasive, unreasonable, and ultimately lethal, approach of "Shoot or don't Shoot". "As the district court explained, the officers 'created an entry plan designed to bring them into proximity of the dogs without providing themselves with any non-lethal means for controlling the dogs: The officers, in effect, left themselves without any option but to kill the dogs in the event they –

---

²Although both testified they were aware that such means existed, see App. Ex. A, page 18, line 19 through p. 19, line 2; App. Ex. A, page 37, line 20 through page 38, line 10.

quite predictably – attempted to guard the home from invasion." San Jose Hells Angels, 402 F.3d at 977.

Accordingly, the Defendants' actions were not reasonable under the Fourth Amendment, and Plaintiff's Fourth Amendment rights were violated. The jury's verdict to the contrary was therefore clearly against the weight of the evidence, and Plaintiff is entitled to judgment as a matter of law.

## POINT II

## A NEW TRIAL IS WARRANTED UNDER FED. R. CIV. P. 59

Rule 59 of the Federal Rules of Civil Procedure governs motions for a new trial. Although a court may not order a new trial simply because were it sitting as the trier of fact it would have come to a different decision, a new trial is justified "if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." Tesser v. Board of Education, 370 F.3d 314, 320 (2d Cir. 2004). In deciding the motion under Rule 59, "the trial judge is free to weigh the evidence [himself] and need not view it in the light most favorable to the winner." Manley v. Ambase Corp., 337 F.3d 237, 244-5 (2d Cir. 2003). "The trial judge has considerable discretion in determining whether a new trial is required." Stobl v. New York Mercantile Exchange, 562 F. Supp. 770, 780 (S.D.N.Y. 1984).

The jury's verdict on June 28, 2011 was not only "against the weight of the evidence", but amounted to a miscarriage of justice. As noted above, the evidence overwhelmingly supported Plaintiff's claims that Plaintiff's constitutional right to be free from unreasonable search and seizure under the Fourth Amendment was violated by the Defendants. All of the

evidence adduced at trial showed that, rather than considering ANY less intrusive means than the use of lethal force, the Defendants specifically chose NOT TO EVEN CONSIDER any non-lethal means to deal with the dog they knew in advance was at the premises. Defendants also conceded that due to the type of warrant involved, a so-called "no-knock" warrant, they would NEVER have made any advance plans to employ non-lethal means, whether they knew there was a dog (or several dogs) at the premises or not. As more fully set forth in Point I, supra, such evidence conclusively and incontrovertibly establishes that Defendants breached their duty under the Fourth Amendment to behave reasonably in conducting the search. Based on the foregoing, there can be no question that the jury's verdict was indeed, a "seriously erroneous result" and "a miscarriage of justice." Tesser v. Board of Education, 370 F.3d 314, 320 (2d Cir. 2004). Accordingly, a new trial is warranted on this ground as well as on the grounds discussed below.

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court issue an Order, pursuant to Fed. R. Civ. P. 50, setting aside the jury's verdict and entering a judgment as a matter of law in favor of Plaintiff on the issue of whether or not Plaintiff's constitutional rights under the Fourth Amendment were violated by the Defendants, or in the alternative, ordering a new trial on the issue pursuant to Fed. R. Civ. P. 59.

Dated: July 28, 2011
      Brighton, New York

      *By:*   CHRISTINA A. AGOLA, PLLC

      /s/ Christina A. Agola
      _____
      Christina A. Agola, Esq.
      Attorneys for Plaintiff
      Sherry Carroll, as Natural Parent & Legal Guardian on Behalf of David Carrol
      1415 Monroe Avenue
      Rochester, New York 14618
      (O) 585.252.3320
      (F) 585.262.3325
      cagola@wnycivilrights.com