UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SHERRY CARROLL, as Natural
Parent & Legal Guardian on
Behalf of DAVID CARROLL,

                         Plaintiff,

    -vs-

COUNTY OF MONROE,and Deputy
Sheriff James Carroll, In His Individual
and Official Capacity,

                       Defendants.
_____

**VOLUME I**

Civ. No.: 07-cv-6123P

       The Plaintiff, in further support of their Post-Trial Motion pursuant to Fed. R. Civ.

P. 50(b) and 59, submit the following documents stipulated to by the parties at trial:

           **EXHIBIT A:**    **Excerpts from Transcript of Proceedings**

           **EXHIBIT B:**    **October 8, 2006 Greece Police Department Field Interview**

           **EXHIBIT C:**    **Photograph of Dog**

           **EXHIBIT D:**    **March 19, 2009 Employee Training History Report of Deputy
James Carroll**

           **EXHIBIT E:**    **January 1, 2004 Firearms/Deadly Physical Force Policy**

           **EXHIBIT F:**    **June 13, 2011 Testimony of Officer Joseph Hopper**

Dated: July 28, 2011
Rochester, New York

CHRISTINA A. AGOLA, PLLC

By:    s/ Christina A. Agola, Esq
_____
Christina A. Agola, Esq.
Attorneys for Plaintiff
1415 Monroe Avenue
Brighton, New York 14618
585.262.3320 (phone)
585.262.3325 (fax)
caa@wnycivilrights.com

**EXHIBIT A**

1    Denise Sailer ,

2    called herein as a witness, after having first been duly

3    sworn, was examined and testified as follows:

4            THE CLERK:  When you are seated, please state your

5    full name and spell your last name for the record.

6            THE WITNESS:  Denise Sailer, S-a-i-l-e-r.

7            THE COURT:  Good afternoon, Ms. Sailer.

8            THE WITNESS:  Good afternoon.

9            THE COURT:  Ms. Agola, you may proceed.

10   DIRECT EXAMINATION

11   BY MS. AGOLA:

12   Q.  Good afternoon, Ms. Sailer.  How are you today?

13   A.  Very well.  Thank you.

14   Q.  Ms. Sailer, where do you currently reside?

15   A.  140 Ava Street in Rochester.

16   Q.  And have you always resided at that address?

17   A.  No, I have not.

18   Q.  Going back to October of 2006, where did you reside?

19   A.  18 Woodside Lane in Greece.

20   Q.  Do you have any children?

21   A.  Yes, I do, one; a son, he's 20.

22   Q.  And do you know the Carroll family?

23   A.  I do.

24   Q.  For how long did you know the Carroll family?

25   A.  Since 1999.

1    Q.    How did you come to know them?

2    A.    When I moved on to Ridgedale Circle I met them.  We're

3    neighbors.

4    Q.    How many houses down would you say you were from them?

5    A.    Five, maybe six.

6    Q.    Did you know their dog Damian?

7    A.    Yes, I did.

8    Q.    Do you recall what type of breed of dog he was?

9    A.    A Bullmastiff.

10   Q.    Do you recall when you first met Damian?

11   A.    I met Damian shortly after they got him.  He was a puppy.

12   Q.    Do you recall how tall he was?

13   A.    Last time I saw Damian he was probably two and a half,

14   maybe three feet tall.

15   Q.    And can you approximate for us how much he weighed?

16   A.    About 50 pounds.

17   Q.    Was he a tail wagger?

18   A.    Yes, he was.  Yes.

19   Q.    Ms. Sailer, did Damian seem overly protective of the

20   Carroll house?

21   A.    No.

22   Q.    Did he seem overly protective of the Carroll's?

23   A.    No.

24          MR. FULLER:  I would object, Your Honor.

25          THE COURT:  Sustained as to form.

1   BY MS. AGOLA:

2   Q.  Did your children ever play with Damian?

3   A.  Yes, all the time.

4   Q.  Did you ever have occasion to visit the Carroll

5   residence?

6   A.  Yes, I have.

7   Q.  And how did Damian act when you knocked on the door?

8   A.  He would bark.  When the door was open, he would be

9   wagging his tail and anxious to see me.

10  Q.  And how did that make you feel?

11  A.  Good.

12          MR. FULLER:  Objection as to the "anxious to see me".

13          THE COURT:  Overruled.

14  BY MS. AGOLA:

15  Q.  What would you say the reputation, if any, Damian had in

16  the neighborhood?

17  A.  He was a family dog.  He had a good reputation.  He was a

18  puppy, friendly.

19  Q.  Did you have any reason to be fearful of Damian?

20  A.  No.

21  Q.  Have you ever seen others be fearful around him?

22  A.  No.

23          MR. FULLER:  Objection.

24          THE COURT:  Overruled.

25  BY MS. AGOLA:

```
 1   Q.  In the time that you lived in the Carroll neighborhood,
 2   did you ever witness Damian act viciously or threatening to
 3   anyone?
 4   A.  Never.
 5   Q.  Did you ever have any reason to complain about Damian to
 6   Animal Control?
 7   A.  No.
 8   Q.  Did you ever contact the police regarding Damian?
 9   A.  No.
10   Q.  Would you say that Damian is a gentle dog?
11   A.  Yes.
12   Q.  Would you say he's a friendly dog?
13   A.  Yes.
14   Q.  What would you base that opinion on?
15   A.  My interaction with him, playing with him, watching him
16   walk throughout the neighborhood.  The Carroll family would
17   walk their dog around the circle.
18   Q.  Do you remember the last time you saw Damian?
19   A.  The last time I saw Damian, he was being walked by the
20   Carroll family.  And after that, my son came home and let me
21   know that Damian had been shot.
22   Q.  And how did that make you feel?
23   A.  Terrible.  Damian was --
24            MR. FULLER:  Objection.
25            THE COURT:  Sustained.
```

```
 1    BY MS. AGOLA:

 2    Q.  You said your son came home and told you?

 3    A.  Yes.

 4    Q.  Did your son play with Damian?

 5    A.  Daily.

 6            MS. AGOLA:  Nothing further.

 7            THE COURT:  Mr. Fuller?

 8            MR. FULLER:  Thank you, Judge.

 9    CROSS-EXAMINATION

10    BY MR. FULLER:

11    Q.  Good afternoon, ma'am.

12    A.  Good afternoon.

13    Q.  Your name is Denise Sailer, correct?

14    A.  Correct.

15    Q.  Do you have an ex-husband named Mike?

16    A.  Yes, I do.

17    Q.  Mike still live in New Jersey?

18    A.  Yes.

19    Q.  You indicated you lived at 18 Woodside Lane?

20    A.  Correct.

21    Q.  Approximately how long was that?

22    A.  Almost eleven years.

23    Q.  Did you ever live on Ridgedale Circle?

24    A.  No, I did not.

25    Q.  So, that's a different street, correct?
```

1   A.  It is part of the circle, but a different street.

2   Q.  And you're friends with the Carroll's?

3   A.  I was neighbors with the Carroll's, not -- yes.

4   Q.  You're friends with the Carroll's; you went down there,

5   you knew Sherry Carroll?

6   A.  Correct.

7   Q.  Your son's named Keith, correct?

8   A.  Correct.

9   Q.  And he played a lot with David Carroll; isn't that true?

10  A.  Yes, correct.

11  Q.  Were you familiar, then, with the goings on at 284

12  Ridgedale Circle?

13  A.  No.

14  Q.  Did you hang out there with your son?

15  A.  No.

16  Q.  Do you allow your son to hang out there?

17  A.  Yes.

18  Q.  And you indicated that Damian the dog -- and I noticed

19  you hesitated.  You said he was a Bullmastiff?

20  A.  Correct.

21  Q.  Are you sure about that?  I mean, are you familiar with

22  dog breeds?

23  A.  Absolutely.

24  Q.  Okay.  And could he have been a Pitbull Mastiff?

25  A.  As in a mixed breed?

1  Q.  Correct.

2  A.  I didn't see pedigree papers, correct.

3  Q.  Are you familiar with other dogs the Carroll family

4  owned?

5  A.  Somewhat, yes.

6  Q.  Goliath, Tia, Right Eye?

7  A.  No.

8  Q.  You weren't familiar with those?

9  A.  No.

10  Q.  And is it fair to say you were never a police officer?

11  A.  It is fair to say.

12  Q.  Is it fair to say that you never had occasion to serve a

13  search warrant?

14  A.  Correct.

15  Q.  As a matter of fact, a no-knock search warrant, you've

16  never had to do that, correct?

17  A.  Correct.

18  Q.  Do you harbor any type of ill feelings toward the police?

19  A.  No.

20  Q.  Now, I'm going to direct your attention to October 11,

21  2006, at approximately 6:45 p.m..  Do you recall where you

22  were?

23  A.  No, I do not.

24  Q.  Is it fair to say you were not at 284 Ridgedale Circle?

25  A.  Correct.

1  Q.  It's accurate to say that you were not there when the

2  GRANET officers were serving a court ordered no-knock search

3  warrant; isn't that true?

4  A.  Correct.

5  Q.  So, you weren't in the house?

6  A.  No, I was not.

7  Q.  So, you didn't have any observations, whatsoever, with

8  regard to the entry by law enforcement officers, correct?

9  A.  Correct.

10  Q.  And in all honesty, you can't tell us how Damian was

11  acting toward the police on October 11, 2006, can you?

12  A.  Correct.

13        MR. FULLER:  No further questions.  Thank you, ma'am.

14  REDIRECT EXAMINATION

15  BY MS. AGOLA:

16  Q.  Ms. Sailer, prior to October 11th of 2006, had you ever

17  seen the police at the Carroll residence?

18  A.  I have.

19  Q.  And, you know, incident to those occasions, you still saw

20  Damian, did you not?

21  A.  Correct.

22  Q.  And after October 11th of 2006, did you see Damian?

23  A.  No.

24        MS. AGOLA:  Thank you.

25        THE COURT:  Any recross?

1       MR. FULLER:  No recross, Your Honor.  Thank you.

2       THE COURT:  Thank you, Ms. Sailer.  You may step

3  down.  You're excused.

4       Ms. Agola, would you call your next witness?

5       MS. AGOLA:  Officer DeSain.  Sergeant DeSain.

6  Sergeant Michael R. DeSain ,

7  called herein as a witness, after having first been duly

8  sworn, was examined and testified as follows:

9       THE CLERK:  Please be seated.  When you are seated,

10 please state your full name and spell your last name for the

11 record.

12      THE WITNESS:  My name is Michael R. DeSain.  It's

13 D-e-S-a-i-n.

14      THE COURT:  Good afternoon, sir.

15      THE WITNESS:  Good afternoon, ma'am.

16 DIRECT EXAMINATION

17 BY MS. AGOLA:

18 Q.  Good afternoon.  Is it Sergeant DeSain?

19 A.  Yes, it is.

20 Q.  Sergeant DeSain, isn't it true that you were part of the

21 entry team that entered the Carroll residence on October 11th

22 of 2006?

23 A.  It is true.

24 Q.  And isn't it also true that you were the person who

25 conducted the briefing at the Greece Police station prior to

1  the execution of that warrant?

2  A.  Yes, it is true.

3  Q.  And is it fair to say that one of the purposes of

4  briefing the entry team is to make them alert as to any

5  potential dangers they might encounter?

6  A.  Yes.

7  Q.  One of those dangers, in your experience, is it fair to

8  say, would be a dog intent on guarding his home, correct?

9  A.  Yes.

10  Q.  The Carroll's reside in Greece, do they not?

11  A.  They do.

12  Q.  And during that briefing at the Greece Police station,

13  isn't it true that the entry team was made aware of the fact

14  that there was a dog at the Carroll residence?

15  A.  I don't recall whether they were or not.

16  Q.  Okay.

17        MS. AGOLA:  Your Honor, the witness does not have an

18  evidence book before him.  Can I put this to him?

19        THE COURT:  Why don't you take out the exhibit you

20  want to show him, and let Mr. Fuller know what you're showing

21  him.  What are you showing him?

22  BY MS. AGOLA:

23  Q.  I'm going to be showing you what's been marked as

24  Plaintiff's Exhibit 1.  Take a moment to review that, and

25  when you're ready, can you identify the document for me?

1    A.   I'm ready.

2    Q.   What is that document?

3    A.   It's a Greece Police Department Field Interview Form.

4    Q.   What would be the purposes of a document like that?

5    A.   An officer typically will complete a form such as this

6    for intelligence purposes; to notify other officers or

7    agencies of something they may have encountered involving

8    either a residence or a person.

9    Q.   Would they also prepare this form in anticipation of

10   executing a search warrant?

11   A.   No.

12   Q.   Well, look at the date of the document on the top.  What

13   is the date of the document?

14   A.   October 8th of 2006.

15   Q.   That's about three days before the execution of the

16   Carroll warrant, is it not?

17   A.   Yes, it is.

18   Q.   And the briefing was held at the Greece Police station,

19   was it not?

20   A.   I am not sure if it was at the Greece Police station or

21   at the Public Safety Building downtown.  I don't recall where

22   the actual briefing was held.

23   Q.   Okay.  And if you look down on the narrative, can you

24   read that paragraph for us?

25            MR. FULLER:  I'm going to object, Your Honor.  That's

1   a document not in evidence.

2           THE COURT:  Sustained.

3           MS. AGOLA:  Well, Your Honor, at this time I'm going

4   to move to have the document placed into evidence.

5           MR. FULLER:  I would object, based on no foundation,

6   hearsay.

7           THE COURT:  Sustained.

8   BY MS. AGOLA:

9   Q.  Sergeant DeSain, is it your testimony here today that you

10  did not prepare the entry team for the possibility that there

11  might be a dog present?

12  A.  That's correct.

13  Q.  So, the entry team went in not knowing a danger -- a

14  potential danger?

15  A.  Well, as I stated, I don't recall that document.  I don't

16  recall any knowledge of a dog prior to entering that

17  residence.  If I had that knowledge, I would absolutely have

18  informed our team of that.

19  Q.  Okay.  And what would you have informed the team to do?

20          MR. FULLER:  Objection; speculation.

21          THE COURT:  Overruled.

22          THE WITNESS:  Be careful, there's a dog at the

23  residence.  That's what I would have informed them.

24  BY MS. AGOLA:

25  Q.  Be careful.  What about using non-lethal forms to

1    restrain the dog?

2    A.   No.

3    Q.   How about pepper spray?

4    A.   No.

5    Q.   Catch pole?

6    A.   No.

7    Q.   How about a Bean Bag?

8    A.   No.

9    Q.   You never discussed any of those things with your

10   officers?

11   A.   They were not discussed, no.

12   Q.   Are you trained to use non-lethal forms of restraining

13   dogs in the execution of search warrants?

14   A.   No.

15   Q.   All right.  Is it fair to categorize or characterize the

16   policy, or the custom that you're accustomed to, as

17   permitting a deputy to use their best judgment in a split

18   second decision making process to shoot or don't shoot?

19   A.   Is that a question?

20   Q.   Yes.

21   A.   What is the question?

22   Q.   The question is, what is -- if you don't train or there

23   is no policy with regard to the use of non-lethal force

24   against a dog, what is the policy?

25   A.   Are you talking about knock search warrants or no-knock

1  search warrants?

2  Q.  Well, let's deal with a no-knock search warrant.

3        THE COURT:  Okay.  And I think we need to clarify.

4  Are we talking about the policy of the Town of Brighton,

5  policy of Monroe County, the policy of GRANET?

6        MS. AGOLA:  Right.

7  BY MS. AGOLA:

8  Q.  And before we get there, isn't it fair to say that there

9  is countywide training with regard to the execution of search

10  warrants?

11  A.  That's fair to say.

12  Q.  So, there's not a separate policy, but for GRANET, right?

13  A.  Correct.

14  Q.  And the countywide training with regard to the use of

15  lethal force against animals, how would you characterize

16  that?

17  A.  There is no training that would state when to use lethal

18  force against a dog.  There is no specific training to

19  address that.  If an officer is on a routine alarm at a home

20  and a dog runs out and attempts to attack him, there's

21  nothing in the book that says you will do A, B, C and D,

22  prior to destroying that dog.

23        Each officer who encounters a situation like this

24  uses his abilities as best as he can to try to handle that

25  threat of a dog.  If it's running on top of a car to get away

1  from the dog, we would do that.  You know, the last thing we

2  want to do is destroy an animal, but when I'm given the job to

3  execute a search warrant that is a no-knock warrant, we don't

4  have that ability.  We don't have that ability to use Animal

5  Control, to use a less than lethal type of weapon.  If I had

6  that ability, we would have chose to do that.  We don't have

7  the time to do that, because our lives are at risk entering

8  that door.

9          If I were able to give a warning to the resident,

10  which would essentially be a knock warrant, then we would use

11  an alternative means.  We would have Animal Control by our

12  side with a noose in order to, you know, obtain that dog to

13  prevent it from attacking us.  But in this particular case we

14  don't have that option.

15  Q.  And you don't have the training?

16  A.  Would there be training?

17  Q.  Sir, I'm asking you.  Is there training?

18  A.  No, there's no training.

19  Q.  So, it's your testimony here today that there is no

20  training with regard to non-lethal uses to control a dog upon

21  the execution of a search warrant?

22  A.  We have training in non-lethal weapons.  Do we have

23  training specific to a vicious dog attacking us by using a

24  non-lethal weapon?  We know from past precedent and

25  experience there are means that you could use if presented

1  with them, but, no, there's no book or training manual that

2  we would refer to use.

3  Q.  And what are the means that you are referring to?

4  A.  The means in what situation?

5  Q.  Well, you just testified -- and I don't want to put words

6  in your mouth, but you said we're advised of means to

7  implement, but we're not trained in those means.

8  A.  Well, the means would be the particular situation you're

9  talking about.

10  Q.  All right.  Let's talk about a no-knock warrant at the

11  Carroll residence on October 11th of 2006.  You previously

12  testified that you had no knowledge there was a dog there,

13  correct?

14  A.  Correct.

15  Q.  And, so, in essence, what did that permit -- the first

16  person in, what did that permit him to do when he saw the

17  dog?

18  A.  Well, first, for the record, with or without knowledge,

19  the end result would have been the same.

20  Q.  Why is that?

21  A.  There are no other means to handle a vicious dog

22  attacking you on a no-knock search warrant.  When you enter a

23  house and a dog takes off after you and is about ready to

24  bite you and slow down the flow of the entry team into the

25  fatal funnel of this home, there is no other means presented,

1    other than to dispatch the dog that's vicious.

2            There are multiple occasions I've been on search

3    warrants with animals where the dog was not dispatched, and

4    that is the ideal way to handle it.  However, if the dog

5    decides to attack an officer upon entry, what that does,

6    essentially, it slows down that officer getting through what

7    we in police worked are trained as the fatal funnel.  If you

8    stop in that fatal funnel, other officers lives are at risk by

9    the bad guy or the bad person inside the home.  They have

10   means to weapons.

11           They don't know we're there.  We don't knock and say,

12   hey, you know, GRANET outside, let us in.  We breach the door

13   by a court authorized search warrant without them knowing.

14   So, they could be in bed, they could be washing the dishes,

15   there's a ton of things that they could be doing.  What

16   happens as a result of that, a vicious dog comes forward and

17   attacks one of our officers, and there's five guys behind him

18   that want to get through that door, and they can't get through

19   it because that officer is dealing with a threat; that threat

20   being a vicious dog.

21   Q.  Okay.  So, it's fair to say that prior to the entry to

22   the Carroll residence, that you did not formulate a plan to

23   isolate the dog?

24   A.  Correct.

25   Q.  And isn't it also true that you left the entry team, in

1  effect, with no other option but to shoot the dog if he posed

2  a threat?

3  A.  I don't think that's a fair statement.

4  Q.  Well, you didn't instruct the team, did you?

5  A.  Whether I did or did not instruct the team, there would

6  not have been anything different.

7  Q.  Right, because --

8  A.  There would not have been -- the third officer in would

9  not have had a noose.  The second officer in would not have

10  had a Taser.  The bottom line is that officer had a shotgun.

11  He had to deal with the threat.

12  Q.  Okay.  And when he's got that shotgun, he's got a split

13  second to make a decision, right?

14  A.  Yes.

15  Q.  Shoot or don't shoot, right?

16  A.  Correct.

17  Q.  Now, wasn't Deputy Carroll the first man in during the

18  raid?

19  A.  Yes.

20  Q.  And, again, you did not instruct Deputy Carroll to use

21  any non-lethal means to restrain the dog?

22  A.  Correct.

23  Q.  And he had -- Deputy Carroll had to make a split second

24  decision, did he not?

25  A.  He did.

1    Q. And again, that split second decision was to shoot or not

2    shoot the dog, correct?

3    A. Correct.

4    Q. And he shot him, did he not?

5    A. He did.

6    Q. Isn't it true, sir, that you told Mrs. Carroll -- that

7    you apologized to Mrs. Carroll for shooting the dog, correct?

8    A. Yes.

9    Q. And you also told her you had no choice?

10   A. Correct.

11          MS. AGOLA:  Thank you.

12          MR. FULLER:  At this time, Your Honor, I'd like to

13   make the witness my own witness.

14          THE COURT:  Go ahead.

15          MR. FULLER:  Thank you.

16   DIRECT EXAMINATION

17   BY MR. FULLER:

18   Q. Good afternoon, sir.

19   A. Good afternoon.

20   Q. We will start at the beginning and get some information

21   on you.  Can you tell us how old you are?

22   A. Forty-two.

23   Q. And your marital status?

24   A. I am married with two children.

25   Q. And what are their ages?

1  A.  My daughter just turned eleven, and my son is eight, soon

2  to be nine.

3  Q.  Do you have any pets at home?

4  A.  I do.

5  Q.  What are they?

6  A.  I currently have a 24-pound cat and a guinea pig.

7  Q.  And did you ever own a dog?

8  A.  I did.

9  Q.  What happened to your dog?

10  A.  My dog died at the age of 14.

11  Q.  And what type was it?

12  A.  It was a Sheltie that my wife got as a gift for

13  graduation.

14  Q.  Now, can you tell us where you are currently employed and

15  in what capacity?

16  A.  I'm currently in the Town of Brighton Police Department.

17  I'm a Sergeant in charge of the Third Platoon.

18  Q.  And how long have you been with the Town of Brighton as a

19  police officer?

20  A.  Fifteen years.

21  Q.  Prior to becoming a police officer with the Town of

22  Brighton, where were you employed?

23  A.  I was a Village of Lyons police officer in Wayne County,

24  from September of 1992 to April of '96.

25  Q.  And where were you employed prior to serving as a police

1  officer for the Village of Lyons?

2  A.  I was in the United States Navy.

3  Q.  And what did you do as a member of the U.S. Navy?

4  A.  I was a gunners mate.

5  Q.  Did you attend any college?

6  A.  I attended college schools, but, no, I do not have a

7  degree.

8  Q.  Did you attend school through the U.S. Navy?

9  A.  Yes.

10  Q.  Now, can you tell the jury about your training, as far

11  as, for instance, did you attend the police academy?

12  A.  I did.

13  Q.  What's some of the training that you had?

14  A.  The use of firearms, the use of non-lethal equipment,

15  tactical proceedings, knowledge of Penal Law and Vehicle &

16  Traffic Law.  Basically how to conduct yourself as a police

17  officer.

18  Q.  All right.  And, in addition, did you have criminal

19  investigation training?

20  A.  I did.

21  Q.  DWI training?

22  A.  I did.

23  Q.  Now, did your -- have you had training regarding

24  execution of search warrants?

25  A.  I have.

1    Q.   And was that in tactical warrant school?

2    A.   That was one of them, yeah.

3    Q.   What was the other one?

4    A.   Various in-service training that are sponsored through

5    Monroe County that multiple agencies usually attend together.

6    Q.   And could you explain what tactical warrant school was?

7    A.   Tactical warrant school, I believe, it's a two-week

8    school that focuses on entries into homes and businesses, how

9    to clear businesses and homes, the proper way to execute

10   search warrants.

11   Q.   Have you executed search warrants in the past?

12   A.   I have.

13   Q.   Approximately how many?

14   A.   Several hundred.

15   Q.   And you were asked about a no-knock search warrant.  Can

16   you explain to the jury what that is and what the need is for

17   it?

18   A.   Sure.  A no-knock search warrant is authorized by the

19   judge.  We request it, and the reason we request it is for

20   the element of surprise.  So, when you enter a home, the

21   residents or occupants there, they don't have time to react

22   to destroy evidence.

23   Q.   And are you familiar with GRANET?

24   A.   I am.

25   Q.   Did you become a GRANET member?

1  A.  I did.

2  Q.  And can you explain how you became a GRANET member?

3  A.  Back in September of 2002, I became a member by applying

4  in my Department and submitting a resume to the command staff

5  with my qualifications.

6  Q.  And do you know what agencies make up GRANET?

7  A.  There are several agencies.  From time to time they may

8  stop participation and start again, depending on their

9  manpower.

10  Q.  Would those be agencies within Monroe County?

11  A.  Yes.

12  Q.  And did you see of any extra training by being a member

13  of GRANET?

14  A.  Yes.  Once in GRANET we had, like, basically a field

15  training investigator with us that would show us different

16  ways to effectively do the job.

17  Q.  Now, you mentioned fatal funnel.  Can you define that for

18  the jury, please?

19  A.   In these schools that I previously mentioned, we are

20  instructed to remove yourself from the fatal funnel.  So, the

21  fatal funnel could be a doorway to a bedroom, a doorway to a

22  home.  And the reason for that is, statistically, if officers

23  are killed upon entry or shot, they're shot at the doorway.

24  Because if you're a bad guy inside of a home, and you have

25  access to weapons, you would grab that weapon and immediately

1  shoot toward a door; whether you were shooting towards a

2  person or not, it wouldn't matter.  But if you shot toward a

3  door, your chances of hitting somebody on entry would be

4  pretty high.  So, our job is to get out of that fatal funnel,

5  and we do so expeditiously and in a certain way every time.

6  Q.  Do you generally know how many members are on the GRANET

7  team at any one time searching a home?

8  A.  On an entry team?

9  Q.  On an entry team, I'm sorry.

10  A.  Ideally, five to seven.

11  Q.  And do they have different responsibilities?

12  A.  They do.

13  Q.  What are some of those responsibilities?

14  A.  One member I assign shotgun, the next member I assign a

15  halo to -- a halo tool is -- if you think like a fireman, you

16  know, the metal spiked tool with a flat head on one side and

17  a spike on another -- another member I assign to ram tool.

18  The ram tool is the breach mechanism used for the door.

19  Q.  Now, I'm going to direct your attention to October 11,

20  2006, and ask you if you were a member of the Greater

21  Rochester Area Narcotics Enforcement Team on that date?

22  A.  I was.

23  Q.  And does GRANET have jurisdiction over the entire Monroe

24  County?

25  A.  Yes.

1   Q.  On October 11, 2006, were you given responsibility as a

2   GRANET member to execute a court ordered search warrant on

3   the premises of 284 Ridgedale Circle?

4   A.  Yes, I was.

5   Q.  Was that in the Town of Greece?

6   A.  It is.

7   Q.  Now, did you have a specific responsibility on that team;

8   you, yourself?

9   A.  I would have been referred to as the team leader.  The

10   warrant was my responsibility to execute.

11   Q.  And approximately 6:45 on October 11, 2006, at 284

12   Ridgedale Circle, were you the person that had the ram tool?

13   A.  I was.

14   Q.  Now, could you explain to us how you entered the home?

15   A.  Based on the court authorized no-knock entry, we would

16   discreetly enter the property of the residence with staying

17   out of sight, basically, or move quickly to the residence, so

18   nobody can look at you through windows and know that you're

19   coming.  Once we were what we call stacked on the door,

20   stacked being members as close as they can to each other to

21   where they are actually touching the leg of the other officer

22   that's in the stack, lines up on the door.  They either line

23   up on the left side or the right side of the door.  Sometimes

24   in front of the door, if there's no way to conceal yourself.

25        Once everybody's in place, my job, with the ram tool,

1    is to breach the door.  The first thing I do is, if there's a

2    storm door, I check and see that it's open, unlocked.  The

3    interior door, I check with my hand to see if the handle is

4    locked or unlocked.  In this particular case, the storm door

5    was unlocked, the actual door to the residence was locked.  If

6    the storm door was locked, hence the halo tool I mentioned

7    earlier, we would use to unlock.  Then, I strike the door with

8    the ram tool.

9    Q.  And how many times did you have to strike this door?

10   A.  Once.

11   Q.  Did the door thereafter fly open?

12   A.  It did.  We're trained to strike a door in a specific

13   area of the door that would cause that door on one strike to

14   open.  Because, obviously, if you did it more than once, the

15   people inside the residence have more time to react.  And in

16   this particular case, once.

17   Q.  And once that door flung open, were you able to make any

18   observations?

19   A.  I was.

20   Q.  And what were those?

21   A.  I saw a dog.

22   Q.  And where did you see it?

23   A.  It was directly in the entrance to the home -- visible

24   from the entrance -- approaching the front door.

25   Q.  And thereafter what did you do?

1  A.  Once I rammed the door -- I have a ram tool that's very

2  heavy -- I stepped back to the side of the door and allowed

3  the entry team to go in.  I'm the last one in, and I throw

4  the ram tool down and wait.  Once I struck the door, Deputy

5  Jim Carroll from the Sheriff's Office entered with shotgun.

6  Q.  And who assigned him that position?

7  A.  I did.

8  Q.  And do you recall the second person that entered?

9  A.  I do not.

10  Q.  Now, once the door is breached, and after, obviously, the

11  noise, do you say anything?

12  A.  The person with the shotgun typically says something.  I

13  did not.

14  Q.  And what is that?

15  A.  "Police.  Search warrant."  Multiple times.

16  Q.  How do they say that?

17  A.  "Police.  Search warrant.  Police.  Search warrant.

18  Police.  Search warrant."

19  Q.  So, are they yelling?

20  A.  Yes.

21  Q.  Did you hear any dog noises after you breached the door?

22  A.  I did.

23  Q.  What kind of noises did you hear?

24  A.  I heard barking, I heard growling, and I could actually

25  hear the dog approach by the -- you know, like the sound a

1  dog makes as it's coming towards you.

2  Q.  And can you tell the jury the purpose of letting Deputy

3  Carroll enter the house first?

4  A.  To deal with the threat.  The shotgun is the ideal weapon

5  to have, to be the first one into the home.

6  Q.  And did there come a time when you heard a gunshot?

7  A.  I did.

8  Q.  Where were you, if you recall?

9  A.  To the side of that front door.

10  Q.  And do you know who fired that shot?

11  A.  Yes.

12  Q.  And who was that?

13  A.  Deputy James Carroll.

14  Q.  Were you able to actually see him do that from your

15  vantage point?

16  A.  Yes.

17  Q.  Do you know approximately how far the dog was from Deputy

18  Carroll when he shot it?

19  A.  About one foot.

20  Q.  And can you tell the jury how the dog was acting when you

21  observed it?

22  A.  It was vicious.  It was not a friendly dog.

23  Q.  In your opinion, and based on your observations, was the

24  dog aggressive?

25  A.  Yes.

1  Q.  Now, when confronted with a vicious dog while making an

2  entry during a no-knock search warrant, can you ever consider

3  retreating?

4  A.  No.

5  Q.  And why is that?

6  A.  That's not an option.  You're authorized and told by the

7  court to go serve this warrant.  The means to serve this

8  warrant are to not give notice.  So, once you enter that

9  house, a dog is starting to attack and slow down your entry

10  team in that fatal funnel, you can't complete your mission.

11  Your mission is to serve the warrant and find whatever the

12  warrant is directed for you to find.  And there was not a

13  retreat.  A retreat would mean evidence destruction.

14  Q.  Now could you tell the jury differences between the

15  situation where it's necessary to shoot a dog and situations

16  where you didn't have to shoot a dog?

17  A.  Absolutely.  I've been in both.  Many of them.

18  Q.  Could you relay some of them to us?

19  A.  Sure.  Situations where you would not have to shoot a dog

20  would be, hopefully the dog does a 180 and runs into a room

21  where you can secure that room.  Several occasions I've

22  encountered dogs, large dogs, small dogs, some known to be

23  mean upon entry.  Turns out -- once we enter, you have five

24  to seven officers with black fatigues on running into a home.

25  Most dogs are going to retreat, you would hope.  But upon

 1    retreating, that dog retreats to a room, and we know that

 2    that room is clear -- like a closet or a bedroom -- and we

 3    can see that there are no people in that room, simply close

 4    the door to the room.  Call for an Animal Control.  Have

 5    Animal Control come with a noose to take the dog out.

 6          On other occasions we've -- I've dealt with dogs in

 7    stairways where a dog just simply sits there, and we go by the

 8    dog, and the dog is no threat to anybody.  You could picture

 9    the types of dogs I'm talking about, but you would simply walk

10    by the dog and it doesn't attack.

11          And I've been on warrants where the officers have

12    yelled, "dog to the left, dog to the left."  The dog there's

13    not attacking, no reason to destroy the dog.  You know, I've

14    been on warrants where dogs were destroyed.  I've been on

15    warrants where dogs have actually ran out of the home after

16    the entry team upon our arrival.  I can give you dozens of

17    scenarios good and bad.

18          MR. FULLER:  I have no further questions.  Thank you,

19    sir.

20          THE WITNESS:  Sure.

21    CROSS-EXAMINATION

22    BY MS. AGOLA:

23    Q.  Is it true, sir, that you have no training as to whether

24    a dog is friendly or not?

25    A.  I have life experience training.

1  Q.  That's not what I asked.  I asked you if you have formal

2  training by the County of Monroe.

3  A.  I didn't hear the formal part.

4  Q.  Let me rephrase the question, then.  Do you have formal

5  training by the County of Monroe, countywide training, to

6  assist you in determining whether a dog is friendly or not?

7  A.  No.

8  Q.  And is it reasonable to believe that a dog might want to

9  protect his home from invasions?

10  A.  Absolutely.

11  Q.  Now, knowing that, isn't it true that you did not assign

12  any member of the entry team on the night in question,

13  October 11, 2006, with the responsibility of restraining the

14  dog?

15  A.  That is true.

16  Q.  And, sir, you keep saying that this was a no-knock

17  warrant, and that's why, presumptively, there were no plans;

18  is that correct?

19  A.  Yes.

20  Q.  If it had been a knock warrant, would that have made a

21  difference?

22  A.  Yes.

23  Q.  How?

24  A.  We knock on the door, we would hear a dog barking inside

25  wanting to protect its property.  We would simply call Animal

1    Control.  "Animal Control, come down, noose up this dog for

2    us."  We have all the time in the world.

3    Q.  All right, sir.  And what if you had known in advance,

4    prior to a no-knock warrant, that there was a dog on the

5    premises?  Is it your testimony here today that you would

6    make no advanced plans?

7    A.  Correct.

8              MS. AGOLA:  Thank you.

9              THE COURT:  Anything else, Mr. Fuller?

10             MR. FULLER:  Very briefly.

11   REDIRECT EXAMINATION

12   BY MR. FULLER:

13   Q.  Sergeant DeSain, in your experience as a police officer,

14   and more specifically, in your experience with the GRANET

15   team serving no-knock search warrants, have you had occasion

16   to observe dogs?

17   A.  Yes.

18   Q.  Are you able to tell an aggressive dog from a

19   non-aggressive dog?

20   A.  Yes.

21   Q.  And is one of the concerns for serving the warrant the

22   safety of yourself, other officers and occupants of the home?

23   A.  Yes.

24   Q.  And do you also have a concern with retrieving evidence

25   before its destroyed?

```
 1   A.  I do.
 2           MR. FULLER:  I have no further questions.  Thank you.
 3           MS. AGOLA:  Nothing, Judge.
 4           THE COURT:  All right.  Mr. DeSain, you may step
 5   down.  Thank you very much.
 6           THE WITNESS:  Thanks.
 7           THE COURT:  Ms. Agola, please call your next witness.
 8           MS. AGOLA:  Yes.  Sergeant Carroll.
 9   Sergeant James Carroll ,
10   called herein as a witness, after having first been duly
11   sworn, was examined and testified as follows:
12           THE CLERK:  When you are seated, please state your
13   full name and spell your last name for the record.
14           THE WITNESS:  James Carroll, C-a-r-r-o-l-l.
15           THE COURT:  You may proceed.
16   DIRECT EXAMINATION
17   BY MS. AGOLA:
18   Q.  Good afternoon, Sergeant Carroll.
19   A.  Yes, ma'am.
20   Q.  And you are a deputy with the Monroe County Sheriff's
21   Department?
22   A.  I'm a sergeant.
23   Q.  You're a sergeant, excuse me.  And isn't it also correct
24   that in October of 2006, you were a member of GRANET?
25   A.  Yes, ma'am.
```

1 Q.  And it's also a fact that you attended Tactical Warrant

2 School in Monroe County?

3 A.  Yes, ma'am.

4 Q.  And that's a countywide training?

5 A.  Yes.

6 Q.  And you have an obligation to follow county policies, do

7 you not?

8 A.  Yes.

9 Q.  And is it fair to say, also, that as a member of GRANET,

10 that there are no separate policies with regard to the

11 execution of search warrants?

12 A.  I'm sorry; try that one more time, ma'am.

13 Q.  Sure.  As a member of GRANET, do you have a separate

14 policy book?

15 A.  Not that I'm aware of.

16 Q.  Sir, do part of the policies that you are referring to

17 mandate that you notify your supervisor if you've used lethal

18 force on an animal?

19 A.  Yes.

20 Q.  And is it fair also to say that you never received any

21 training involving the identification of a friendly or a

22 non-friendly dog?

23 A.  Formal training, no.

24 Q.  Have you ever received any formal training on how to

25 isolate a dog upon the execution of a search warrant?

1   A.  Other than what I've learned in previous warrants.

2   Q.  So, it's fair to say there is no formal training with

3   regard to that?

4   A.  I don't believe so.

5   Q.  So, you've never been trained perhaps to use pepper spray

6   on a dog?

7   A.  I've never heard of an episode where pepper spray worked

8   on a dog.

9   Q.  How about a catch pole?

10  A.  I've seen Animal Control use one.

11  Q.  How about a Taser?

12  A.  We didn't have Tasers back in '06.

13  Q.  All right.  Now, prior to the entry into the Carroll

14  residence back in 2006, you were briefed by Officer DeSain,

15  were you not?

16  A.  Yes, ma'am.

17  Q.  And isn't it true that you knew there was a dog present

18  at the Carroll residence?

19  A.  I believe he did tell me that there was a dog at the

20  location.

21  Q.  Is it also correct, Sergeant, that there were no specific

22  plans to isolate any dogs that might have been present at the

23  Carroll residence?

24  A.  We don't plan on isolating a dog for no-knock search

25  warrant.  Again, like Sergeant DeSain said, if it's a knock

1  warrant, we have time on our side, and that's when we come up

2  with other plans.  But a no-knock warrant is specifically

3  designed to get the team in out of the fatal funnel.  If the

4  dog chooses to retreat, that gives you more time to figure

5  out how you're going to deal with the dog.

6  Q.  And where was the briefing held?

7  A.  I believe this one was at the Greece police station on

8  Long Pond, but I'm not positive.  I believe it was at the

9  Greece police station, though.

10  Q.  So, when you entered the Carroll residence, you had to

11  make a judgment call, did you not?

12  A.  Yes, ma'am.

13  Q.  And that left you essentially without any option but to

14  kill the Carroll dog, in the event that he attempted to guard

15  his home?

16  A.  He was making his way at me in a vicious manner.  That's

17  when I chose to dispatch the dog.

18  Q.  Well, understood.  But the question is, was there any

19  other option?

20  A.  The way things were laid out at that time, no, there

21  wasn't.

22  Q.  And it was a deliberate choice not to create any

23  alternatives, correct?

24  A.  We did not have the time to come up with another way to

25  deal with this.

1  Q.  Well, when you say you didn't have the time, you knew in

2  advance, did you not?

3  A.  Yes, we did.

4  Q.  And isn't it true, sir, that you were the first person

5  through the door after the door was breached?

6  A.  Yes, ma'am.

7  Q.  And Officer Hopper was behind you?

8  A.  He was somewhere behind me.  I'm not positive if he was

9  the next man or the man after that, but he was behind me.

10  Q.  And upon entering the Carroll residence, you saw the

11  Carroll dog making a fast walking approach towards you?

12  A.  Correct.

13  Q.  And that wasn't a surprise, was it?  You knew the dog was

14  there?

15  A.  I knew a dog was there, but I wasn't expecting a fast,

16  aggressive approach at me.

17  Q.  Who was behind the dog?

18  A.  Nobody at the first point of entry.

19  Q.  And when you walked into the living room, was there

20  somebody behind?

21  A.  Within a couple seconds, as the dog was making his way

22  down the threshold of the hallway, at one point I did see a

23  large female at the end of the hallway.

24  Q.  Do you recall telling her, "dog, dog, dog"?

25  A.  I recall saying "dog" to the team.

1   Q.   Do you recall telling her, "get your dog, get your dog"?

2   A.   I never said that.

3   Q.   Do you recall telling Ms. Carroll, "step out of the way"?

4   A.   I did.

5   Q.   When she stepped out of the way, you shot the dog, right?

6   A.   Mrs. Carroll was in no position to be able to capture

7   that dog before the dog got to me.

8   Q.   That's not my question.   My question is, at that point

9   you made the split second decision to shoot the dog, correct?

10   A.   There were things that led up to that point, though,

11   ma'am.

12   Q.   I'm asking a question.   I am just respectfully requesting

13   that you just answer my question.

14         MR. FULLER:   Objection, it's argumentative.

15         THE COURT:   Overruled.

16   BY MS. AGOLA:

17   Q.   Was there a chance that you could have had Ms. Carroll

18   trap the dog in a room?

19   A.   Not at this point, no.

20   Q.   Did you plan in advance to perhaps negotiate with the

21   owners to place the dog in a room?

22   A.   No, ma'am.

23   Q.   You shot the dog one time in the head and he collapsed,

24   correct?

25   A.   Yes, ma'am.

1  Q.  And where were the children in the house at that point?

2  A.  They were in a room, I believe, towards the back of the

3  hallway.  I never saw children until we were actually

4  clearing the house.

5  Q.  Is it fair to say they heard that gunshot?

6  A.  Yes.

7  Q.  In that split second, Sergeant, isn't it true that you

8  thought that Damian was a Pitbull?

9  A.  I did.

10  Q.  Isn't it also true that a month prior to the Carroll

11  entry, that you had shot two Pitbulls in Penfield --

12  A.  Correct.

13  Q.  -- during a search warrant?

14  A.  Yes, ma'am.

15  Q.  And they attacked you?

16  A.  Yes.

17  Q.  So, as that Carroll dog quickly approached you, you felt

18  you had no alternative but to shoot it, correct?

19  A.  Not until he was about a foot away from me.

20  Q.  Where were you exactly in the living room?

21  A.  I want to say I was off to the right.  If you come in

22  through the door, there's a hallway directly across.  It was

23  a living room, but there was a hallway directly across.  Off

24  to the right of the living room, I believe there was a

25  kitchen.  I was just right of the hallway between the kitchen

1  and the hallway in the living room.

2  Q.  And was the dog headed towards you?

3  A.  Yes, ma'am.

4  Q.  All right.  I want to show you what's previously been

5  marked as Plaintiff's Exhibit 2.  I will tell you to take a

6  look at it, and when you're ready, identify it for me.

7  A.  I'm ready.

8  Q.  Okay.  Do you know what that is?

9  A.  Yes.

10  Q.  What is it?

11  A.  I believe his name was Damian, the Bullmastiff at the

12  Carroll house that night.

13  Q.  And the photograph that's before you is a picture of?

14  A.  After I dispatched it.

15  Q.  After you dispatched the dog.  Okay.

16      THE COURT:  Any objection, Mr. Fuller?

17      MR. FULLER:  I made previous objections, Your Honor.

18  I believe they were ruled upon.

19      THE COURT:  You may publish it to the jury.

20  BY MS. AGOLA:

21  Q.  Now, looking at that photo -- and I think there's a

22  screen right there, sir, for you.  Is it your testimony that

23  you were inside of that hallway area here (indicating)?

24  A.  I believe that was the doorway to the location.  The

25  doorway that we came in through.

1  Q.  And you breached the doorway, you walked past the

2  doorway?

3  A.  I walked past the doorway, yes.

4  Q.  And, so, you were standing to the right of the doorway?

5  A.  Yes, ma'am.  Probably where that vacuum cleaner is.

6  Q.  And you said the dog was running towards you, correct?

7  A.  Making a fast approach towards me, yes.

8  Q.  What's that room to the side?

9  A.  I believe that's a kitchen.

10  Q.  Isn't it true that his head is pointed towards the

11  kitchen?

12  A.  His head, to me, appears to be towards the vacuum

13  cleaner, where I was standing.

14  Q.  Is it possible that that dog was running away from you?

15  A.  No, ma'am.

16  Q.  He was running right towards you?

17  A.  Yes, ma'am.

18  Q.  And isn't it true that because there was no plan to deal

19  with the dog that you knew was there, you placed yourself in

20  close proximity with Damian?

21  A.  It's a no-knock search warrant, ma'am.

22  Q.  And what would you have done differently if it was a

23  knock search warrant regarding plans to deal with the animal?

24  A.  We probably would have had Animal Control with us, maybe

25  negotiated with Ms. Carroll to put the dog in a room until we

1  can deal with the problem, but that wasn't -- that's not the

2  way it was.

3  Q.  What other non-lethal uses of force would you have used

4  in a knock search warrant, as opposed to a no-knock?

5  A.  A knock search warrant, what less lethal would I use?

6  Q.  Non-lethal.

7  A.  I don't think we would have to go to that if we were

8  talking about a knock.  We would be negotiating and planning

9  along.  I don't see a need to hurt the animal if it was a

10  knock warrant.

11 Q.  And I guess my question to you is, are you trained with

12 regard to the use of non-lethal means of restraining a dog?

13 A.  I am.  No, I'm sorry, not with the dog.

14        MS. AGOLA:  Thank you.

15        THE COURT:  Mr. Fuller?

16        MR. FULLER:  At this time I'd like to make Sergeant

17 Carroll my witness, Your Honor.

18        THE COURT:  Yes.

19        MR. FULLER:  Thank you.

20 DIRECT EXAMINATION

21 BY MR. FULLER:

22 Q.  Good afternoon, sir.

23 A.  Good afternoon.

24 Q.  You have the same last name Carroll.  Are you related in

25 any way to plaintiff, David Carroll?

1    A.  No, sir.

2    Q.  Anybody in the family?

3    A.  No, sir.

4    Q.  Are you married?

5    A.  Yes.

6    Q.  Do you have any children?

7    A.  Two.  Two boys.

8    Q.  And what are their ages?

9    A.  Twelve and nine.

10   Q.  And do you have any pets?

11   A.  I do.

12   Q.  Can you tell the jury what your pets are?

13   A.  I have a Bichon Havanese lapdog, and we've just recently

14   acquired my son's grammar school fish for the summer.

15   Q.  Did you have any pets before that?

16   A.  I did.  I had a yellow lab named Mac.

17   Q.  What happened to Mac?

18   A.  I had to put Mac down after 14 years.

19   Q.  Can you tell us what your education is?

20   A.  I have a high school diploma, a two-year college degree,

21   and hours of police training.

22   Q.  In addition, did you go to FBI school?

23   A.  I did.  I'm a certified bomb technician from the FBI.

24   Q.  Where are you currently employed?

25   A.  I'm a Sergeant with the Monroe County Sheriff's Office,

1  road patrol and bomb commander.

2  Q.  How long have you been employed with the Monroe County

3  Sheriff's Office?

4  A.  Twenty-one years.

5  Q.  And how long have you held the rank of Sergeant?

6  A.  Four.

7  Q.  Four years.  And when were you promoted?

8  A.  2007.

9  Q.  Now, when you first joined Monroe County Sheriff's

10  Department, where were you assigned?

11  A.  I started off as a part-time deputy assigned to the

12  Marine Patrol.  After that, I went to Henrietta Knife Patrol.

13  There, I was a uniformed crime scene technician for about

14  ten, eleven years, a field training officer, which means I

15  train the recruits after they come out of the police academy,

16  a background investigator for employment for the Sheriff's

17  Office; I conducted an investigation on your past.  I was a

18  drill instructor at the police academy for three years, which

19  means I'm a counselor.  My job is to help the recruits find

20  their weak points and help them through it, whether it be

21  physically fit or school, book-wise.  And again, I'm the

22  commander of the Sheriff's Bomb Squad.

23  Q.  And are you familiar with the Greater Rochester Area

24  Narcotics Enforcement Team?

25  A.  I am.

1  Q.  And can you tell us some of the members of that team, as

2  far as law enforcement agencies?

3  A.  East Rochester used to be in it, Irondequoit, the

4  Sheriff's Department, the City of Rochester, Brighton, and I

5  think that's all that's in it now.  And Greece.  I'm sorry,

6  Greece Police.

7  Q.  How do you become a member of GRANET?

8  A.  In my department it's kind of difficult to become a

9  member.  You have to have some years of on-the-job, a descent

10  reputation with the department, be able to think on your

11  feet, they go through your internal affairs history, make

12  sure that you're not a problem candidate.  They want somebody

13  to represent the Sheriff's Department well.  You put a resume

14  together, and then you are selected by your command staff.

15  Q.  And were you thereafter selected?

16  A.  I was selected, yes.

17  Q.  And did you receive any additional training?

18  A.  I went to Tactical Warrant School.

19  Q.  Now, approximately how long did you serve on GRANET?

20  A.  Two years, before I was promoted.

21  Q.  Now is GRANET a permanent or temporary assignment?

22  A.  Temporary assignment.

23  Q.  After GRANET where did you go?

24  A.  I was promoted to Sergeant, went to C-zone substation,

25  which is the west side of the County, as a patrol supervisor.

1   After that, after about a year of patrol, I was assigned to

2   the Criminal Investigation section of the Sheriff's

3   Department Warrant Unit.

4   Q.  And is that the Fugitive Warrant Unit?

5   A.  Fugitive Warrant Unit, yes.

6   Q.  In addition to that, what other responsibilities did you

7   have?

8   A.  I supervise the sex offenders of the Monroe County area,

9   online cyber crimes, crimes against children on the

10  computers, and the financial economic crimes.

11  Q.  Were you involved in any Federal task forces?

12  A.  I was.  I was Assistant Supervisor to the Fugitive

13  Warrant Task Force with the Marshals Office and Assistant

14  Supervisor with the FBI for the Cyber Crime Task Force.

15  Q.  We've obviously sat here and heard the explanation of

16  no-knock warrants.  Can you tell us what concerns you have in

17  executing no-knock search warrants?

18  A.  No-knock search warrants are very dangerous.  We

19  generally get the permission -- you have to get the

20  permission of the judge to get it for a no-knock, and you

21  have to specifically lay out your probable cause to show that

22  there's either going to be danger to the officers entering

23  the location, a sufficient risk of evidence being destroyed

24  in the location.  So, they are difficult warrants to get.

25  Q.  And have you ever encountered dogs?

1  A.  Numerous times.

2  Q.  And do you recall what kind of dogs?

3  A.  I've encountered everything from a Chocolate Lab to a

4  lapdog, German Shepards, Pitbulls.  That's pretty much the

5  range of the dogs I'm used to seeing.

6  Q.  Now, when you executed these warrants, did all the dogs

7  you encounter attack?

8  A.  No.

9  Q.  And can you tell us approximately how many times you've

10  been attacked by a vicious dogs while attempting to comply

11  with a no-knock warrant?

12  A.  This was the third time.

13  Q.  And were you ever injured as a result of a dog attack

14  while executing a warrant?

15  A.  I was.

16  Q.  And what were your injuries?

17  A.  I have sustained a knee injury while being attacked by

18  two Pitbulls on a warrant in Penfield.

19  Q.  And did you have to shoot those Pitbulls?

20  A.  I did.

21  Q.  And did they survive?

22  A.  Both of them survived.

23  Q.  I'm going to direct your attention, Sergeant, to October

24  11, 2006.  Were you working on the GRANET team at that time?

25  A.  I was.

1   Q.   And how long had you been on GRANET at that time?

2   A.   About a year.

3   Q.   Did there come a time where you were notified that a

4   County Court Judge signed a court ordered search warrant for

5   the premises located at 284 Ridgedale Circle?

6   A.   I was.

7   Q.   Is that in the Town of Greece, County of Monroe?

8   A.   It is.

9   Q.   And were you on the team that was assigned to enter this

10  premises?

11  A.   I was.

12  Q.   Do you recall some of the agencies that were

13  participating in that particular entry?

14  A.   I do.

15  Q.   And who were they?

16  A.   Officer DeSain from Brighton, Officer Hopper, Sergeant

17  Trowbridge and Sergeant Henderson from Greece, myself from

18  the Sheriff's Department, and I believe Jose Solario from the

19  Rochester Police Department.

20  Q.   In addition to entering the house, is there also a

21  perimeter set up outside?

22  A.   Yes.

23  Q.   And for what purpose is that done?

24  A.   For anybody who wants to run outside of the house and

25  take off on foot.

1  Q.  And can you tell the jury what position you were

2  assigned?

3  A.  I was assigned to the shotgun; first man through the

4  door.

5  Q.  And who assigned you that position?

6  A.  Officer DeSain.

7  Q.  How were you dressed?

8  A.  I was dressed in black fatigues, a flack jacket that said

9  "sheriff" on the back and a sheriff star on the front.

10  Q.  When you say flack jacket, is that a bullet resistant or

11  bulletproof vest?

12  A.  It's a thicker bulletproof vest.

13  Q.  Now, do you remember who was in charge of breaching the

14  door?

15  A.  Officer DeSain.

16  Q.  Do you remember who was directly behind you?

17  A.  I don't.  I just know the rest of the team was behind me.

18  Q.  Okay.  And what was the responsibility of your position?

19  A.  My job is to provide security for the team as they are

20  approaching.  We are all coming into the house.  The shotgun

21  is designed to keep everything in front of you safe, while

22  the team splits up into two and hits hallways or rooms off to

23  the area that you're searching.  My job is to make sure that

24  nothing comes and surprises us in the front.  I provide

25  security in the hallway and get everybody out of the fatal

1    funnel as fast as possible.

2    Q.  Now, did you hear any noises emanating from inside the

3    house after Sergeant DeSain breached the door?

4    A.  I did.

5    Q.  What were those noises?

6    A.  A barking dog.  A barking, growling dog.

7    Q.  Immediately after the door was breached and you stepped

8    in, what did you observe?

9    A.  There was a hallway directly across from the room that I

10   was standing in.  It was probably about 20 feet long, maybe

11   25 feet long.

12   Q.  Now, when you say across, do you mean in front of you?

13   A.  In front of me, a 25 feet long hallway.  After being in

14   the house for probably a second, I saw the dog coming around

15   the corner and down the hallway towards me.

16   Q.  At that time, when you first saw the dog, did you see

17   anybody else?

18   A.  No.

19   Q.  Can you describe the way the dog was coming toward you?

20   A.  He was coming in -- not a run, but a fast pace, direct

21   movement towards me.  He wasn't hesitating.  He was showing

22   me his front teeth, and growling, and barking at the same

23   time.

24   Q.  And did there come a time when you saw somebody else in

25   the hallway?

1  A.  Yes.

2  Q.  How many other people did you see?

3  A.  One woman.

4  Q.  And where was she in relation to the dog?

5  A.  She was probably 10-15 feet behind the dog.

6  Q.  And can you describe that woman?

7  A.  She was a large female, white.

8  Q.  Was she adult?

9  A.  Yes.

10  Q.  Now, after observing the large dog acting in an

11  aggressive manner, what did you do?

12  A.  I notified the team, "dog."  The dog was still making an

13  approach.  As he was getting closer to me, I could realize

14  that he wasn't going to retreat or back off.  I lowered my

15  shotgun down on him, again, announced, "dog, dog, dog," at

16  which time I saw the female coming down the hall faster, but

17  she was still quite a ways away from the dog.  This wasn't an

18  opportunity where she could grab the dog, because he was

19  right on me.  There was a bedroom off to my left -- I'm

20  sorry; a room off to my left in the hallway that I'm talking

21  about.  I ordered the woman to get into the hallway.  She did

22  comply and at that time I took the shot.

23  Q.  Before -- immediately before you took the shot, did you

24  have to do anything?

25  A.  I had to get the woman out of the hallway.

1   Q.  And did you take the shot straight on or did you move?

2   A.  I tilted off to the left -- I'm sorry, my right.  I had

3   to lower the shotgun down, because the dog was literally

4   within a foot, if less, to my leg, and I fired in a downward

5   direction for two reasons; I didn't want any of the spray of

6   the shotgun to go down the hallway.  I had to make sure my

7   backdrop was clear so nobody else would get hurt.

8   Q.  Why did you wait so long before dispatching the dog?

9   A.  Because I couldn't get Ms. Carroll out of the hallway.

10  Q.  And could you show us or describe the angle of the

11  shotgun?

12  A.  It was pointed downward (indicating).

13  Q.  So, you are indicating the barrel was downward.  The back

14  part of the stock is up?

15  A.  The stock is up towards my shoulder and the barrel is

16  probably a foot off my foot.

17  Q.  Do you recall where you shot the dog?

18  A.  I shot him in, I believe, the eye.

19  Q.  How many times did you shoot him?

20  A.  Once.

21  Q.  What gauge was that shotgun?

22  A.  Twelve-gauge tactical buckshot.

23  Q.  Why do you use buckshot?

24  A.  It's a slower round.  It's designed not to go through

25  walls.  It's a slow round, so less chance of hurting people

1  with frag or -- frag from the gun.

2  Q.  And is buckshot a standard issue for search warrant

3  ammunition?

4  A.  Yes.

5  Q.  Now, in your opinion, and based on your observations and

6  experience, was the dog acting aggressively when you

7  encountered it?

8  A.  Yes.

9  Q.  Did you believe that it caused you or other members

10  physical injury, potentially?

11  A.  Yes.

12  Q.  Now, do you ever have a consideration to stop the warrant

13  team or retreat?

14  A.  It's not an option for tactical warrant service.  Once

15  you've gained this momentum and you've gained your ground,

16  you can't give it back up.  It gives the suspects a chance to

17  arm themselves or destroy evidence that could be in the

18  house.

19  Q.  Now, during your years of police service, approximately

20  how many times have you encountered dogs during a search

21  warrant?

22  A.  Probably 20 or 30 times.

23  Q.  And approximately how many times was it necessary to

24  shoot the dog?

25  A.  Three.

1   Q.  Can you explain the differences to the jury between times

2   when it was necessary to shoot a dog and times when it

3   wasn't?

4   A.  Yes.  We've had times where the dog just ran away, which

5   is obviously the best case scenario.  We've also negotiated

6   where the owner was able to grab the dog, and we negotiated

7   the dog into a room, a bathroom, somewhere where we can

8   secure the dog until we're done searching the house.  We've

9   had dogs just lay right down.  I know of one case where a

10  German Shepard ran out through a window and just ran down the

11  street.  These were all occasions where, obviously, we didn't

12  feel it was needed to shoot the dog.

13  Q.  Would you do anything different if you know there's a dog

14  on the premises versus not knowing there's a dog on the

15  premises?

16  A.  On a no-knock warrant there's no difference.

17  Q.  And why is that?

18  A.  Again, we use the element of surprise to our advantage,

19  whether there's bad armed people in the location or at the

20  risk of destroying evidence.

21  Q.  Did you know that there was a vicious dog in the house at

22  284 Ridgedale Circle on October 11, 2006?

23  A.  I believe I was briefed that there was a dog.

24  Q.  Did you know the dog would be vicious?

25  A.  I did not.

1    Q.  Did you know that dog would attack you?

2    A.  No, I did not.

3    Q.  Were you planning on intentionally killing a dog that

4    day?

5    A.  Absolutely not.

6    Q.  Now, when a firearm is discharged in any situation

7    involving a law enforcement officer in the line of duty, is

8    there some type of investigation?

9    A.  Yes.

10   Q.  And was there one done in this case?

11   A.  There was.

12   Q.  And what was the outcome?

13   A.  I was cleared of any wrongdoing at the scene.

14          MR. FULLER:  At this time, Your Honor, I'm showing

15   the Plaintiff's attorney Defendant's Exhibit No. 400, Defense

16   Exhibit No. 401, Defense Exhibit No. 402.  I'd like to enter

17   them into evidence at this time.

18          THE COURT:  I believe, Ms. Agola, you have no

19   objection to the admission of 400, 401 or 402?

20          MS. AGOLA:  No, I do not.

21          THE COURT:  All right.  Defense Exhibits 400, 401 and

22   402 are admitted.

23          MR. FULLER:  I have no further questions.  Thank you,

24   sir.

25   CROSS-EXAMINATION

1    BY MS. AGOLA:

2    Q.   Sergeant, if you had known in advance that there was a

3    dog present in a knock search warrant scenario --

4    A.   In a knock, ma'am?

5    Q.   Yes, in a knock.  How would you have planned the entry

6    team?

7    A.   On a knock search warrant, we generally have --

8            MR. FULLER:  I'm going to object, based on the

9    relevance, Your Honor, and speculation.

10           THE COURT:  Overruled.  You may answer the question.

11           THE WITNESS:  I'm sorry, ma'am.  On a knock search

12   warrant what would I have done differently?

13   BY MS. AGOLA:

14   Q.   Well, you said here today you have many years of

15   experience, and you've testified that you've been in many

16   execution search warrants and many residences, correct?

17   A.   Yes, ma'am.

18   Q.   And why don't I break it down this way.  How many of

19   those warrants that you've just testified to were knock

20   warrants?

21   A.   I don't know.

22   Q.   Is it fair to say that you wouldn't know how many are

23   no-knock?

24   A.   Correct.

25   Q.   So, I guess what I'm having a difficulty understanding is

1   what prohibits you as a police officer from designating

2   someone on the entry team to provide some form of non-lethal

3   means of restraining an animal on a no-knock warrant?

4   A.  I don't know who makes the policies for less lethal

5   weapons for a no-knock warrant.  GRANET does not use them.  I

6   believe that some of the data shows that less lethal devices

7   do not work well on more vicious dogs.

8   Q.  So, sir, are you just simply telling me that you're not

9   trained to use non-lethal means of restraining a dog?

10  A.  We do not use less lethal means on a vicious dog.

11  Q.  And my question was, are you trained to use --

12  A.  No.

13          MS. AGOLA:  Thank you.

14          THE COURT:  Anything else, Mr. Fuller?

15          MR. FULLER:  Very briefly.

16  REDIRECT EXAMINATION

17  BY MR. FULLER:

18  Q.  Sergeant, are you trained to enter into homes?

19  A.  Yes.

20  Q.  And are you given training through Monroe County

21  Sheriff's Office?

22  A.  Yes.

23  Q.  And training through the Greater Rochester Area Narcotics

24  Enforcement Team?

25  A.  Yes.

1    Q.  And does that involve the use of deadly weapons?

2    A.  Yes.

3    Q.  And do you have experience in using your discretion with

4    entering homes during search warrants?

5    A.  Yes.

6    Q.  And approximately how many search warrants did you say

7    you served?

8    A.  Probably over 100.

9            MR. FULLER:  I have no further questions.

10   RECROSS EXAMINATION

11   BY MS. AGOLA:

12   Q.  And you just made reference, sir, to discretion?

13   A.  Yes.

14   Q.  And isn't that discretion, more or less, the ability in a

15   split-second scenario to make a decision shoot or don't

16   shoot?

17   A.  I don't know if you call it discretion, but, yes, you

18   have seconds to make the decision.

19           MS. AGOLA:  Thank you.

20           MR. FULLER:  One more, Your Honor.

21   REDIRECT EXAMINATION

22   BY MR. FULLER:

23   Q.  And Sergeant, that discretion or that decision, is that

24   based on your experience as a police officer, police

25   sergeant, a member of GRANET, and the person that served over

1  100 search warrants?

2  A.  Yes.

3  Q.  Is it also based on your experience and observations of

4  vicious dogs versus non-vicious dogs?

5  A.  Correct.

6  Q.  And is it also based on your experience of being attacked

7  in the past and injured by a vicious dog?

8  A.  Correct.

9       MR. FULLER:  Thank you.

10  RECROSS EXAMINATION

11  BY MS. AGOLA:

12  Q.  And when we make a distinction between vicious and

13  non-vicious dogs, is it fair to say you received no formal

14  training with regard to how to make that determination?

15  A.  Formal, no, but life experience, I think I know what a

16  vicious dog is.

17  Q.  I believe you testified to that.  My question is, did you

18  receive formal training on how to make a distinguishment

19  between a vicious and a non-vicious dog?

20       MR. FULLER:  Objection; asked and answered.

21       THE COURT:  Overruled.  You may answer.

22       THE WITNESS:  No, I do not believe I've received

23  training on identifying a vicious dog.  Formal training.

24       MS. AGOLA:  Thank you.

25       THE COURT:  Are you done?

1      MR. FULLER:  Yes, Judge.

2      THE COURT:  All right.  Thank you.

3      THE WITNESS:  Thank you, ma'am.

4      MS. AGOLA:  I call Sergeant Scott Walsh to the stand.

5  Sergeant Scott Walsh ,

6  called herein as a witness, after having first been duly

7  sworn, was examined and testified as follows:

8      THE CLERK:  Please be seated.  When you are seated,

9  please state your full name and spell your last name for the

10 record.

11     THE WITNESS:  Scott Walsh, W-a-l-s-h.

12 DIRECT EXAMINATION

13 BY MS. AGOLA:

14 Q.  Good afternoon.  Is it Sergeant?

15 A.  Investigator Sergeant.

16 Q.  Investigator, okay.  So, it's Investigator Walsh?

17 A.  Investigator Sergeant.

18 Q.  Investigator Sergeant Walsh.  Sorry.

19 A.  That's okay.

20 Q.  How are you this afternoon?

21 A.  Good.  Thank you.

22 Q.  How long have you been with the Sheriff's Department?

23 A.  I'm in my twenty-fifth year.

24 Q.  And what is your role there?

25 A.  Currently, I supervise the Major Crimes Unit, the

1    Technicians Unit, the Economics Crimes Unit and Arson

2    Investigation Unit.

3    Q.  Do you have any experience with regard to the execution

4    of search warrants?

5    A.  I do.

6    Q.  And what is your role with regard to that?

7    A.  I supervise the execution of search warrants for the

8    various members of my units that actually do the executions,

9    and I participated in search warrants on several occasions.

10   Q.  And did you do any training with regard to those search

11   warrants; executions of the search warrants?

12   A.  I've attended training regarding those.

13   Q.  And here, today, as an Investigator Sergeant, are you

14   fully familiar with those policies?

15   A.  I believe I am.

16   Q.  Okay.  And why don't you tell us -- tell the ladies and

17   gentlemen of the jury, what is the policy with regard to the

18   execution of search warrants, if officers know in advance

19   that there is a dog at the residence?

20           MR. FULLER:  Objection, Your Honor.  Are we talking

21   about knock or no-knock?

22           THE COURT:  Overruled.  Is there a policy on that

23   issue?

24           THE WITNESS:  I'm sorry, could you repeat it?

25           MS. AGOLA:  Sure.

1    BY MS. AGOLA:

2    Q.  Would you kindly tell the ladies and gentlemen of the

3    jury, what is the policy in the County of Monroe with regard

4    to the execution of search warrants if officers know in

5    advance that there's a dog present at the residence?

6         THE COURT:  Is there a policy regarding the execution

7    of search warrants, if the officers know in advance there's a

8    dog at the residence?

9         THE WITNESS:  There's not a specific policy, no.

10   BY MS. AGOLA:

11   Q.  Okay.  Is it fair to say that -- strike that.

12       Is there a policy at all?

13   A.  It's up to the individual supervisor briefing the warrant

14   team.  That is always one of the considerations that is

15   actually asked and addressed.

16   Q.  And isn't that because the person who is conducting the

17   briefing has to make the members of the entry team aware of

18   any potential dangers on the scene?

19   A.  Correct.

20   Q.  And one of those potential dangers might be a dog intent

21   on protecting his realm?

22   A.  Dogs, children, correct.  A lot of things come up during

23   these that members are made aware of.

24   Q.  Are officers trained at the County to recognize whether a

25   dog is vicious or not?

1  A.  It's discussed.  I don't know if they are specifically

2  trained in it.

3  Q.  Okay.  Is there a formal policy with regard to that?

4  A.  With regard to --

5  Q.  Recognizing a vicious dog.

6  A.  I don't believe we have a formal policy on that, no.

7  Q.  Is there a policy with regard to the use of lethal force

8  against an animal?

9  A.  There is.

10  Q.  And can you briefly describe what that policy is?

11  A.  The dog has to be a danger to the individual officer or

12  others.

13  Q.  Is there a policy with regard to the use of non-lethal

14  force against animals?

15  A.  I've never read one on non-lethal force, no.

16  Q.  And would you characterize -- in your many years of

17  experience, would you characterize the custom for sheriffs at

18  the County, that when they encounter a dog at a residence,

19  that they have some latitude of discretion, some level of

20  discretion to make a split-second decision?

21  A.  You're asking me to characterize?

22  Q.  Is it fair to characterize the custom as being --

23  enabling the officers at that point to make a split-second

24  decision?

25  A.  I believe the order that we're referring to, the use of

1  firearms and deadly physical force, states that it is up to

2  the officers individual discretion.  They have to justify

3  their use of that deadly physical force.

4  Q.  And, so, when they might engage or encounter an animal,

5  they have to think, shoot or don't shoot, right?

6  A.  Correct.

7            MS. AGOLA:  Thank you.

8            MR. FULLER:  I have no questions.  Thank you.

9            THE COURT:  All right.  Mr. Walsh, you may step down.

10           THE WITNESS:  Thank you, Your Honor.

11           THE COURT:  It's getting a little warm in here.  Why

12  don't we take a break, not that it will be any cooler when we

13  come back.  We will use that as an excuse to take a break, and

14  we will resume in about 15 minutes.

15           Remember not to discuss the case and don't begin your

16  deliberations.

17           (The jury was excused.)

18           (Outside the presence of the jury.)

19           THE COURT:  We are zipping right along.  You have one

20  more witness?

21           MS. AGOLA:  Yup.

22           THE COURT:  And, Paul, you better figure out how to

23  run the video machine on this break.

24           MR. FULLER:  Today, Judge?

25           THE COURT:  Yeah.  I think we will finish with

1    Christina, we will take a break, and then we will come back

2    and you will run the video, and then we will be done for the

3    day.  And we will have a charging conference in the morning

4    and you can sum up tomorrow.

5            (Recess at 2:08 p.m., until 2:26 p.m.)

6            THE COURT:  Christina, are you ready?

7            MS. AGOLA:  Yes.

8            THE COURT:  We are ready for the jury.

9            (The jury was brought in.)

10           THE COURT:  Ms. Agola, you may call your next

11   witness.

12           MS. AGOLA:  I call my final witness to the stand, and

13   that is Mr. Carroll.

14           THE COURT:  David Carroll, please step forward here.

15   Place your left hand on the Bible and raise your right hand.

16   David Carroll ,

17   called herein as a witness, after having first been duly

18   sworn, was examined and testified as follows:

19           THE CLERK:  Please be seated.  When you're seated,

20   please state your full name and spell your last name for the

21   record.

22           THE WITNESS:  My name is David Carroll,

23   C-a-r-r-o-l-l.

24           THE COURT:  Good afternoon, Mr. Carroll.

25           THE WITNESS:  Same to you.

1  DIRECT EXAMINATION

2  BY MS. AGOLA:

3  Q.  Good afternoon, Mr. Carroll.  How are you?

4  A.  Pretty good.

5  Q.  Can you please tell the ladies and gentlemen of the jury

6  how old you were back in October of 2006?

7  A.  Twelve.

8  Q.  How old are you now?

9  A.  Seventeen.

10  Q.  Do you recall when your family first obtained Damian?

11  A.  Six months before he died.

12  Q.  And did you name him Damian?

13  A.  Yeah.

14  Q.  Why?

15  A.  Me and my mom.  Both my brothers have the same first

16  initial as me, which is "D", and the dog was like a brother

17  to us, so we named him Damian, because it started with a "D".

18  Q.  What are the names of your other two brothers?

19  A.  Derrick and Devan.

20  Q.  Did you have a nickname for Damian?

21  A.  Meatball.

22  Q.  Meatball?

23  A.  Yeah.

24       THE COURT:  Mr. Carroll, try to keep your voice up so

25  the jury can hear you.

1  BY MS. AGOLA:

2  Q.  Do you recall where your family obtained Damian from?

3  A.  In the City somewhere.  I'm not sure where.

4         MS. AGOLA:  I'm having a difficult time hearing him.

5         THE COURT:  Just keep your voice up.

6  BY MS. AGOLA:

7  Q.  What sort of breed was he?

8  A.  Bullmastiff.

9  Q.  And do you recall how big he was back in October of 2006?

10  A.  Like two feet tall, 50 pounds.

11  Q.  At the time he died, how old was he?

12  A.  Between six and eight months.

13  Q.  Where was the dog kept?

14  A.  In the house.

15  Q.  And what sorts of activities did Damian engage in with

16  your family?

17  A.  Just going on walks and running with him.  We used to

18  play around with him in the backyard.

19  Q.  How much of the day did you spend with him?

20  A.  Like two-thirds of the day I would be with him.

21  Q.  Was he playful?

22  A.  Yeah.

23  Q.  Was he curious?

24  A.  Yeah.

25  Q.  Was he sociable?

1    A.  Yeah.

2    Q.  Was he aggressive?

3    A.  No.

4    Q.  Was Damian ever picked up by Animal Control?

5    A.  No.

6    Q.  Did anyone ever complain to you in the neighborhood about

7    him?

8    A.  No.

9    Q.  About his barking?

10   A.  No.

11   Q.  Did he ever bite anybody?

12   A.  No.

13   Q.  Where were you the night of October 11, 2006?

14   A.  In the back room of my house.

15          THE COURT:  Mr. Carroll, this is important, so try to

16   lean in, speak into the microphone, and try to keep your voice

17   up so the jury can hear you.

18   BY MS. AGOLA:

19   Q.  And was the dog with you?

20   A.  Yes.

21   Q.  And were you watching TV?

22   A.  Yes.

23   Q.  And did you hear a gunshot?

24   A.  Yeah.

25          MR. FULLER:  I object to the leading nature of the

1  questions, Your Honor.

2        THE COURT:  Try to ask them in a non-leading fashion.

3  BY MS. AGOLA:

4  Q.  Did you hear any significant sounds that evening?

5  A.  Yeah.

6  Q.  What did you hear?

7  A.  A loud, like, explosion sound.

8  Q.  What else did you hear?

9  A.  My dog making like a yelping sound, crying sound.  Like a

10  loud pitched, like -- I can't really describe it.  A yelp.

11  Q.  Did you see Damian after he was shot?

12  A.  Yeah, like, about 15 minutes after he got shot.

13  Q.  And what did you see?

14  A.  Him laying on the ground, and I saw the blood on the

15  ground around his head.

16  Q.  What were you feeling at that point?

17  A.  Sick to my stomach.

18  Q.  Do you miss the dog?

19  A.  Yeah.

20        MS. AGOLA:  Thank you.

21  CROSS-EXAMINATION

22  BY MR. FULLER:

23  Q.  Good afternoon, sir.

24  A.  Same to you.

25  Q.  Can you speak up a little bit?

1   A.  Yeah.

2   Q.  Now, you indicated that you don't know where Damian was

3   purchased?

4   A.  No.

5   Q.  Was it the City of Rochester, though?

6   A.  Yes.

7   Q.  And what breed did you indicate Damian was?

8   A.  Bullmastiff.

9   Q.  Isn't it true -- well, first of all, do you remember

10  testifying July 29, 2009, in an examination before trial?

11  A.  I recall being there, yeah.

12  Q.  I asked you questions, other attorneys asked you

13  questions?

14  A.  Yeah.

15  Q.  And you swore to tell the truth at that time, correct?

16  A.  Yes.

17  Q.  And the testimony you gave at that time was the truth?

18  A.  Yes.

19  Q.  Certainly.  Do you recall stating that -- to the

20  question -- and this, counsel, would be page 17 of his

21  deposition, and that would be line 15 and 16.  The question

22  would be, "Do you know what kind of dog he was?"  Referring

23  to Damian.  And your answer was, "Pitbull Mastiff."

24      Do you recall that?

25  A.  No, I don't.

1  Q.  You do recall testifying at the deposition, correct?

2  A.  Yes.

3  Q.  And being asked questions?

4  A.  Yes.

5  Q.  Do you recall being asked, "Who decided on the name?  Why

6  did you name him Damian?"  And your answer was, "I don't

7  know.  It just sounded like a good name."

8  A.  No, I don't remember that.

9  Q.  But today you're testifying that you named him Damian

10  because of the "D"?

11  A.  Yes.

12  Q.  But you don't remember in July saying you just picked

13  that because it sounded like a good name?

14  A.  No, I don't.

15  Q.  Isn't it true after the dog was shot it died instantly;

16  there was no noise, there was no yelping?

17  A.  I heard a yelp come from him.

18  Q.  You're stating you heard yelping?

19  A.  Yes.

20  Q.  Did you also previously state that you were in the

21  hallway?

22  A.  Yes.

23  Q.  Do you recall that?

24  A.  Yes.

25  Q.  Isn't it true you were never in the hallway, it was your

1  mother, Sherry Carroll, who was in the hallway?

2  A.  I was behind my mom.

3  Q.  You were behind your mom?

4  A.  Yes.

5  Q.  Isn't it true when you testified previously that you

6  never testified that your mom was in the hallway at all,

7  correct?

8  A.  Correct.

9  Q.  As a matter of fact, you testified that you were holding

10 the dog in your arms and bent down by the dog.  Do you

11 remember that testimony?

12 A.  Yes.

13 Q.  That wasn't true, was it, sir?

14 A.  It was true.

15 Q.  Isn't it true that the officers that looked down the hall

16 saw just the dog, and then your mother behind the dog; that

17 you were not there?

18 A.  Possibly.

19 Q.  And isn't that a fact because you weren't there?

20 A.  I was in the hallway.  I was behind my mom.

21 Q.  You indicated during your deposition, basically, that the

22 officer was screaming to you, "let go of the dog, let go of

23 the dog", and you had the dog by the collar.

24     Isn't it a fact you never had that dog by the collar?

25 A.  Yes.

1  Q.  So, you weren't being honest at your deposition, correct?

2  A.  I must not have been.

3  Q.  And that was July 29, 2009 that you were under oath?

4       THE COURT:  Is that a question?

5       MR. FULLER:  Yes.

6  BY MR. FULLER:

7  Q.  Were you under oath?  Do you remember that?

8  A.  I don't recall being put under oath, no.

9  Q.  Would it make a difference to you if you swore to tell

10 the truth or you didn't?

11 A.  Yes.

12 Q.  So, if you don't recall being under oath, that would be

13 an excuse for you not to tell the truth?

14 A.  I wouldn't have lied if I did in the first place, if I

15 was under oath.

16 Q.  Well, what's correct then?  Did you, in fact, have the

17 dog by the collar in the hall as the police were yelling to

18 you, "let go of the dog"?

19 A.  No, I didn't.

20 Q.  So, you weren't even there, correct?

21 A.  I was in the hallway.

22 Q.  Do you recall stating that you were holding the dog with

23 both your arms around him, and were actually squatting and

24 kneeling down.  Do you recall that?

25 A.  No.

```
1    Q.  You don't recall?

2    A.  No.

3    Q.  Do you recall stating that you were holding the dog by

4    the collar, you picked the dog up in your arms, you bent down

5    and grabbed him, and you cradled him in your arms.  Do you

6    recall that?

7    A.  No.

8    Q.  But it's your testimony today none of that ever happened?

9         MS. AGOLA:  Objection.  He didn't testify to that.

10   He didn't testify to any location.

11        MR. FULLER:  I believe he said he wasn't --

12        THE COURT:  Overruled.

13   BY MR. FULLER:

14   Q.  Isn't it true you never saw the dog shot at all?

15   A.  I didn't.

16   Q.  You didn't purchase Damian, did you?

17   A.  My mother did.

18   Q.  You don't know how much the dog cost?

19   A.  No, I don't.

20   Q.  You didn't know where the dog was purchased, other than

21   the City of Rochester, correct?

22   A.  Yeah, correct.

23   Q.  Pardon?

24   A.  Correct.

25   Q.  Isn't it true the dog was never neutered?
```

1  A.  I believe so.

2  Q.  Do you believe he was never neutered or he was neutered?

3  A.  He was never.

4  Q.  He was never neutered.  And you never took the dog to the

5  vet, correct?

6  A.  My mom has before.  I know he went to the vet for shots

7  and stuff.

8  Q.  You personally never took him anywhere?

9  A.  No.

10  Q.  Never bought him food?

11  A.  No.

12  Q.  Your family had dogs prior to and after Damian; isn't

13  that true?

14  A.  Yes.

15  Q.  And mostly those were all Pitbulls?

16  A.  We've had Golden Labs, we've had different kind of dogs.

17  Q.  For the most part, they were Pitbulls, weren't they?

18  A.  Yes.

19  Q.  And do you recall you had dogs named Goliath, Tia and

20  Right Eye?

21  A.  Yes.

22  Q.  Do you recall those dogs?  Do you recall what happened to

23  those dogs?

24  A.  We got rid of them, and two of them were puppies.

25  Q.  Isn't it true Greece Police had to take them away after

1  your father requested they be euthanized?

2  A.  Yes.

3  Q.  Because they attacked your mother?  "They turned vicious

4  and attacked your mother for no apparent reason"?

5  A.  No.

6  Q.  That, "they were vicious in nature and unpredictable."

7  Isn't it true that's what your father told Greece Police?

8  A.  No.

9  Q.  These were dogs you had after Damian?

10 A.  Yes.

11 Q.  Three of them?

12 A.  Yes.

13 Q.  And all three of them were euthanized?

14 A.  No.  Two of them were puppies, and we got rid of one of

15 them.

16 Q.  So, you have the other two is what your testimony is?

17 A.  No, we have none of them now.  We had three other

18 puppies.

19 Q.  Isn't it true that one of them also bit your father

20 before they attacked your mother?

21 A.  No.

22 Q.  January 22, 2009, these three dogs were destroyed, based

23 on your father's call to Greece Police, because they attacked

24 your mother; isn't that true, sir?

25 A.  No, my mom called to get the dogs picked up.

1  Q.  Now, when the team made its entry, did you hear that

2  noise?

3  A.  Which noise?

4  Q.  The noise of the door being broken down.

5  A.  Yes.

6  Q.  Sir, I'm going to show you what's been marked as Defense

7  Exhibit No. 406 for identification.  Do you recognize that?

8  A.  Yes.

9  Q.  Can you tell the jury what that is?

10  A.  The front door to my house.

11  Q.  And does that front door to your house have a mark in it,

12  damaged condition?

13  A.  Yes.

14  Q.  Is that a fair and accurate representation of the front

15  door to your house --

16  A.  Yes.

17  Q.  -- as it appeared after October 11, 2006?

18  A.  Yes.

19  Q.  And Exhibit No. 407 for identification, that's obviously

20  a photograph.  Could you tell us what that depicts?

21  A.  The hallway and front room to my house.

22  Q.  And is that the front door to your house --

23  A.  Yes.

24  Q.  -- at the end of the picture?

25  A.  Yes.

1  Q.  Other than that gate, because that gate wasn't there on

2  October 11th, right?

3  A.  Yes.

4  Q.  Other than that gate and the woman in the hallway, is

5  that a true and fair and accurate representation of your

6  hallway facing the front door as it appeared on October 11,

7  2006?

8  A.  Yes.

9  Q.  And Defendant's Exhibit No. 408, is that just a closer

10  depiction of what was shown in 407?

11  A.  Yes.

12  Q.  And same with photograph 409 for identification, is that

13  an even closer depiction?

14  A.  Yes.

15  Q.  And are all these photographs true, fair and accurate

16  representations of how the inside of your home and your door

17  looked on October 11, 2006?

18  A.  Yes.

19       MR. FULLER:  At this time, Your Honor, I'd like to

20  enter them into evidence.

21       THE COURT:  Any objection?

22       MS. AGOLA:  No.

23       THE COURT:  406, 407, 408 and 409 are admitted.

24  BY MR. FULLER:

25  Q.  Now, 409 that's now in evidence -- and again, you've

1  testified that gate was not there.  Does that show your

2  living room area?

3  A.  Yes.

4  Q.  And is that the area where Damian was shot?

5  A.  Yes.

6  Q.  And with regard to 407, is that the hallway that Damian

7  was walking down?

8  A.  Yes.

9  Q.  And he was walking down toward your front door, correct?

10  A.  Yes.

11       MR. FULLER:  I have no further questions.  Thank you

12  very much.

13       THE WITNESS:  Yup.

14       THE COURT:  Ms. Agola, any further questions?

15  REDIRECT EXAMINATION

16  BY MS. AGOLA:

17  Q.  Mr. Carroll, your mother was ahead of you; is that

18  correct?

19  A.  Yes.

20  Q.  And did you hear the officers say anything to your

21  mother?

22  A.  I heard them tell her to step out of the way.

23  Q.  Now, at that point, had you stepped out of the way, too?

24  A.  Yeah.  I was in the bedroom that she just came out of.

25  Q.  And your testimony here today is that you did not see

1  this dog be shot?

2  A.  No, I heard it.

3  Q.  But you heard it?

4  A.  Yeah, and I saw the flash.

5  Q.  And then, after the dog was shot, you did see the dog on

6  the living room floor dead?

7  A.  Yes.

8        MS. AGOLA:  Thank you.

9        MR. FULLER:  Nothing.

10        THE COURT:  Mr. Carroll, thank you.  You may step

11  down.

12        Ms. Agola, anything else?

13        MS. AGOLA:  No, the Plaintiff rests.

14        THE COURT:  All right.  Ladies and gentlemen, that

15  includes the proof that is being offered by Mr. Carroll by his

16  attorneys, and it's customary that we take a brief recess.  We

17  will recess for probably about 15 minutes.  After the recess I

18  would expect that the defense will present their case.  And

19  Mr. Fuller, you have one video deposition, right?

20        MR. FULLER:  I have it, Your Honor, whether we play

21  it or not --

22        THE COURT:  We are having a few technical

23  difficulties, so I expect we will have you back in 15 minutes

24  with a video for you to watch.  If we're a few minutes more

25  than that, we're trying to work out technical glitches.

1          Don't discuss the case.  The Plaintiff has rested,

2    the Defendant has not begun their case, so you must not begin

3    your deliberations.  Be sure to keep an open mind and we will

4    see you after the break.  Thank you.

5          (The jury was excused.)

6          (Outside the presence of the jury.)

7          THE COURT:  Mr. Marianetti, you indicated that you

8    had a motion that you intended to make following the

9    conclusion of the Plaintiff's proof?

10         MR. MARIANETTI:  Yes, Your Honor.

11         THE COURT:  Go ahead.

12         MR. MARIANETTI:  Yes.  At this time, Your Honor,

13   Defendant's would move for a judgment as a matter of law in

14   favor of Defendants on the grounds that there has been

15   insufficient evidence produced showing that the shooting of

16   the dog was an unreasonable seizure under the Fourth

17   Amendment.  Additionally, there's been no offer of proof as to

18   ownership of the dog, that David Carroll did own the dog.  So,

19   Defense would argue that there can't be recovery for

20   unreasonable seizure of property that was not owned by David

21   Carroll.

22         MS. AGOLA:  We cross-move for Judgment NOV.  We

23   believe here that the proof is such that it demonstrates that

24   there was actually no policies, that the police officers had

25   advance noticed that there was an animal present, that there

1  was no training.  That there's a complete lack of training and

2  a deliberate choice to exercise no other non-lethal

3  alternatives, and that this dog was shot for no good reason.

4        And with regard to the ownership, the Plaintiff in

5  this case is a minor, and the mother is -- or the family owns

6  the dog and he is a part of the family.

7        THE COURT:  All right.  I'm going to deny the motion

8  insofar as it is based upon the contention that because there

9  was no testimony that the minor's funds were used to purchase

10  the dog, as opposed to the mother purchasing the dog for the

11  family.  I'm going to deny it on that basis.

12        As to the remainder of your motion and the

13  Plaintiff's cross motion, I will reserve on that.

14        MR. MARIANETTI:  There were additional grounds I

15  wanted to just talk to you about.

16        THE COURT:  Go ahead.

17        MR. MARIANETTI:  I'd also like to move on the failure

18  to train claim, on the grounds that there was insufficient

19  evidence to reach the standard to show that there was a

20  deliberate deference to the rights of individuals that the

21  police would come into contact with.  There was evidence about

22  extensive training regarding the execution of search warrants.

23        And I'd also, on additional grounds, make the motion

24  for a judgment in favor of Defendant, County of Monroe, on the

25  grounds that there was no direct involvement, and there was no

1  policy or custom established as to result in unconstitutional

2  acts.

3          THE COURT:  All right.  Thank you.  I will reserve on

4  those motions, as well.

5          MR. MARIANETTI:  Thank you.

6          THE COURT:  All right.  So, we will proceed to the

7  Defendant's case.  And I'm right that we've got one video,

8  right?

9          MR. FULLER:  Yes, Your Honor.

10          THE COURT:  So, hopefully we can get that all ironed

11  out and then what we will do is excuse the jury.  I will give

12  you, after I make just a couple of changes, some proposed jury

13  instructions for you two, and a special verdict form for you

14  to look at overnight.  And I think what we will do is

15  reconvene tomorrow morning about 9:00.  I will have the jury

16  come in later than that, so you can tell me any issues you

17  have with instructions and we can hammer those out.  That way

18  you will know what the instructions will be before you have to

19  sum up.  Okay?

20          MR. FULLER:  Sounds good, Your Honor.  And with

21  regard to the stipulation?  That will be read by Your Honor

22  during --

23          THE COURT:  In your case, just offer the stipulation

24  and then I will read it.  But just make sure you do offer it,

25  so I don't forget to read it.  Anything else?

1          MS. AGOLA:  No, Judge.

2          MR. MARIANETTI:  Thank you, Judge.

3          THE COURT:  We will take a few minutes until Paul is

4     ready to operate the video.

5          (A recess was taken.)

6          (The jury was brought in.)

7          THE COURT:  Mr. Fuller, are you ready to proceed?

8          MR. FULLER:  I hope so, Judge.  I will call my next

9     witness.  That would be Greece Police Officer Joseph Hopper.

10          THE COURT:  And by agreement of the parties and the

11    Court, you will hear Officer Hopper's testimony through a

12    video deposition that will be played for you on -- it will

13    play on the monitors in front of you.  If at any time you

14    don't see it on the monitors in front of you, let us know.  We

15    think, hopefully, we corrected the problems we were having

16    with that.

17          Mr. Fuller?

18          (Exhibit was played for the jurors.)

19          THE COURT:  Mr. Fuller, do you have any other

20    witnesses or evidence to offer?

21          MR. FULLER:  Yes, Your Honor.  For the record, I

22    would offer Defense Exhibit No. 404, which is a stipulation.

23    I'd offer that into evidence.  I'm showing Plaintiff's

24    counsel, and obviously it's an agreement.

25          THE COURT:  Ladies and gentlemen of the jury, I will

1    now read to you the stipulation that has been entered into and

2    agreed to by the parties.  You should consider the facts as

3    set forth herein as true and agreed to facts between the

4    parties.

5            The parties stipulate as follows:  Number one,

6    Plaintiff David Carroll stipulates and agrees that the

7    no-knock search warrant ordered by a County Court Judge and

8    executed at 284 Ridgedale Circle on October 11, 2006, was in

9    all respects proper and based upon probable cause.

10           Two, Plaintiff is not challenging the reason for the

11   no-knock search warrant or the reason that the law enforcement

12   officers had in entering the premises.

13           Three, Plaintiff agrees that the GRANET officers

14   properly and lawfully entered the premises in the ordinary

15   course of their duties to execute the court ordered no-knock

16   search warrant.

17           Anything further Mr. Fuller?

18           MR. FULLER:  No, Your Honor.  Defense rests.

19           THE COURT:  All right.  Ladies and gentlemen, that

20   concludes the proof in this matter.  The trial has moved more

21   swiftly than we anticipated, which I suppose is good news for

22   you.

23           Do remember, however, that I have not instructed you

24   to begin your deliberations yet, so you still may not discuss

25   the case with one another, and you certainly may not discuss

1  the case with anyone else.  You are instructed further to

2  continue to keep an open mind.

3          When we resume tomorrow, the attorneys will make

4  their closing arguments to you, following which I will

5  instruct you on the law.  At that point, you will retire to

6  the jury room and then you will be instructed that you may

7  begin your deliberations.

8          So, we're done about ten minutes earlier than I

9  anticipated today.  I'm going to have you return tomorrow at

10 11:00 so that I may meet with the attorneys ahead of time, so

11 that we can go over some legal matters concerning the legal

12 instructions.

13         Then, when you come to court at 11:00, you can expect

14 to hear their closing arguments and receive the Court's

15 instructions.  We will, if you are deliberating at that point,

16 provide you lunch and you can begin your deliberations

17 following the instructions.  Okay?

18         Thank you for your service today.  Get home safely,

19 return to court safely, and we will see you at 11:00.  And you

20 should assemble in the jury room.  Ms. Mar will take your

21 notebooks tonight so don't take them home.  Thank you.

22         (The jury was excused.)

23         THE COURT:  Counsel, I've got proposed special

24 verdict forms, which I will give both of you or all of you.

25 You can look at those overnight.  We will get together

1   tomorrow morning, why don't we say 9:30, and you can tell me

2   if you have any objections to the verdict form.

3         If you want to come to my office in about ten minutes

4   I can give you the proposed jury instructions, as well.  I

5   just want to make a couple of changes to them based on what

6   I've heard today.

7         Let me just -- just a couple of things as you go

8   through the jury instructions.  I'm, of course, happy to

9   entertain any issues you have with any of the instructions,

10   including any that you think should be given that are not in

11   there.

12         I would say the ones to pay particular attention to

13   is the instruction concerning the unreasonable seizure, the

14   claim that the shooting of the dog amounts to an unreasonable

15   seizure.  That's one for which there is no model instruction

16   and I've put together based on an analysis of, for the most

17   part, a number of cases that are listed at the bottom of that

18   instruction.  That's the one that instructs them, among other

19   things, that they are to consider the totality of the

20   circumstances.  And you can, if you read the cases, see where

21   I got the language.  But I would pay particular attention to

22   that instruction, as well as the instruction on failure to

23   train and deliberate inference.  That's another instruction

24   that I spent a fair amount of time with.  So, those two

25   probably got more of my attention than the other ones which

1   are more commonly given.

2          Take a look at those.  I instruct the jury and I want

3   to make sure that we're all in agreement here.  If they find

4   liability against the individual Defendant Carroll, then they

5   will proceed to consider whether there is Monell liability to

6   be imposed against the County, under either the theory of an

7   unconstitutional policy or custom or deliberate inference with

8   respect to failure to train.

9          If they find that Officer Carroll is not liable, they

10  do not continue onto the question of liability against the

11  County.  So, the verdict form is structured that way, and I

12  instruct them on that, as well.

13         If they find Officer Carroll liable and the County

14  liable on either of your theories under 1983, my view is that

15  the Plaintiff has suffered one injury, for which compensable

16  damages may be awarded.  He hasn't suffered separate injuries

17  as a result of the County's liability and the individual

18  Defendant's liability.

19         So, the jury form asks them to go through claim one

20  against Officer Carroll first.  If they find that he is not

21  liable, that's the end of the matter.  If they find that he is

22  liable, then they proceed to consider the County's liability

23  on the two theories.  Then, if they find any of those

24  defendants liable, they are to award one sum of compensatory

25  damages, and I have instructions that indicate why, in this

1  case, we're talking about one injury with one sum of

2  compensable damages.

3  I just wanted to bring that to your attention.  So,

4  look at those two instructions in particular.  That's how the

5  verdict form is set out.  Why don't we meet at 9:30.  I don't

6  think it's going to take us an hour and a half, but if you all

7  have issues and you want me to incorporate them, it's going to

8  take me some time to be able to do that before they come back

9  at 11:00.  So, that's what I was thinking.  So, let me give

10  you the verdict forms now, and if you just come down in about

11  ten minutes you can get the instructions.

12  Anything else?  Thank you for being so efficient.

13  (The proceeding adjourned at 3:52 p.m.)

14  * * *

15  CERTIFICATE OF REPORTER

16

17  I certify that the foregoing is a correct transcript

18  to the best of my ability of the record of proceedings in the

19  above-entitled matter.

20

21  S/ Erin R. Keniston

22  Erin R. Keniston, RPR

23  Official Court Reporter

24

25

1    THE COURT:  The the record should reflect that I'm

2  here in court with Ms. Agola and Mr. Laprade.  I was informed

3  by the Court's marshals that Ms. Agola had an issue that she

4  wanted to raise with me concerning conduct of one of the

5  jurors.  Mr. Fuller, counsel for the Defendant, has apparently

6  left the building.  They're not here.

7    I don't know what the issue is, so I will, at this

8  point, allow Ms. Agola to indicate for the record what the

9  issue is she wants raised with the Court.

10    MS. AGOLA:  Well, Your Honor, I wasn't looking

11  directly at -- is it the last juror?

12    MR. LAPRADE:  I was the one, actually.

13    THE COURT:  One at a time.  Mr. Laprade?

14    MR. LAPRADE:  Judge, I was the one who actually made

15  the observation.  I just -- shortly after the verdict was

16  announced, and right before the jury was excused, as they all

17  stood up to leave I observed juror number eight, with her left

18  hand, waive at the defense table.  I just didn't know what to

19  make of it at the time.  It took me a second to process what I

20  had just seen.  Maybe there was nothing to it, but I just

21  found it sort of odd that a juror would be waiving.

22    I'm not sure who she may have been waiving to, but it

23  certainly seemed her eyes were looking over my head, right

24  behind me, toward defense counsel table.  And she clearly,

25  with her left hand, kind of waived like -- I know it's not

1  going come to up in the record, but it seemed to me almost

2  like a waive you might give someone you were familiar with.

3          I don't know, but I found it very odd, and I

4  mentioned it to Ms. Agola, and we thought it was best to at

5  least make the Court aware of that.  Whatever it means, I

6  don't know, but I found it odd.

7          THE COURT:  All right.  I will supplement the record

8  by indicating that defense table is physically situated in

9  front of the left side of the gallery, as you're facing

10  forward.  I don't think Mr. Laprade is indicating with

11  certainty that the gesture, if it was a waive, was directed

12  toward -- it may have been directed in that direction, whether

13  it may have been to somebody in the gallery who was behind

14  defense table.  The juror in question was number four,

15  Ms. Reynard?

16          MS. AGOLA:  Number eight.  Ms. Casciola, I believe.

17          THE COURT:  Ms. Casciola?

18          MR. LAPRADE:  Correct.

19          THE COURT:  All right.  I think, given the fact that

20  Mr. Fuller is not here and that I have accepted the verdict,

21  and in that sense discharged the jury, I wanted to let you

22  make whatever observations you want to make.

23          I'm not comfortable, at this time, questioning

24  Ms. Casciola without allowing Mr. Fuller to be heard on this.

25          MR. LAPRADE:  Understood.

1          THE COURT:  We know who she is, we have contact

2   information.  I would say you've placed it on the record, why

3   don't you go back and talk about the issue further.  If you

4   have an application to make -- if you look at the case law and

5   think there's something further you would like the Court to

6   do, certainly make that application, and I'm happy to consider

7   it, and we will have Mr. Fuller then respond to that.

8          MS. AGOLA:  Very good.

9          MR. LAPRADE:  Thank you, Your Honor.  And just to be

10  clear, I'm not opining who she may have been waiving to.  It

11  certainly could have been somebody in the gallery.

12         THE COURT:  That's fine.  I don't think that -- I

13  think you've done the proper thing in raising the issue.  I

14  think it's a technical matter.  The verdict is in and, so --

15  otherwise, I would have Mr. Fuller come in, I would question

16  her now.  That may, at some point, be the relief that you're

17  seeking, and I would have to look at the cases in order to

18  determine when it is appropriate for a judge to then make some

19  post-verdict inquiry of a juror.  And I don't want to do that

20  without giving opposing counsel an opportunity to be heard on

21  whether relief is appropriate, and if so, what kinds.

22          So, thank you for bringing it to the Court's

23  attention, and I will wait to hear from you as to whether you

24  have any formal application for some action or relief from the

25  Court.

1    MR. LAPRADE:  Thank you, Your Honor.

2    THE COURT:  Anything else?

3    MS. AGOLA:  Very good.

4    THE COURT:  Thank you very much.

5    MR. LAPRADE:  Have a nice afternoon.

6                        * * *

7              CERTIFICATE OF REPORTER

8

9        I certify that the foregoing is a correct transcript

10   to the best of my ability of the record of proceedings in the

11   above-entitled matter.

12

13   S/ Erin R. Keniston

14   Erin R. Keniston, RPR

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

# OFFICER SAFETY

**Greece Police Department** — Field Interview Form

Page ⅟ of /

| 1 Location | | | 2 Sector | 3 M | D | Y | T | 4 CR # | |
|---|---|---|---|---|---|---|---|---|---|
| 284 Ridgedale Cir. | | | 4 | 10 | 08 | 06 | 2100 | 06004252 | |

**5 Context of FIF** — Context #'s: 9
1. Drugs  2. Intelligence  3. Burglary  4. Robbery  5. Sex Offense  6. Gang Activity  7. Forgery  8. Weapons  9. Officer Safety  10. Arson  11. Murder  12. Public Order  13. Gambling  14. Organized Crime  15. Alcohol Offense  16. Known Offender  17. Suspicious Person  18. Suspicious Vehicle  19. Other

**6 Source of FIF** — Source #'s:
1. Informant  2. Relative  3. First Hand  4. Hearsay  5. Police Officer  6. Other Agency  7. Phone  8. Other

**7 Evaluation of Information** — Evaluation #:
1. Confirmed  2. Probable  3. Doubtful  4. Improbable  5. Unknown

**8 Status of Information** — Status #:
1. Founded  2. Unfounded  3. Undetermined

**9 Evaluation of Source (if any)** — Evaluation #:
1. Reliable  2. Usually Reliable  3. Unreliable  4. Unknown

| 10 Name of Person #1 | | | | | Address | | | | DOB |
|---|---|---|---|---|---|---|---|---|---|
| Sex | Race | Height | Weight | Hair Color | Hair Length | Eyes | Facial Hair | Ethnicity | Moris # |
| | | | | | | | | | |

| Clothing, Distinguishing Jewelry | | Physical Oddities | |
|---|---|---|---|

| Moniker / Alias | Place of Birth | ☐ Parole  ☐ Probation | Alien | Car Position (if any) |
|---|---|---|---|---|

| Name of Person #2 | | | | | Address | | | | DOB |
|---|---|---|---|---|---|---|---|---|---|
| Sex | Race | Height | Weight | Hair Color | Hair Length | Eyes | Facial Hair | Ethnicity | Moris # |
| | | | | | | | | | |

| Clothing, Distinguishing Jewelry | | Physical Oddities | |
|---|---|---|---|

| Moniker / Alias | Place of Birth | ☐ Parole  ☐ Probation | Alien | Car Position (if any) |
|---|---|---|---|---|

**11 VEH**

| Year | Make | Model | Type | Color | Plate # | State | Interior Color |
|---|---|---|---|---|---|---|---|

Exterior 1. 2. 3. 4.
Windows: 1. Dark Tinted  2. Reflective  3. Damaged
Driver Front:  Passenger Front:  Driver Rear:  Passenger Rear:
Other Identifying Marks / Characteristics

**12 Narrative:** DUE TO OUR FREQUENT RESPONSE AT ABOVE LOCATION, OFFICER SAFETY INFO. BE AWARE THAT A LARGE GRAY/BLACK ROTTWEILER LIVES IN THE GARAGE/BACKYARD. IT APPEARS THAT THE DOGS HANGS OUT W/ THE KIDS & THEIR FRIENDS AT LOCATION. IN THE GARAGE THE GARAGE OVERHEAD DOOR IS PADLOCKED AND THERE IS A MAN-DOOR ON REAR OF GARAGE. BACKYARD OF #109 RIDGEDALE CIR PROVIDES GOOD VIEW OF BACKYARD AND EXIT DOOR.

**PLAINTIFF'S EXHIBIT**
CASE NO. 07-6123
EXHIBIT NO.

| Reporting Officer & IBM # | Car | Sector | Supervisors Review / Approval & IBM # | XC To: |
|---|---|---|---|---|
| Helfer #1212 | 321 | 4 | (signature) 1020 | |

**EXHIBIT C**

PLAINTIFF'S
EXHIBIT

CASE
NO. 07-6123

EXHIBIT
NO. 2



**EXHIBIT D**

**PLAINTIFF'S EXHIBIT**

CASE NO. 07-6123

EXHIBIT NO. 3



# Employee Training History

| | |
|---|---|
| **IBM Number** | **2285** |
| **Last Name** | **CARROLL** |
| **First Name** | **JAMES** |
| **Position** | **DS SERGEANT ROADPATROL** |

| Training Date | Training Description | Hours |
|---|---|---|
| 5/23/1991 | BASIC COURSE FOR PART-TIME POLICE OFFICERS | 840 |
| 1/14/1993 | RADAR OPERATION | 32 |
| 1/24/1995 | IST/TQM TRAINING | 24 |
| 4/26/1995 | HEARING CONSERVATION | 0.25 |
| 5/15/1995 | IST/FIREARMS | 2 |
| 6/9/1995 | IMPAIRED DRIVER RECOGNITION SCHOOL | 24 |
| 6/9/1995 | IMPAIRED DRIVER RECOGNITION | 28 |
| 10/30/1995 | IST/FIREARMS | 2 |
| 2/13/1996 | IST/DOMESTIC VIOLENCE | 8 |
| 5/20/1996 | IST/DXT TRAINING | 4 |
| 5/29/1996 | SPEC/TQM FACLITATOR | 8 |
| 6/19/1996 | IST/SUMMER FIREARMS | 2 |
| 9/16/1996 | IST/CPR | 8 |
| 9/24/1996 | IST/DXT PHASE 2 | 4 |
| 10/25/1996 | PHOTOGRAPHY IN LAW ENFORCEMENT | 35 |
| 11/4/1996 | IST/EVIDENCE TECH. COURSE | 80 |
| 2/7/1997 | INTERVIEW AND INTERROGATION | 35 |
| 3/21/1997 | FP PROCED/ PRACTICES - LEVEL ONE | 30 |
| 11/7/1997 | FIELD TRAINING AND EVALUATION PROGRAM | 40 |
| 12/2/1997 | BACKGROUND INVESTIGATION COURSE | 7 |
| 3/6/1998 | FINGERPRINT LEVEL II TRAINING COURSE | 40 |
| 1/31/1999 | EMERGENCY VEHICLE SCENE MANAGEMENT | 1 |
| 2/28/1999 | BLOODBORNE PATHOGEN 1999 | 1 |
| 3/15/1999 | ENHANCED INSERVICE TRAINING | 8 |
| 3/31/1999 | RIGHT TO KNOW HAZ MAT | 1 |
| 4/24/1999 | SEVERELY DISABLED PARKING | 0.25 |
| 5/20/1999 | VOL 8.4 - AUTOMOBILE SEARCH | 1 |
| 5/24/1999 | BASIC TECHNICIAN REFRESHER COURSE | 8 |
| 5/31/1999 | WEAPON RETENTION | 1 |
| 6/4/1999 | 1999 SPRING FIREARMS | 3 |
| 7/20/1999 | VOL. 8.5 - COMPUTER RELATED INVESTIGATIONS | 1 |
| 7/31/1999 | SPEAK THE LANGUAGE | 1 |
| 8/31/1999 | LAW ENFORCEMENT & DIVERSITY | 1 |
| 9/27/1999 | 1999 ASR RECERT | 0.25 |
| 10/21/1999 | 1999 PR-24 RECERT | 2 |
| 10/21/1999 | 1999 FALL FIREARMS | 2 |

| Training Date | Training Description | Hours |
|---|---|---|
| 10/31/1999 | DOGFIGHTING IN AMERICA | 1 |
| 11/4/1999 | CRUELTY TO ANIMALS | 0.25 |
| 1/19/2000 | VOL 9.1 - SUPREME COURT DECISION AND DEALING WITH D/HOH PE | 1 |
| 1/24/2000 | NUCLEAR, BIOLOGICAL, CHEMICAL (NBC) WEAPONS AWARENESS TR | 0.25 |
| 3/9/2000 | VOL 9.2 - COURT DECISIONS | 1 |
| 3/13/2000 | VIDEO ENHANCEMENT | 1 |
| 3/24/2000 | ENHANCED IN-SERVICE TRAINING | 7.5 |
| 4/13/2000 | EXPLOSIVE TRACE DETECTION TRAINING | 2 |
| 5/16/2000 | 2000 SPRING FIREARMS IN-SERVICE | 2 |
| 5/18/2000 | SEXUAL HARASSMENT | 1 |
| 6/27/2000 | HAZMAT 2000 REFRESHER | 1 |
| 7/11/2000 | THE S. A. N. E. PROJECT | 0.25 |
| 10/2/2000 | BLOODBORNE PATHOGENS 2000 | 1 |
| 10/2/2000 | EPILEPSY 2000 REFRESHER | 1 |
| 11/6/2000 | 2000 FALL IN-SERVICE FIREARMS TRAINING | 2.5 |
| 2/12/2001 | PURSUIT POLICY MONROE COUNTY | 1 |
| 3/11/2001 | TRAINING TIMES 10.1 - V & T ISSUES AND OFFICER SAFETY ALERT | 1 |
| 4/27/2001 | 2001 SPRING FIREARMS IN-SERVICE | 4 |
| 5/24/2001 | BLOODBORNE PATHOGENS REFRESHER 2001 | 1 |
| 5/24/2001 | HAZMAT RIGHT TO KNOW 2001 REFRESHER | 1 |
| 6/12/2001 | GUN CABLE LOCK APPLICATION & FIREARMS SAFETY | 0.25 |
| 9/25/2001 | FALL 2001 FIREARMS | 3.5 |
| 11/1/2001 | FINGERPRINTING | 1 |
| 11/1/2001 | HDS TRAINING | 8 |
| 11/1/2001 | 10.3 - INCREASED VIGILANCE(TERRORIST THREAT POTENTIAL) | 1 |
| 11/1/2001 | ANTHRAX/FIRST RESPONDER | 1 |
| 11/1/2001 | 10.2 - CELL PHONE LAW ENACTMENT | 1 |
| 11/16/2001 | HDS TRAINING | 8 |
| 12/7/2001 | HDS TRAINING | 8 |
| 1/2/2002 | TRAINING TIMES 11.1 | 1 |
| 1/17/2002 | HAZARDOUS DEVICES SQUAD | 8 |
| 1/24/2002 | HAZARDOUS DEVICES SQUAD | 8 |
| 2/1/2002 | HAZMAT FOR PATROL | 1 |
| 2/2/2002 | TRAINING TIMES 11.2 | 1 |
| 2/5/2002 | HAZARDOUS DEVICES SQUAD | 8 |
| 3/5/2002 | SURVIVE WEAPONS OF MASS DESTRUCTION | 1 |
| 3/7/2002 | HAZARDOUS DEVICES SQUAD | 8 |
| 3/18/2002 | HAZARDOUS DEVICES SQUAD | 8 |
| 4/22/2002 | HAZARDOUS MATERIAL TECHNICIAN COURSE | 40 |
| 4/24/2002 | HAZARDOUS DEVICES SQUAD | 8 |
| 5/24/2002 | HAZARDOUS DEVICES SQUAD | 8 |
| 5/30/2002 | HAZARDOUS DEVICES SQUAD | 8 |

| Training Date | Training Description | Hours |
|---|---|---|
| 6/20/2002 | HAZARDOUS DEVICES SQUAD | 8 |
| 7/1/2002 | BLOODBORNE 2002 | 1 |
| 7/11/2002 | HAZARDOUS DEVICES SQUAD | 8 |
| 7/29/2002 | HAZARDOUS DEVICES SQUAD | 8 |
| 7/31/2002 | TRAINING TIMES 11.3 | 1 |
| 8/22/2002 | HAZARDOUS DEVICES SQUAD | 8 |
| 9/1/2002 | JUVENILE FIRE STARTERS | 1 |
| 9/3/2002 | HAZARDOUS DEVICES SQUAD | 8 |
| 9/27/2002 | HAZARDOUS DEVICES SQUAD | 8 |
| 10/1/2002 | TRAINING TIMES 11.4 | 1 |
| 10/3/2002 | HAZARDOUS DEVICES SQUAD | 8 |
| 11/8/2002 | HAZARDOUS DEVICES SQUAD | 8 |
| 11/14/2002 | HAZARDOUS DEVICES SQUAD | 8 |
| 12/1/2002 | TRAINING TIMES 11.5 | 1 |
| 12/1/2002 | ALZHEIMER DISEASE | 1 |
| 12/20/2002 | HAZARDOUS DEVICES SQUAD | 8 |
| 1/7/2003 | HDS TRAINING | 8 |
| 1/16/2003 | HDS TRAINING | 8 |
| 2/6/2003 | HDS TRAINING | 8 |
| 3/17/2003 | HDS TRAINING | 8 |
| 3/26/2003 | HDS TRAINING | 8 |
| 4/1/2003 | WEAPONS OF MASS DESTRUCTION | 1 |
| 4/24/2003 | CAPSTUN HOSLTER TRAINING | 0.5 |
| 5/1/2003 | HDS TRAINING | 8 |
| 5/1/2003 | BLOODBORNE | 1 |
| 5/19/2003 | HDS TRAINING | 8 |
| 5/23/2003 | HDS TRAINING | 8 |
| 5/25/2003 | HDS TRAINING | 8 |
| 5/26/2003 | HAZARDOUS DEVICES BASIC SCHOOL | 120 |
| 6/1/2003 | HAZMAT | 1 |
| 6/12/2003 | HDS TRAINING | 8 |
| 7/1/2003 | DRUG RECOGNITION EXPERT | 1 |
| 7/18/2003 | HDS TRAINING | 8 |
| 7/24/2003 | HDS TRAINING | 8 |
| 8/27/2003 | HDS TRAINING | 8 |
| 9/4/2003 | HDS TRAINING | 8 |
| 9/15/2003 | HDS TRAINING | 8 |
| 10/1/2003 | 2003 FALL FIREARMS IN-SERVICE | 8 |
| 10/1/2003 | CENTER FOR YOUTH SERVICES | 1 |
| 10/3/2003 | HDS TRAINING | 8 |
| 10/10/2003 | HDS TRAINING | 8 |
| 11/1/2003 | AMBER ALERT PART I | 1 |

| Training Date | Training Description | Hours |
|---|---|---|
| 11/3/2003 | HDS TRAINING | 8 |
| 11/21/2003 | HDS TRAINING | 8 |
| 12/1/2003 | PROBATION FIELD INTERVENTION | 1 |
| 12/12/2003 | HDS TRAINING | 8 |
| 2/7/2004 | WEAPONS OF MASS DESTRUCTION LIVE AGENT TRAINING | 48 |
| 2/13/2004 | PROBATION FIELD INTERVENTION | 1 |
| 2/26/2004 | FIREARMS RECERTIFICATION | 8 |
| 3/8/2004 | HDS TRAINING | 8 |
| 3/17/2004 | HDS TRAINING | 8 |
| 4/7/2004 | HDS TRAINING | 8 |
| 4/9/2004 | BUFFER ZONE PROTECTION PLAN ASSESSMENT TRAINING | 16 |
| 4/30/2004 | HDS TRAINING | 8 |
| 5/13/2004 | HDS TRAINING | 24 |
| 5/19/2004 | IDENTITY CRIME | 1 |
| 5/19/2004 | BLOODBORNE PATHOGENS 2004 | 1 |
| 6/9/2004 | HDS TRAINING | 8 |
| 6/20/2004 | TRAINING TIMES-SUICIDE BOMBER 13-1 | 1 |
| 6/23/2004 | CPR/AED FOR PROFESSIONAL RESCUERS | 8 |
| 6/24/2004 | HDS TRAINING | 8 |
| 7/6/2004 | HAZMAT REFRESHER 2004 | 1 |
| 7/15/2004 | HDS TRAINING | 8 |
| 7/27/2004 | HDS TRAINING | 8 |
| 8/9/2004 | HDS TRAINING | 8 |
| 8/27/2004 | HDS TRAINING | 8 |
| 9/2/2004 | HDS TRAINING | 8 |
| 9/16/2004 | HAZMAT 2003 | 1 |
| 9/24/2004 | HDS TRAINING | 8 |
| 10/1/2004 | ROLL CALL TRAINING P.B.G.O. #51 | 0.5 |
| 10/1/2004 | POLICE BUREAU BULLETIN #08-04 | 0.5 |
| 10/1/2004 | IN-SERVICE FALL FIREARMS 2004 | 3 |
| 10/1/2004 | NYSIBRS/ILEADS TRAINING | 3 |
| 10/8/2004 | TACTICAL WARRANTS AND BUILDING SEARCH | 40 |
| 10/12/2004 | WORKPLACE HARASSMENT AND DISCRIMINATION | 1 |
| 10/12/2004 | ROLL CALL TRAINING P.B.G.O. #25 | 0.5 |
| 10/21/2004 | HDS TRAINING | 8 |
| 11/4/2004 | HDS TRAINING | 8 |
| 11/10/2004 | ALL BUREAU TRAINING NEWS VOL.1 NO.1 | 1 |
| 11/10/2004 | ROLL CALL TRAINING PBGO #46 | 0.5 |
| 11/10/2004 | ROLL CALL TRAINING MBGO #05-96 | 0.5 |
| 11/12/2004 | HDS TRAINING | 8 |
| 11/30/2004 | LEGAL UPDATE-INVENTORY SEARCHES | 0.5 |
| 11/30/2004 | ROLL CALL TRAINING-HOBBLE AND SPIT SOCK TRAINING | 0.5 |

| Training Date | Training Description | Hours |
|---|---|---|
| 12/9/2004 | HDS TRAINING | 8 |
| 12/10/2004 | LARGE VEHICLE POST BLAST INVESTIGATIONS COURSE | 40 |
| 12/10/2004 | HDS TRAINING | 8 |
| 12/14/2004 | ROLL CALL TRAINING MBGO #12-03 | 0.5 |
| 1/5/2005 | MBGO #45 NYSPIN SECURITY | 0.5 |
| 1/6/2005 | HDS TRAINING | 8 |
| 1/18/2005 | HDS TRAINING | 8 |
| 1/24/2005 | EXPANDABLE BATON TRANSITIONAL | 3 |
| 1/29/2005 | MBGO #07-01 BIAS CRIME INVESTIGATIONS | 0.5 |
| 1/31/2005 | ASR FALL IN-SERVICE TRAINING | 0.25 |
| 2/3/2005 | TRANSITIONAL FIREARMS | 24 |
| 2/7/2005 | JANUARY 2005 UPDATE NYSSAI | 0.5 |
| 2/7/2005 | PATROLING IN THE NEW ERA OF TERRORISM | 0.5 |
| 3/2/2005 | ALL BUREAU TRAINING NEWS VOL.2 NO.1 | 1 |
| 3/9/2005 | GENERAL ORDER REVIEW - ARREST PROCEDURES | 0.5 |
| 3/12/2005 | ROLL CALL TRAINING MBGO #22-98 | 0.5 |
| 4/6/2005 | HDS TRAINING | 8 |
| 4/8/2005 | SPRING ENHANCED IN-SERVICE TRAINING | 8 |
| 4/11/2005 | IN-SERVICE FIREARMS TRAINING - PRISIM | 0.5 |
| 4/19/2005 | FIREARMS IN-SERVICE 2005 - PRISIM | 0.5 |
| 4/29/2005 | HDS TRAINING | 8 |
| 5/13/2005 | HDS TRAINING | 40 |
| 5/27/2005 | IN-SERVICE FIREARMS TRAINING - PRISIM | 0.5 |
| 6/3/2005 | FIREARMS | 0.5 |
| 6/22/2005 | HDS TRAINING | 40 |
| 6/28/2005 | WMD TRAINING SPRING 2012 | 8 |
| 6/29/2005 | CLAN LAB INVEST | 4 |
| 7/7/2005 | HAZARDOUS DEVICES SQUAD TRAINING | 8 |
| 7/28/2005 | HAZARDOUS DEVICES SQUAD TRAINING | 8 |
| 8/4/2005 | HAZARDOUS DEVICES SQUAD TRAINING | 8 |
| 8/17/2005 | UNDERCOVER OPERATIONS TRAINING SEMINAR | 16 |
| 8/25/2005 | HAZARDOUS DEVICES SQUAD TRAINING | 8 |
| 9/8/2005 | HAZARDOUS DEVICES SQUAD | 8 |
| 9/21/2005 | WMD FULL SCALE EXERCISE | 8 |
| 10/13/2005 | DT/EVOC | 8 |
| 10/27/2005 | BOMB SQUAD TRAINING | 16 |
| 11/14/2005 | BOMB SQUAD TRAINING | 16 |
| 12/8/2005 | BOMB SQUAD TRAINING | 8 |
| 12/16/2005 | BOMB SQUAD TRAINING | 8 |
| 12/23/2005 | 2005 FALL IN-SERVICE/ FIREARMS | 8 |
| 1/28/2006 | JANUARY BOMB SQUAD TRAINING | 16 |
| 2/2/2006 | BOMB SQUAD READINESS CONFRENCE | 16 |

| Training Date | Training Description | Hours |
|---|---|---|
| 2/25/2006 | FEBRUARY BOMB SQUAD TRAINING | 16 |
| 3/13/2006 | FLEXIBLE RESTRAINT TRAINING | 0.25 |
| 3/30/2006 | MARCH 2006 TRAINING TIMES | 0.5 |
| 4/30/2006 | APRIL 2006 TRAINING TIMES | 0.5 |
| 5/30/2006 | MAY 2006 TRAINING TIMES | 0.5 |
| 6/30/2006 | JUNE 2006 TRAINING TIMES | 0.5 |
| 7/30/2006 | JULY 2006 TRAINING TIMES | 0.5 |
| 8/30/2006 | AUGUST 2006 TRAINING TIMES | 0.5 |
| 9/6/2006 | 09/06/06 HDS TRAINING | 8 |
| 9/19/2006 | 09/19/06 HDS TRAINING | 8 |
| 9/22/2006 | HAZARDOUS DEVICES RECERT SCHOOL | 40 |
| 9/30/2006 | SEPTEMBER 2006 TRAINING TIMES | 0.5 |
| 10/3/2006 | PREV. AND RESP. TO SUICIDE AND TERR. INCID. | 8 |
| 10/3/2006 | RESP TO TERRORIST/SUICIDE BOMB. | 8 |
| 10/30/2006 | 10/30/06 HDS TRAINING | 8 |
| 10/30/2006 | OCTOBER 2006 TRAINING TIMES | 0.5 |
| 11/6/2006 | BIVONA CHILD ADVOCACY TRAINING VIDEO | 0.5 |
| 11/8/2006 | 11/08/06 HDS TRAINING | 8 |
| 11/16/2006 | METHAMPHETAMINE AND CLAN LAB AWARE | 8 |
| 11/17/2006 | 11/17/06 HDS TRAINING | 8 |
| 11/24/2006 | ANTI DEFAMATION GUIDE ROLL CALL TRAINING | 0.5 |
| 11/30/2006 | NOVEMBER 2006 TRAINING TIMES | 0.5 |
| 12/1/2006 | FALL 2006 FIREARMS/ O.C./ BATON | 4 |
| 12/1/2006 | FALL 2006 PEPPER BALL LAUNCHER TRAINING | 4 |
| 12/8/2006 | FALL 2006 IN-SERVICE EVOC/CROWD CONTROL | 8 |
| 12/14/2006 | BOMB SQUAD RESPONSE TO CIVIL AVIATION | 16 |
| 12/14/2006 | RESP TO CIVIL AVIATION INCIDENTS | 16 |
| 12/22/2006 | HAZMAT/ BLOOD BORNE PATHOGENS 2006 TRAINING | 0.5 |
| 12/30/2006 | DECEMBER 2006 TRAINING TIMES | 0.5 |
| 1/15/2007 | JANUARY 15 HDS TRAINING | 8 |
| 1/19/2007 | JANUARY 19 HDS TRAINING | 8 |
| 1/31/2007 | TERRORIST SCREENING CENTER TRNG. | 0.5 |
| 2/2/2007 | BOMB TRAINING | 8 |
| 2/2/2007 | FEBRUARY 02 HDS TRAINING | 8 |
| 2/19/2007 | JANUARY 2007 TRAINING TIMES | 0.5 |
| 2/19/2007 | ELDER ABUSE VIDEO TRAINING | 0.5 |
| 2/21/2007 | FEBRUARY 21 HDS TRAINING | 8 |
| 2/21/2007 | BOMB TRAINING | 8 |
| 3/1/2007 | NYS BOMB SQUAD STAKEHOLDERS MEETING | 24 |
| 3/5/2007 | FEBRUARY 2007 TRAINING TIMES | 0.5 |
| 3/5/2007 | NYSPIN RECERTIFICATION CD | 0.5 |
| 3/9/2007 | PANDEMIC FLU/PEER SUPPORT INSERVICE TRNG. | 8 |

| Training Date | Training Description | Hours |
|---|---|---|
| 3/16/2007 | MARCH 16 HDS TRAINING | 8 |
| 3/16/2007 | MAY BOMB TRAINING | 8 |
| 3/22/2007 | ADVANCED EXPLOSIVES DISPOSAL TECHNIQUEST | 80 |
| 3/22/2007 | ADVANCED EXPLOSIVES DISP. | 80 |
| 3/30/2007 | MARCH BOMB TRAINING | 8 |
| 3/30/2007 | MARCH 30 HDS TRAINING | 8 |
| 4/2/2007 | ILEADS TRAINING | 2.5 |
| 4/13/2007 | 2007 SIMUNITION IN-SERVICE TRAINING | 8 |
| 4/20/2007 | APRIL 20 HDS TRAINING | 8 |
| 4/27/2007 | RADIATION AND ISOTOPE ID | 24 |
| 4/27/2007 | APRIL 27 HDS TRAINING | 8 |
| 4/30/2007 | SUPERVISOR SCHOOL | 240 |
| 4/30/2007 | APRIL 2007 TRAINING TIMES | 0.5 |
| 5/11/2007 | POLICE SUPERVISION SCHOOL | 120 |
| 5/11/2007 | MAY 11 HDS TRAINING | 8 |
| 5/29/2007 | MAY 2007 TRAINING TIMES | 0.5 |
| 5/30/2007 | MAY BOMB TRAINING | 8 |
| 5/30/2007 | MAY 30 HDS TRAINING | 8 |
| 6/13/2007 | JUNE BOMB TRAINING | 8 |
| 6/13/2007 | JUNE 13 HDS TRAINING | 8 |
| 6/17/2007 | SERGEANTS FIELD TRAINING | 200 |
| 6/20/2007 | JUNE 2007 TRAINING TIMES | 0.5 |
| 6/27/2007 | 2007 SUPERVISORS IN SERVICE | 8 |
| 6/29/2007 | JUNE 29 HDS TRAINING | 8 |
| 6/29/2007 | JUNE BOMB TRAINING | 8 |
| 7/2/2007 | FIREWORKS AND THE FIRST RESPONDER VIDEO TRNG. | 0.5 |
| 7/3/2007 | JULY BOMB TRAINING | 8 |
| 7/25/2007 | JULY BOMB TRAINING | 8 |
| 8/3/2007 | JULY AND AUGUST 2007 TRAINING TIMES | 0.5 |
| 8/7/2007 | AUGUST BOMB TRAINING | 8 |
| 8/10/2007 | AUGUST BOMB TRAINING | 8 |
| 9/10/2007 | SEPTEMBER BOMB TRAINING | 8 |
| 9/14/2007 | SEPTEMBER BOMB TRAINING | 8 |
| 9/14/2007 | OCTOBER BOMB TRAINING | 8 |
| 9/26/2007 | SEPTEMBER 2007 TRAINING TIMES | 0.5 |
| 10/24/2007 | OCTOBER BOMB TRAINING | 8 |
| 10/26/2007 | BLOOD BORNE PATHOGENS AND HAZMAT 2007 | 0.5 |
| 10/28/2007 | BOMB TRAINING | 8 |
| 10/31/2007 | SUPERVISORS ILEADS TRAINING | 3 |
| 11/12/2007 | NOVEMBER BOMB TRAINING | 8 |
| 11/20/2007 | OCTOBER 2007 TRAINING TIMES | 0.5 |
| 11/21/2007 | NOVEMBER 2007 TRAINING TIMES | 0.5 |

| Training Date | Training Description | Hours |
|---|---|---|
| 11/30/2007 | NOVEMBER BOMB TRAINING | 8 |
| 12/6/2007 | DECEMBER BOMB TRAINING | 8 |
| 12/13/2007 | M.O.L.S.T. VIDEO TRAINING | 0.5 |
| 12/13/2007 | ACTIVE SHOOTER 3 DAY SCHOOL | 24 |
| 12/14/2007 | DECEMBER BOMB TRAINING | 8 |
| 12/19/2007 | DECEMBER 2007 TRAINING TIMES | 0.5 |
| 12/20/2007 | FALL 2007 IN-SERVICE TRAINING | 8 |
| 12/21/2007 | SAFE SEARCH VIDEO TRAINING | 0.5 |
| 1/10/2008 | JANUARY BOMB TRNG. | 8 |
| 1/21/2008 | JANUARY BOMB TRNG. | 8 |
| 1/31/2008 | JANUARY 2008 ROLL CALL TRAINING PBGO 14-P-06 | 0.5 |
| 1/31/2008 | JANUARY 2008 TRAINING TIMES | 0.5 |
| 2/1/2008 | FEBRUARY BOMB TRNG. | 8 |
| 2/28/2008 | FEBRUARY BOMB TRNG. | 8 |
| 2/28/2008 | FEBRUARY 2008 TRAINING TIMES | 0.5 |
| 2/28/2008 | FEBRUARY 2008 ROLL CALL TRAINING PBGO 43-P-07 | 0.5 |
| 3/17/2008 | MARCH BOMB TRNG. | 8 |
| 3/22/2008 | PREVENTION AND RESPONSE TO SUICIDE BOMBING | 40 |
| 3/27/2008 | MARCH BOMB TRNG. | 8 |
| 3/28/2008 | MARCH 2008 TRAINING TIMES | 0.5 |
| 3/31/2008 | MARCH 2008 ROLL CALL GENERAL ORDER TRAINING | 0.5 |
| 4/2/2008 | APRIL 2008 ROLL CALL GENERAL ORDER TRAINING | 0.5 |
| 4/7/2008 | APRIL BOMB TRNG. | 8 |
| 4/28/2008 | APRIL 2008 ALL BUREAU TRAINING TIMES | 0.5 |
| 4/29/2008 | APRIL BOMB TRNG. | 8 |
| 5/13/2008 | MAY BOMB TRNG. | 8 |
| 5/30/2008 | MAY BOMB TRNG. | 8 |
| 5/31/2008 | MAY 2008 ROLL CALL TRAINING ROADBLOCKS/ TSTOPS | 0.5 |
| 6/12/2008 | JUNE BOMB TRAINING | 8 |
| 6/17/2008 | SPRING 2008 IN-SERVICE FIREARMS..PRISIM | 0.5 |
| 6/18/2008 | MAY/JUNE ALL BUREAU TRAINING TIMES | 0.5 |
| 6/30/2008 | JUNE BOMB TRAINING | 8 |
| 6/30/2008 | JUNE ROLL CALL 06-P-07 | 0.5 |
| 7/22/2008 | JULY BOMB TRAINING | 8 |
| 7/30/2008 | JULY ROLL CALL | 0.5 |
| 7/30/2008 | TRAINING TIMES | 0.5 |
| 8/21/2008 | AUGUST BOMB TRAINING | 8 |
| 8/28/2008 | AUGUST BOMB TRAINING | 8 |
| 8/30/2008 | ROLL CALL S1-P-07 TEMP DETENTION | 0.05 |
| 8/30/2008 | GINNA POWER PLANT PROTOCOLS | 0.05 |
| 9/25/2008 | SEPTEMBER BOMB TRAINING | 8 |
| 9/26/2008 | SEPTEMBER BOMB TRAINING | 8 |

| Training Date | Training Description | Hours |
|---|---|---|
| 9/30/2008 | 09/08 ROLL CALL PRISONER CUSTODY MB-22-07 | 0.5 |
| 9/30/2008 | ROLL CALL MB-22-07 PRISONER CUSTODY | 0.05 |
| 9/30/2008 | TRAINING TIMES | 0.05 |
| 10/10/2008 | OCTOBER BOMB TRAINING | 8 |
| 10/16/2008 | OCTOBER 2008 TRAINING TIMES | 0.5 |
| 10/16/2008 | 10/08 ROLL CALL COMPUTER RULES MB-55-04 | 0.5 |
| 10/17/2008 | OCTOBER BOMB TRAINING | 8 |
| 11/14/2008 | NOVEMBER BOMB TRAINING | 8 |
| 11/21/2008 | NOVEMBER BOMB TRAINING | 8 |
| 11/30/2008 | NOV. 2008 TRAINING TIMES | 0.5 |
| 11/30/2008 | 11/08 G.O. ROLL CALL TRNG. MBGO 69-P-03 | 0.5 |
| 12/10/2008 | E-JUSTICE TRAINING SEMINAR | 8 |
| 12/12/2008 | DECEMBER BOMB TRAINING | 8 |
| 12/19/2008 | DECEMBER BOMB TRAINING | 8 |
| 12/30/2008 | 12/08 ROLL CALL TRNG. MB 16-P-07 | 0.5 |
| 12/31/2008 | FALL 2008 IN-SERVICE FIREARMS AND D.T. | 8 |
| 7/28/2009 | JULY BOMB TRAINING | 8 |

*Grand Total* **4027**

# EXHIBIT E



PLAINTIFF'S EXHIBIT

CASE NO. 07-6123

EXHIBIT NO. 4

# COUNTY OF MONROE
# OFFICE OF THE SHERIFF
## ROCHESTER, NEW YORK

| GENERAL ORDER MULTI-BUREAU | DATE OF ISSUE December 23, 2003 | EFFECTIVE DATE January 01, 2004 | No. 15-04 |
|---|---|---|---|
| SUBJECT: GENERAL ORDER Firearms/Deadly Physical Force | | DISTRIBUTION All Personnel | AMENDS |
| REFERENCE: CALEA Standards: 1.3.2, 1.3.3, 1.3.5, 1.3.6, 1.3.8, 1.3.9, 1.3.11, 1.3.12 NYSLEAP Standards 14.5, 20.4, 20.5, 20.47, 21.1, 21.2, 32.3, 40.2 NYS Penal Law Article 35 | | RESCINDS MBGO 15-98 | |

**Purpose:** To familiarize employees with policies and procedures regarding the use of firearms.

**Policy:** Only those members who have satisfactorily completed an Office of Sheriff approved firearms program will be authorized to carry an agency weapon. Deadly physical force shall only be used when necessary to protect the member or a third person from the imminent use of deadly physical force by another.

**Definitions:** **Deadly Physical Force:** Physical force which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury.

**Serious Physical Injury:** Physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ.

I. **Deadly Physical Force**

   A. Members of the Monroe County Sheriff's Office may use deadly physical force when that force is necessary to defend the deputy or another from what the deputy reasonably believes to be the use or imminent use of deadly physical force.

   B. Members will be held responsible for maintaining a working knowledge of New York State Penal Law Article 35, Defense of Justification.

   C. The use of a firearm by a member in any other situation involving human life is strictly prohibited.

II. **Displaying a Weapon**

   A. New York State Penal Law Article 35 falls short of enumerating when a person is justified in displaying a weapon as precautionary gesture. The discretion remains with and must be a judgment made by individual members based upon their perception of imminent possible danger to themselves or another. Imminent possible danger is defined as potential exposure to death or serious physical injury.

B.     Each member then is held responsible for justifying their actions when a particular situation warrants displaying firearms (e.g., checking a building for a possible burglar, stopping a known or potential stolen vehicle, apprehending a known or potential felon, etc.).

## III.   Restrictions

A.     Warning Shots

1.     Members of this Office will not fire warning shots.

2.     Article 35 only allows for the firing of a weapon when deadly physical force may be the outcome and no other implication shall be construed.

3.     Members may be held criminally and civilly liable for the death or injury of a person caused either intentionally or accidentally.

B.     Any unauthorized or careless handling of a firearm, on or off duty, by any member of this Office is prohibited and may be cause for disciplinary action.

## IV.   On/Off Duty Procedure Upon Discharge

A.     When a member of this Office discharges an agency firearm accidentally or discharges any weapon in the performance of their official duties, they shall adhere to the following:

1.     Notify the immediate supervisor of the circumstances surrounding the weapon discharge.

2.     Complete and submit a Firearms Discharge Report (PJCB #33) to include all pertinent details relating to the accidental or intentional discharge of the weapon. The report is to be completed on all firearms discharges, including the destruction of animals. In order to ensure an objective and timely review and critique of such documented incidents, the report shall be submitted to the Major of Operations, through the chain of command.

3.     In the event the member who discharged the weapon is unable to complete the written report, their immediate supervisor shall be responsible for completing the report as soon as possible.

4.     Complete and submit a Subject Management Resistance Report (MB #119) when applicable (reference MBG0 #33).

B.     Members may use firearms against animals when they are;

1.     Attacking or presenting an imminent danger to any person. In these instances, the supervisor's responsibility will be as stated below in **Section IV. C.**

2.     Injured or sick.

C.     Supervisory Responsibilities

1.     Whenever a member of this Office has accidentally or intentionally discharged a firearm, it will be the responsibility of the supervisor to notify the on-duty command officer.

2.     The supervisor will respond to the location of the weapon discharge and protect the scene pending an investigation.

D.    Command Responsibilities

1.    Appropriate notifies must be made in accordance with the current notification policy.

2.    Internal Affairs is to be notified immediately.

3.    Initiate a preliminary investigation.

4.    In the event of a discharge not involving the destruction of an animal, an agency armorer will be notified and respond to the scene. After inspecting the weapon, the armorer will submit a written report to Internal Affairs regarding the operating condition of said weapon.

V.    **Procedure Upon Discharge Involving Injury or Death**

A.    Member Responsibilities

1.    Determine the physical condition of any injured person, render first aid and request emergency medical assistance.

2.    Notify the Emergency Communications Department (ECD) and immediate supervisor of the incident and location.

3.    Remain at the scene, unless injured or the pursuit of additional suspects is necessary, and relate a brief account of the incident to a supervisor upon their arrival.

B.    Supervisory Responsibilities

1.    Notify the on-duty command officer immediately.

2.    Protect the scene, sealing off the immediate area and remove non-essential personnel.

3.    Admit only authorized personnel to the scene.

4.    Maintain security of evidence.

5.    Immediately request the services of a Technical Services Unit technician.

6.    As soon as practicable, take custody of the member's weapon and leather gear. The supervisor will maintain initial security of this evidence and subsequently relinquish control to the responding technician from TSU.

7.    Identify all witnesses, including police and civilian personnel, ensuring that witnesses remain separated.

8.    Brief arriving command officers requiring administrative information in order to reduce the number of times the involved member must repeat the details of the incident.

C.    Command Responsibilities

1.    The responding command officer shall assume control of the scene until relieved by higher authority or a ranking Criminal Investigation Section (CIS) command officer.

2.    Make appropriate notifies in accordance with the notification policy.

3. Designate a central staging area for news media.

   Note: Only the Sheriff or authorized designee will release details of the incident to the news media.

E. Responsibilities of CIS

1. CIS commanding officer has overall responsibility of the scene and subsequent investigation and will brief Internal Affairs personnel upon their arrival.

2. Identify and interview all witnesses and take statements.

3. Prioritize witnesses in order that key witnesses can be interviewed by Internal Affairs personnel before their release.

4. Advise involved member of constitutional rights, conduct interviews and prepare statements as appropriate.

5. Coordinate the identification and collection of evidence.

6. Arrange for the communication tape(s) of the incident to be held by the ECD.

7. Prepare an investigative package for presentation by the District Attorney's Office to the grand jury.

F. Responsibilities of Internal Affairs

1. Upon arrival, Internal Affairs personnel will report to the CIS command officer for briefing.

2. Coordinate with TSU technicians processing the scene, in order to complete any additional services required by Internal Affairs.

3. Coordinate with the CIS commanding officer for the taking of statements from agency personnel and witnesses.

4. Determine if the firing of the weapon was in compliance with rules, regulations and polices of this Office. The findings of the investigation will be summarized in a written report and submitted to the Sheriff.

5. The Internal Affairs investigation shall be conducted concurrent with, but separate from the CIS investigation.

G. Administrative Assignment

1. When a member fires a weapon resulting in injury or death of another person, he/she shall be relieved of assigned duties with pay until it is deemed appropriate to return the individual to his/her assignment.

   Note: This policy does not imply that the member acted improperly.

2. The nature of the administrative assignment will be determined by the Sheriff or authorized designee.

3. The member shall be available at all times for official interviews and statements regarding the case and shall be subject to recall to duty at any time.

4.  Members shall not discuss the case with anyone, except members of the District Attorney's Office, their personal attorney, a union representative or authorized agency personnel as designated by the Sheriff.

5.  Upon completion of the investigation, the Sheriff will determine what course of action shall be taken.

VI.  **Shotgun Procedures**

A.  All shotguns will be numbered for identification.

B.  Shotguns will remain loaded with four rounds of "00" Tactical Buckshot in the magazine tube. The Davis Speed Feed Stock will contain four rounds of Tactical Slugs.

C.  The action will remain open with the safety mechanism engaged.

D.  It will be the responsibility of the unit commander to ensure that shotguns are cleaned twice a month. A log will be maintained indicating the date(s) cleaned and overall condition.

E.  It will be the responsibility of each supervisor to maintain accountability of all shotguns assigned to the unit during the tour of duty.

F.  Shotguns will be handled in a safe and careful manner, as with any other weapon.

G.  If the shotgun is discharged, standard firearm discharge procedures will be followed.

H.  Upon discharge, the shotgun will be cleaned before being returned to service.

VII.  **Security of Issued Firearms**

Any member issued an agency firearm is charged with the responsibility of ensuring proper firearms safety in the work place and home at all times. They shall have the specific responsibility to ensure that their firearms are secured and not accessible to children or any unauthorized person.

A.  All members issued an agency firearm will receive a cable gun lock. These locks will be keyed alike, with replacements available from the Quartermaster in the event of breakage.

B.  Members are strongly encouraged to use these locks when storing agency firearms. Members are also strongly encouraged to ensure the safety and security of personally owned weapons. Additional gun cable locks may be purchased from the Quartermaster at a reduced cost, pursuant to current procedures. These locks will be keyed differently.

C.  Cable gun locks are only to be applied to unloaded weapons in accordance with Multi-Bureau Bulletin #09-01 and training. The locked weapon should never be stored with the key or ammunition in close proximity. A firearm should never be stored where children or unauthorized persons may attempt to handle it. Failure to adhere to these safety warnings can result in an unintentional discharge. Members may be held accountable should a discharge occur.

D.  Firearms stored in one of the agency facilities in a locked cabinet or locker do not require the use of a departmental cable gun lock.

E.  The storage of firearms in vehicles is strongly discouraged, however, if this is the only option available, the firearms will be stored in the trunk, never in the glove box or passenger compartment. They should be unloaded and secured to a part of the vehicle by a lock or set of handcuffs.

VIII. **Assignment of Issued Firearms**

A.    Members authorized to carry agency firearms in conjunction with their assigned duties shall not adjust, repair or alter any such firearm at any time.

B.    Only agency designated certified armorers are authorized to adjust, repair or alter agency issued firearms.

C.    Only members who have satisfactorily completed an Office approved firearm program, conforming to Municipal Police Training Council (MPTC) standards and requirements, will be allowed to posses an agency weapon. To maintain firearms certified status, members must satisfactorily complete all firearms requalification courses on an annual basis.

D.    Members who do not satisfactorily complete firearms requalification will be subject to remedies as enumerated in the current collective bargaining agreements.

E.    Only agency approved and issued weapons and service ammunition may be carried while on-duty.

F.    Members assigned to the Greater Rochester Narcotics Enforcement Team and the Gun Task force (GRANET) will be authorized to carry a department issued Smith & Wesson .38 cal model 442 revolver and ammunition under the following circumstances:

      Members will adhere to use of firearms and deadly physical force as delineated in this order.

2.    On completion of the department approved revolver firearms training program.

3.    The .38 caliber revolver may be carried when the member is actively involved in an undercover situation, when concealment is necessary in furtherance of his/her duty and to provide increased officer safety. During duty hours other than a "buy situation" members will carry their authorized S & W 9mm or H & K .45 caliber issued firearm.

      NOTE: The GRANET supervisor may permit the manner in which the .38 is used other than the above stated restrictions.

4.    Only one firearm will be carried, the alternate firearm will be secured with a gun lock in a department issued lock box at the respective unit office when not in use.

IX. **Firearms Registration**

Employees must be in complete compliance with existing Penal Law requirements regarding the registration of personal handguns.

A.    The Sheriff discourages the carrying of privately owned handguns by non-police bureau employees while off duty. Employees are advised that only sworn individuals, who are assigned to duty in the police bureau, are authorized to carry an agency owned firearm and **only department issued** service ammunition while off duty. Additionally, only certified police bureau deputies, due to their training and assignment, are authorized to identify themselves as police officers, while off duty, for the purpose of invoking or attempting to invoke the police powers inherent in the title of deputy sheriff. Non-police bureau members and employees are reminded that engaging in unsanctioned actions of this description, which do not fall within the scope of duties normally associated with their employment, may well expose such members and employees to personal liability litigation and the loss of legal defense and indemnification normally provided by the County of Monroe.

B.    When an employee chooses to posses a personal weapon, they must obtain a New York State pistol permit. No personal weapons will be carried on a badge of the Monroe County Sheriff's Office. Employees who are not in compliance must surrender all personal firearms to the Sheriff's property clerk until they are in compliance with this order.

C.    Employees will ensure that any personally owned weapons and ammunition are of such quality and condition so as to not be of any danger to the user.

K.    **Responsibility of the Standards and Compliance Unit**

The Standards and Compliance Unit will conduct an annual review and analysis of all Firearms Discharge Reports (PJCB #33). The review process will check for completeness, accuracy and timeliness of filing of these reports. The findings are to be summarized in writing and submitted to the Undersheriff.

Note:    The intent of the review also is to reveal any patterns or trends that may need to be addressed by training or change in policy with respect to the discharge of a weapon.

By Order of the Sheriff,

Patrick M. O'Flynn

**EXHIBIT F**



PLAINTIFF'S
EXHIBIT

CASE
NO. 07-6123

EXHIBIT
NO. 5

1            JOSEPH HOPPER - DX BY MR. FULLER

10:07:57   2   JOSEPH HOPPER,

10:07:57   3            called herein as a witness, first being sworn,

10:07:57   4            testified as follows:

10:07:58   5            DIRECT EXAMINATION BY MR. FULLER

10:07:58   6            Q.   Good morning, sir.

10:08:01   7            A.   Good morning.

10:08:02   8            Q.   Would you state your name for the Court,

10:08:04   9   please?

10:08:04   10           A.   Joseph Hopper, H-O-P-P-E-R.

10:08:07   11           Q.   And are you currently married?

10:08:09   12           A.   Yes, I am.

10:08:10   13           Q.   Do you have any children?

10:08:12   14           A.   Yes, I do.  I have two children.

10:08:14   15           Q.   And have you now or have you ever owned a

10:08:17   16   dog in the past?

10:08:17   17           A.   Yes.  I have owned several dogs.

10:08:19   18           Q.   Okay.  And could you tell us where you're

10:08:23   19   currently employed?

10:08:24   20           A.   I'm currently employed with the Town of

10:08:27   21   Greece Police Department.

10:08:27   22           Q.   And in what capacity?

10:08:28   23           A.   As a police officer.

10:08:29   24           Q.   How long have you been a police officer

10:08:31   25   with the Town of Greece?

| | | |
|---|---|---|
| | 1 | JOSEPH HOPPER - DX BY MR. FULLER |
| 10:08:33 | 2 | A.   I'm been a police officer with the Town of |
| 10:08:35 | 3 | Greece for approximately nine years. |
| 10:08:37 | 4 | Q.   Were you a police officer prior to that? |
| 10:08:38 | 5 | A.   Yes, I was. |
| 10:08:39 | 6 | Q.   Where was that? |
| 10:08:40 | 7 | A.   The Village of Avon Police Department. |
| 10:08:42 | 8 | Q.   And in what capacity? |
| 10:08:43 | 9 | A.   I was a police officer and was promoted to |
| 10:08:47 | 10 | sergeant before I left the Avon Police Department. |
| 10:08:51 | 11 | Q.   Could you tell us some of your educational |
| 10:08:53 | 12 | background? |
| 10:08:54 | 13 | A.   High school diploma, associate's degree in |
| 10:08:57 | 14 | criminal justice. |
| 10:08:58 | 15 | Q.   And thereafter, did you attend the police |
| 10:09:01 | 16 | academy? |
| 10:09:02 | 17 | A.   Yes, I did. |
| 10:09:02 | 18 | Q.   Did you have training subsequent to the |
| 10:09:05 | 19 | academy? |
| 10:09:06 | 20 | A.   Yes. |
| 10:09:06 | 21 | Q.   And could you briefly tell us what some of |
| 10:09:10 | 22 | that training was? |
| 10:09:10 | 23 | A.   Some of the Key Point training that I have |
| 10:09:14 | 24 | had.   I went to an 80-hour school put on by the |
| 10:09:20 | 25 | Department of -- Drug Enforcement Agency, which was a |

| | 1 | JOSEPH HOPPER - DX BY MR. FULLER |
|---|---|---|
| 10:09:25 | 2 | course that highlighted on narcotics investigations, |
| 10:09:30 | 3 | working surveillances, search warrants, that type of |
| 10:09:36 | 4 | training. |
| 10:09:36 | 5 | I am also a firearms instructor through |
| 10:09:40 | 6 | New York State. I'm a field training officer. I have |
| 10:09:47 | 7 | had extensive training in firearms, including training |
| 10:09:51 | 8 | in SWAT's level 1, 2 and 3. |
| 10:09:53 | 9 | Q. Can you tell us what SWAT is? |
| 10:09:56 | 10 | A. It's basically a tactical training in |
| 10:09:59 | 11 | tactical situations. |
| 10:10:01 | 12 | Q. Okay. And can you tell us what your |
| 10:10:04 | 13 | current assignment is with Greece? |
| 10:10:05 | 14 | A. I'm currently assigned to the road patrol |
| 10:10:08 | 15 | with the Greece Police Department. |
| 10:10:10 | 16 | Q. Officer, I'm going to direct your |
| 10:10:12 | 17 | attention to October 11, 2006, and ask you if you were |
| 10:10:14 | 18 | a member of the Greater Rochester Area Narcotics |
| 10:10:17 | 19 | Enforcement Team? |
| 10:10:17 | 20 | A. Yes, I was. |
| 10:10:18 | 21 | Q. Is that also known as GRANET? |
| 10:10:21 | 22 | A. Yes. |
| 10:10:21 | 23 | Q. Can you tell us what GRANET is? |
| 10:10:23 | 24 | A. GRANET is an investigative unit that is |
| 10:10:28 | 25 | made up of several different agencies from Monroe |

| | |
|---|---|
| 1 | JOSEPH HOPPER - DX BY MR. FULLER |
| 10:10:32  2 | County.  Our primary objective is the enforcement of |
| 10:10:37  3 | narcotics distribution. |
| 10:10:39  4 |         Q.    Okay.  How did you become a member of |
| 10:10:41  5 | GRANET? |
| 10:10:41  6 |         A.    I was selected through my past training in |
| 10:10:46  7 | narcotics enforcement.  In my prior agency I worked as |
| 10:10:50  8 | an undercover officer in an undercover capacity.  And |
| 10:10:54  9 | my proactive work on the road was one of the reasons |
| 10:10:58  10 | why I was selected for this team. |
| 10:10:59  11 |         Q.    Okay.  Is GRANET a permanent position |
| 10:11:02  12 | assignment or temporary? |
| 10:11:03  13 |         A.    It's a temporary assignment. |
| 10:11:05  14 |         Q.    Okay.  And what were some of your duties |
| 10:11:07  15 | and responsibilities as a GRANET member? |
| 10:11:09  16 |         A.    Primarily it was the investigation of mid |
| 10:11:14  17 | to upper level narcotics distribution dealers.  It |
| 10:11:19  18 | was -- once we investigated those, we would work an |
| 10:11:22  19 | investigation and ultimately execute a search warrant. |
| 10:11:25  20 |         Q.    Okay.  How many search warrants did you |
| 10:11:28  21 | serve prior to October 11, 2006, approximately? |
| 10:11:31  22 |         A.    Approximately 35. |
| 10:11:33  23 |         Q.    Do you recall how many dogs were on the |
| 10:11:36  24 | premises of those places that you searched? |
| 10:11:40  25 |         A.    Out of those 35, I would say at least 10 |



**ALLIANCE**
COURT REPORTING, INC.
*Video Conferencing and Videography Center*
585.546.4920          www.alliancecourtreporting.net          800.724.0836

| | |
|---|---|
| 1 | JOSEPH HOPPER - DX BY MR. FULLER |
| 10:11:45  2 | of those had dogs present. |
| 10:11:47  3 | Q.   Okay.  How many search warrants have you |
| 10:11:50  4 | conducted total?  That's before and after October 11, |
| 10:11:56  5 | 2006. |
| 10:11:56  6 | A.   More than 100. |
| 10:11:57  7 | Q.   Okay.  And out of those 100, how many |
| 10:12:01  8 | occasions do you recall a dog having to be shot? |
| 10:12:04  9 | A.   Out of those hundred that I was a |
| 10:12:06  10 | participant in, one. |
| 10:12:08  11 | Q.   All right.  Directing your attention, |
| 10:12:11  12 | again, to October 11, 2006.  Were you a member of the |
| 10:12:14  13 | Greater Rochester Area Narcotics Enforcement Team on |
| 10:12:17  14 | that date? |
| 10:12:18  15 | A.   Yes. |
| 10:12:18  16 | Q.   Did there come a time when you were given |
| 10:12:20  17 | the responsibility of executing a search warrant at |
| 10:12:23  18 | the premises of 284 Ridgedale Circle? |
| 10:12:23  19 | A.   Yes. |
| 10:12:27  20 | Q.   Is that in the Town of Greece, County of |
| 10:12:29  21 | Monroe? |
| 10:12:30  22 | A.   Yes, it is. |
| 10:12:30  23 | Q.   Were you part of the GRANET entry team? |
| 10:12:33  24 | A.   Yes, I was. |
| 10:12:34  25 | Q.   Do you recall your position? |



**ALLIANCE**
COURT REPORTING, INC.
*Video Conferencing and Videography Center*
585.546.4920      www.alliancecourtreporting.net      800.724.0836

1    JOSEPH HOPPER - DX BY MR. FULLER

10:12:36  2        A.   I was -- I guess we would call it a stack.

10:12:38  3    I was number two in the stack.

10:12:40  4        Q.   All right.  And do you recall -- well,

10:12:42  5    first of all, was there somebody there by the name of

10:12:45  6    Deputy James Carroll?

10:12:46  7        A.   Yes, there was.

10:12:47  8        Q.   Do you recall his position in the stack?

10:12:49  9        A.   He was position number one.

10:12:51  10       Q.   Now, at 284 Ridgedale Circle, was the door

10:12:56  11   breached?

10:12:56  12       A.   Yes, it was.

10:12:57  13       Q.   By whom?

10:12:58  14       A.   By Officer DeSain.  He was a GRANET

10:13:01  15   member, but was employed by the Brighton Police

10:13:04  16   Department.

10:13:04  17       Q.   Now, after the door was breached, who was

10:13:07  18   the first one to actually fully enter the premises?

10:13:10  19       A.   Deputy Carroll.

10:13:12  20       Q.   Who entered after Deputy Carroll?

10:13:15  21       A.   Myself.

10:13:15  22       Q.   Now, upon entry was anything said, to the

10:13:18  23   best of your memory?

10:13:19  24       A.   Upon entry, once the door is breached,

10:13:23  25   just prior to the door being breached, we start



**ALLIANCE**
COURT REPORTING, INC.
*Video Conferencing and Videography Center*
585.546.4920 · www.alliancecourtreporting.net · 800.724.0836

| | |
|---|---|
| 1 | JOSEPH HOPPER - DX BY MR. FULLER |
| 10:13:25  2 | announcing ourselves, "Police, search warrant, police, |
| 10:13:30  3 | search warrant," very loudly. |
| 10:13:31  4 | Q.  Who did that? |
| 10:13:31  5 | A.  I know I did.  And I know that Officer -- |
| 10:13:36  6 | or, I'm sorry, Deputy Carroll did as well. |
| 10:13:38  7 | Q.  Okay. |
| 10:13:39  8 | A.  Mainly it's all members of the team, but I |
| 10:13:42  9 | can speak for myself and Deputy Carroll. |
| 10:13:44  10 | Q.  All right.  Now, while you and Deputy |
| 10:13:46  11 | Carroll were yelling words to the effect of "Police, |
| 10:13:48  12 | search warrant," did you observe anything inside the |
| 10:13:50  13 | house? |
| 10:13:51  14 | A.  Once -- yes.  Once we breached the door -- |
| 10:13:54  15 | Deputy Carroll entered; I entered second -- a dog |
| 10:13:57  16 | appeared directly in front of Deputy Carroll in a |
| 10:14:01  17 | hallway. |
| 10:14:02  18 | Q.  Can you describe the dog, to the best of |
| 10:14:05  19 | your memory? |
| 10:14:05  20 | A.  It was a very large dark-colored dog. |
| 10:14:08  21 | Q.  Okay.  And how was the dog acting? |
| 10:14:11  22 | A.  Aggressive.  Barking, showing its teeth, |
| 10:14:14  23 | just in an aggressive manner. |
| 10:14:16  24 | Q.  What happened at that point? |
| 10:14:17  25 | A.  At that point, from the time we saw the |



**ALLIANCE**
COURT REPORTING, INC.
*Video Conferencing and Videography Center*
585.546.4920    www.alliancecourtreporting.net    800.724.0836

|  | 1 | JOSEPH HOPPER - DX BY MR. FULLER |
|---|---|---|
| 10:14:21 | 2 | dog, the dog kind of entered into the hallway straight |
| 10:14:25 | 3 | in front of us. Deputy Carroll started yelling, "Get |
| 10:14:30 | 4 | your dog, get your dog." |
| 10:14:33 | 5 | A female then -- the dog entered the |
| 10:14:38 | 6 | hallway. Then a female almost directly after that |
| 10:14:42 | 7 | entered the hallway, right behind the dog way -- or |
| 10:14:45 | 8 | right behind the door -- the dog. |
| 10:14:46 | 9 | The dog then began kind of coming at us in |
| 10:14:53 | 10 | an aggressive manner. Deputy Carroll began yelling to |
| 10:14:56 | 11 | the female, "Get your dog, get your dog." The dog did |
| 10:15:01 | 12 | nothing but continue to charge at the front door, |
| 10:15:05 | 13 | Deputy Carroll. |
| 10:15:06 | 14 | Deputy Carroll then kind of sidestepped. |
| 10:15:10 | 15 | And he said, "Step out of the way, step out of the |
| 10:15:13 | 16 | way," yelling to the female -- or yelling down the |
| 10:15:16 | 17 | hallway to step out of the way. Again, Deputy Carroll |
| 10:15:19 | 18 | sidestepped just prior to the dog, you know, getting |
| 10:15:23 | 19 | to Deputy Carroll's location. He fired one round into |
| 10:15:27 | 20 | the dog with a shotgun. |
| 10:15:29 | 21 | Q. Now, where was this person, this civilian, |
| 10:15:35 | 22 | in relation to the dog when you first saw her? |
| 10:15:38 | 23 | A. She was directly behind the dog. It was a |
| 10:15:42 | 24 | hallway and the dog was first and then the female. |
| 10:15:47 | 25 | Q. Okay. Was anyone else in the hallway? |



**ALLIANCE**
COURT REPORTING, INC.
*Video Conferencing and Videography Center*
585.546.4920          www.alliancecourtreporting.net          800.724.0836

| | | |
|---|---|---|
| | 1 | JOSEPH HOPPER - CX BY MS. AGOLA |
| 10:15:49 | 2 | A. No. |
| 10:15:49 | 3 | Q. Now, did you testify you saw Sherry |
| 10:15:54 | 4 | Carroll -- did you know her by name on October 11th, |
| 10:15:57 | 5 | 2006? |
| 10:15:57 | 6 | A. Yes, I did. |
| 10:15:57 | 7 | Q. And had you ever seen her before that |
| 10:15:59 | 8 | date? |
| 10:16:00 | 9 | A. Yes, I had. |
| 10:16:00 | 10 | Q. And when you saw her in the hallway, did |
| 10:16:03 | 11 | you recognize her? |
| 10:16:03 | 12 | A. Yes. |
| 10:16:04 | 13 | Q. And did you know her name? |
| 10:16:05 | 14 | A. Yes. |
| 10:16:06 | 15 | Q. Okay. Did you ever see a child in the |
| 10:16:08 | 16 | hallway when you entered the house before the dog was |
| 10:16:10 | 17 | shot? |
| 10:16:10 | 18 | A. I did not. |
| 10:16:12 | 19 | MR. FULLER: No further questions. |
| 10:16:13 | 20 | CROSS-EXAMINATION BY MS. AGOLA: |
| 10:16:13 | 21 | Q. Okay. Officer, how far was the dog |
| 10:16:17 | 22 | approximately before Deputy Carroll -- before he shot |
| 10:16:21 | 23 | him? Could you estimate for us? |
| 10:16:23 | 24 | A. I would estimate -- again, I don't know |
| 10:16:29 | 25 | exactly, but I would estimate 10 feet. |

1    JOSEPH HOPPER - CX BY MS. AGOLA

10:16:31  2    Q.    10 feet?

10:16:32  3    A.    Yes.

10:16:32  4    Q.    When you said he fired one round, was that

10:16:35  5    buckshot?

10:16:36  6    A.    Yes, it was.

10:16:36  7    Q.    Okay.  You testified earlier that you're

10:16:39  8    trained in firearms?

10:16:40  9    A.    Yes.

10:16:40  10   Q.    Okay.  And you're trained also in

10:16:43  11   ammunition?

10:16:43  12   A.    Yes.

10:16:43  13   Q.    Okay.  Is there a reason why Deputy

10:16:47  14   Carroll was utilizing buckshot that evening?

10:16:50  15   A.    Buckshot versus slugs?

10:16:52  16   Q.    Yes.

10:16:53  17   A.    Okay.  The two types of ammunition we

10:16:55  18   generally carry would be slugs and buckshot.  The

10:16:57  19   reason we don't carry slugs is primarily the -- what

10:17:01  20   it can carry through.  Again, if we shoot something

10:17:04  21   into the floor, through a wall, the slug will continue

10:17:08  22   to carry and we don't want that round to carry through

10:17:12  23   walls striking things that we don't know that it's

10:17:12  24   going to strike.

10:17:13  25         So the primary reason for firing buckshot



**ALLIANCE**
COURT REPORTING, INC.
*Video Conferencing and Videography Center*
585.546.4920          www.alliancecourtreporting.net          800.724.0836

| | |
|---|---|
| | 1 |
| .0:17:15 | 2 |
| 10:17:16 | 3 |
| 10:17:20 | 4 |
| 10:17:23 | 5 |
| 10:17:26 | 6 |
| 10:17:28 | 7 |
| 10:17:29 | 8 |
| 10:17:32 | 9 |
| 10:17:36 | 10 |
| 10:17:36 | 11 |
| 10:17:37 | 12 |
| 10:17:40 | 13 |
| 10:17:44 | 14 |
| 10:17:46 | 15 |
| 10:17:49 | 16 |
| 10:17:50 | 17 |
| 10:17:52 | 18 |
| 10:17:55 | 19 |
| 10:17:56 | 20 |
| 10:17:59 | 21 |
| 10:18:00 | 22 |
| 10:18:01 | 23 |
| 10:18:05 | 24 |
| 10:18:07 | 25 |

JOSEPH HOPPER - CX BY MS. AGOLA

is for the safety purposes.

Q.    Before you did this -- before you breached the doorway and before you entered the premises pursuant to a properly executed search warrant, is it fair to say that you did some sort of planning?

A.    Yes.

Q.    Okay.  And part of the planning would involve choosing what form of ammunition to load the gun with, correct?

A.    Correct.

Q.    Okay.  And as part of that planning, is it fair to say -- and only answer if you know.  Is it fair to say that there was a deliberate choice to choose buckshot over lead slugs?

A.    Yes.  Any search warrant that we ever do is -- I don't even want to say it's a discussion. It's just known that we always carry buckshot.

Q.    Okay.  And is one of the considerations for choosing buckshot the fact that there might be animals present?

A.    Sure.

Q.    Okay.  And the reasoning behind that, would that be because if you shoot the dog or if you shoot an animal, the chances of that bullet going



**ALLIANCE**
COURT REPORTING, INC.
*Video Conferencing and Videography Center*
585.546.4920          www.alliancecourtreporting.net          800.724.0836

1          JOSEPH HOPPER - CX BY MS. AGOLA

2    through a doorway or a wall is diminished?

3          A.   Right.  It's primarily for safety

4    purposes, yes.

5          Q.   Okay.  And when you say that Officer

6    Carroll shot one round, do you mean by that one

7    bullet?

8          A.   One round fired -- he fired one.

9          Q.   One time, okay.

10         A.   Yes.

11         Q.   Do you know where that struck the animal?

12         A.   I believe it struck the animal -- the

13    front part.  I believe the head of the animal.

14         Q.   Do you know what part of the head?

15         A.   I can't say I know it was the head, so I

16    can't say exactly what part of the head.

17         Q.   To the best of your recollection, did the

18    dog drop where he was?

19         A.   Yes.

20         Q.   Okay.  Did he drop to the side?

21         A.   Yes.

22         Q.   Did he drop to the left side?

23         A.   I believe the dog was lying -- it was

24    lying on its left side, yes.

25         Q.   Do you know when he was lying -- the dog

| | |
|---|---|
| | 1 |
| 10:19:13 | 2 |
| 10:19:15 | 3 |
| 10:19:17 | 4 |
| 10:19:27 | 5 |
| 10:19:29 | 6 |
| 10:19:32 | 7 |
| 10:19:32 | 8 |
| 10:19:35 | 9 |
| 10:19:37 | 10 |
| 10:19:37 | 11 |
| 10:19:42 | 12 |
| 10:19:42 | 13 |
| 10:19:45 | 14 |
| 10:19:48 | 15 |
| 10:19:48 | 16 |
| 10:19:48 | 17 |
| 10:19:55 | 18 |
| 10:19:57 | 19 |
| 10:19:58 | 20 |
| 10:20:02 | 21 |
| 10:20:02 | 22 |
| 10:20:03 | 23 |
| 10:20:03 | 24 |
| 10:20:05 | 25 |

JOSEPH HOPPER - CX BY MS. AGOLA

was lying on his left side, whether his head was

pointed towards the kitchen?

    A.   I can't say that for sure. I can't say.

    Q.   But it was your earlier testimony -- and

correct me if I'm wrong -- that when you entered the

premises, that he was charging at you; correct?

    A.   Yes.

    Q.   And he was about 10 feet away?

    A.   Approximately, yes.

    Q.   All right. And was he heading directly

towards Officer Carroll -- or Deputy Carroll -- strike

that.

    Was he heading directly towards Deputy

Carroll?

    A.   Yes.

    Q.   All right. Prior to -- as part of your

planning, did you have any reason to know that there

was going to be a dog there?

    A.   Specifically, no. We always plan for the

possibility.

    (The following exhibit was marked at a previous

    deposition: Number 1.)

    Q.   I'm going to show you what has been

previously marked as Plaintiff's Exhibit 1.

1             JOSEPH HOPPER - CX BY MS. AGOLA

10:20:14   2             Officer, I'm going to put this before you.

10:20:17   3   If you would just take a moment to review it and then

10:20:19   4   if you would identify it for the record.

10:20:22   5          A.    Okay.

10:20:37   6          Q.    What is that document?

10:20:38   7          A.    This is a field information interview

10:20:42   8   form.

10:20:42   9          Q.    How is that implemented?

10:20:45   10         A.    It's basically implemented by officers on

10:20:49   11   the street that develop information.

10:20:53   12         Q.    Before you go into a location pursuant to

10:20:55   13   a warrant, you might build this information so that

10:20:58   14   you know what you're entering into?

10:21:00   15         A.    Yes.

10:21:00   16         Q.    Is it fair to say that -- and take a

10:21:03   17   moment to review it if you need to. But is it fair to

10:21:05   18   say that the document before you, that's Plaintiff's

10:21:07   19   Exhibit No. 1, identifies that there is a dog on the

10:21:10   20   premises?

10:21:10   21         A.    Yes. It says that there is a dog that

10:21:13   22   hangs out in the garage/backyard area.

10:21:16   23         Q.    Is it your testimony here today that you

10:21:18   24   never saw that document before you went in?

10:21:19   25         A.    I don't recall seeing the document. It's

JOSEPH HOPPER - CX BY MS. AGOLA

10:21:21  2  not that I haven't seen it.  I don't recall seeing it.

10:21:24  3  Deputy Carroll may have seen it.

10:21:25  4    Q.  Would it -- if Deputy Carroll had seen

10:21:29  5  that document, would that be one of the reasons why he

10:21:33  6  might have loaded his gun with buckshot that day?

10:21:35  7    A.  No.  On every search warrant, we always

10:21:38  8  carry a shotgun and it's always loaded with buckshot.

10:21:40  9    Q.  You always carry a gun.  Do you know whose

10:21:43  10  gun that was that day?

10:21:44  11    A.  Who owned the gun?

10:21:45  12    Q.  Uh-huh.

10:21:45  13    A.  Most guns are owned by either the County

10:21:50  14  of Monroe or the City of Rochester.  We take them out

10:21:53  15  of a gun locker before we go.  That's where they're

10:21:56  16  stored.

10:21:56  17    Q.  Okay.  So you don't have any personal

10:21:58  18  knowledge today as to whether --

10:21:59  19    A.  That particular gun, no.

10:22:00  20    Q.  That particular gun.  But it is fair to

10:22:02  21  say that there was a meeting of the minds as to the

10:22:06  22  fact of who is going to go first, correct?

10:22:08  23    A.  Yes.

10:22:08  24    Q.  What the gun was going to be loaded with,

10:22:12  25  correct?



**ALLIANCE**
COURT REPORTING, INC.
*Video Conferencing and Videography Center*
585.546.4920  www.alliancecourtreporting.net  800.724.0836

| | |
|---|---|
| 1 | JOSEPH HOPPER - CX BY MS. AGOLA |
| 10:22:12  2 | A.   Yes. |
| 10:22:12  3 | Q.   Based upon your recognizance before you |
| 10:22:17  4 | entered the premises, correct? |
| 10:22:17  5 | A.   Yes. |
| 10:22:17  6 | Q.   And your testimony here today is that |
| 10:22:19  7 | although that document emanates from the Greece Police |
| 10:22:22  8 | Department, that you've never seen it before? |
| 10:22:23  9 | A.   I'm not saying I haven't seen it.  I don't |
| 10:22:26  10 | recall seeing it. |
| 10:22:26  11 | Q.   Okay. |
| 10:22:27  12 | A.   Generally whoever is planning the search |
| 10:22:28  13 | warrant would gather this information and would put it |
| 10:22:31  14 | into the planning. |
| 10:22:32  15 | Q.   And as the second person in, is it less |
| 10:22:38  16 | important for you to know whether there's an animal on |
| 10:22:40  17 | the premises because you weren't the lead man in? |
| 10:22:43  18 | A.   No. |
| 10:22:43  19 | Q.   Okay.  So your testimony is that you |
| 10:22:46  20 | simply did not know whether there was an animal there? |
| 10:22:49  21 | A.   My testimony is that there could or could |
| 10:22:57  22 | have not been a dog, that we always plan that there |
| 10:22:59  23 | could or could not be animals.  We always plan for |
| 10:23:01  24 | that. |
| 10:23:01  25 | Q.   And you are not an employee of the County |



**ALLIANCE**
COURT REPORTING, INC.
*Video Conferencing and Videography Center*
585.546.4920          www.alliancecourtreporting.net          800.724.0836

| | | |
|---|---|---|
| | 1 | JOSEPH HOPPER - CX BY MS. AGOLA |
| 10:23:04 | 2 | of Monroe? |
| 10:23:05 | 3 | A. Correct. |
| 10:23:05 | 4 | Q. And you have different policies than the |
| 10:23:09 | 5 | County of Monroe as a Greece police officer, correct? |
| 10:23:12 | 6 | A. Correct. |
| 10:23:13 | 7 | Q. Okay. So you're not governed by any of |
| 10:23:16 | 8 | the policies that might be promulgated by the County, |
| 10:23:20 | 9 | correct? |
| 10:23:20 | 10 | A. Correct. |
| 10:23:20 | 11 | Q. And you stated earlier that you saw a |
| 10:23:25 | 12 | female in the hallway that you identified as Sherry |
| 10:23:27 | 13 | Carroll; correct? |
| 10:23:28 | 14 | A. Yes. |
| 10:23:28 | 15 | Q. And that Deputy Carroll did affirmatively |
| 10:23:31 | 16 | state to her, "Get your dog," or -- |
| 10:23:33 | 17 | A. "Get the dog, get the dog." You know, |
| 10:23:35 | 18 | just shouting commands. "Get the dog, get the dog." |
| 10:23:39 | 19 | Q. And the dog was 10 feet away from Deputy |
| 10:23:43 | 20 | Carroll before he shot? |
| 10:23:43 | 21 | A. Approximately, yes. |
| 10:23:43 | 22 | Q. Okay. |
| 10:23:46 | 23 | A. I didn't measure it. I'm saying |
| 10:23:48 | 24 | approximately. |
| 10:23:49 | 25 | MS. AGOLA: Okay. Thank you. |



**ALLIANCE**
COURT REPORTING, INC.
*Video Conferencing and Videography Center*
585.546.4920 · www.alliancecourtreporting.net · 800.724.0836

| | |
|---|---|
| 1 | JOSEPH HOPPER - RDX BY MR. FULLER |
| 10:23:49   2 | RE-DIRECT EXAMINATION BY MR. FULLER: |
| 10:23:50   3 | Q.  Okay.  Do you know approximately how far |

RE-DIRECT EXAMINATION BY MR. FULLER:

Q.  Okay.  Do you know approximately how far
the dog was from Deputy Carroll when the dog went
down?

A.  I believe in the -- almost the same area.
I don't think it traveled much further after the shot
was fired.

Q.  Okay.  This is from your recollection and
your vantage point?

A.  Yes.

Q.  Now, did you plan the search warrant?

A.  I did not.

Q.  Do you know who did?

A.  I believe it was Deputy Carroll.

Q.  Could it have been somebody from Brighton?

A.  It could have been Officer DeSain.

Q.  You don't recall?

A.  I don't recall who was the planning
officer, no.

Q.  Does GRANET have its own policies?

A.  Yes.

Q.  Okay.  And before -- or actually while you
were in GRANET, did you receive training concerning
GRANET?

| | 1 | JOSEPH HOPPER - RDX BY MR. FULLER |
|---|---|---|
| 0:24:45 | 2 | A.   Yes. |
| 10:24:45 | 3 | Q.   Do you recall what that was? |
| 10:24:45 | 4 | A.   Prior to any member of our department |
| 10:24:52 | 5 | going to GRANET, we receive -- we go to a high risk |
| 10:24:56 | 6 | warrant school. |
| 10:24:57 | 7 | Q.   Okay. |
| 10:24:57 | 8 | A.   Which is a 40-hour course that |
| 10:25:00 | 9 | specifically deals with executing high risk type |
| 10:25:04 | 10 | warrants. |
| 10:25:04 | 11 | Q.   And do you know some of the agencies |
| 10:25:07 | 12 | involved in GRANET? |
| 10:25:08 | 13 | A.   The Greece Police Department, the Monroe |
| 10:25:12 | 14 | County Sheriff's Office, Brighton Police, Irondequoit |
| 10:25:16 | 15 | Police, the Rochester Police Department.  We also have |
| 10:25:20 | 16 | members from -- some federal agents that are part of |
| 10:25:24 | 17 | the unit. |
| 10:25:27 | 18 | Q.   Okay.  To your knowledge, does Greece have |
| 10:25:32 | 19 | different policies from the other agencies? |
| 10:25:34 | 20 | A.   On minor things.  I think generally our |
| 10:25:39 | 21 | policies pretty much overlap each other. |
| 10:25:42 | 22 | Q.   Okay.  With all these agencies, do you |
| 10:25:46 | 23 | follow GRANET policies? |
| 10:25:48 | 24 | A.   For executing a search warrant, we follow, |
| 10:25:52 | 25 | yes, the GRANET policy.  Everything is done a certain |

JOSEPH HOPPER - RDX BY MR. FULLER

1

2  way.

3          When incidents outside of GRANET happen or

4  after the search warrant is executed, then we fall

5  back.  If an incident involves a certain officer from

6  that department, then the policies of that department

7  take over.

8          MR. FULLER:  Okay.  No further questions.

9          MS. AGOLA.  That's it.  Thank you, sir.

10          VIDEOGRAPHER:  The time is 10:25.  This

11  deposition is now complete.

12              (TIME:  10:25 a.m.)

13                *        *        *

14

15

16

17

18

19

20

21

22

23

24

25

**ALLIANCE**
COURT REPORTING, INC.
*Video Conferencing and Videography Center*
585.546.4920          www.alliancecourtreporting.net          800.724.0836

```
 1
 2                    W I T N E S S
 3   Name            Examination by              Page
 4   -----------------------------------------------------
 5   Joseph Hopper        DX Mr. Fuller          4-12
 6        "      "        CX Ms. Agola          12-20
 7        "      "        RDX Mr. Fuller        21-23
 8
 9                    *       *       *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```